**FILED**

**JULY 1, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BAB SYSTEMS, INC.,** an Illinois corporation, | ) ) ) | RECEIVED: JUNE 30, 2008<br>08CV3737 |
| Plaintiff, | ) ) | JUDGE LINDBERG |
| v. | ) ) | **Case No.** MAGISTRATE JUDGE COLE |
| **STEINMAN & STEINMAN, INC.,** a Florida corporation, Marc Steinman, Lee Steinman, individually and as personal representative of the Estate of Marvin Steinman, and Mara Henderson, | ) ) ) ) ) ) ) | TC |
| Defendants, | ) ) | |

## PETITION TO COMPEL ARBITRATION

Petitioner BAB Systems, Inc., by its attorneys, for its Petition to Compel Arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, alleges as follows:

### Nature of the Action

1.  This is an action to compel arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 1, et seq.. The written franchise agreement (the "Franchise Agreement") between Petitioner BAB Systems, Inc. ("BAB") and Respondents Marc Steinman, Lee Steinman, and Marvin Steinman (the "Steinmans"), calls for arbitration of all disputes between them in Chicago, Illinois under the American Arbitration Association's Commercial Arbitration Rules.[1]

2.  Notwithstanding the obligation to arbitrate disputes, Steinman & Steinman commenced an action in Florida state court, entitled *Steinman & Steinman, Inc. v. BAB Systems,*

---

[1] The Steinmans assigned the Franchise Agreement, including the Agreement to arbitrate, to Steinman & Steinman, Inc. The assignment was without novation and further with the express guaranty of the Steinmans and Mara Henderson to perform and be personally bound by all of the obligations of Steinman & Steinman, Inc. under the Franchise Agreement, including the agreement to arbitrate.

*Inc.,* Case No. 2008-CA-3206 (Circuit Court, First Judicial Circuit, Okaloosa County, Florida) (the "State Court Action"), claiming that BAB was not entitled to enforce certain provisions of the Franchise Agreement upon its expiration on June 11, 2008, because BAB fraudulently induced its entry ten years earlier and/or had failed to render "adequate" support and perform other obligations thereunder during its term. In connection therewith, Steinman & Steinman applied for and obtained an *ex parte* temporary injunction enjoining BAB from taking certain actions in furtherance of its rights under the Franchise Agreement.

3.    BAB instituted proceedings in arbitration against Steinman & Steinman, Inc., Marc Steinman, Lee Steinman and Mara Henderson, seeking relief against Respondents for breach of their post-expiration obligations under the Franchise Agreement.

4.    Respondents deny their obligation to arbitrate their claims or BAB's claims.

5.    By this action, Petitioner seeks to compel arbitration of Respondents' claims set forth in their pleading in the State Court Action and Petitioner's claims in arbitration.

## The Parties

6.    Petitioner BAB is an Illinois corporation with its principal place of business in Deerfield, Illinois. BAB grants franchises to qualified persons to operate Big Apple Bagels stores selling freshly baked bagels, muffins, cream cheeses, coffee and other food and beverage items throughout the United States.

7.    Respondent Steinman & Steinman, Inc. is a Florida corporation with its principal place of business in Shalimar, Florida.

8.    Respondents the Steinmans and Mara Henderson ("Henderson") are or were shareholders of Steinman & Steinman, Inc., guaranteed its obligations under the Franchise Agreement, and agreed to be personally bound by its terms and personally liable for their breach.

The Steinmans are residents and citizens of the State of Florida and Henderson is a resident and citizen of the State of Texas.

### Jurisdiction and Venue

9.      This Court has original subject matter jurisdiction of this action in that, save for the parties' agreement to arbitrate, this Court would have jurisdiction under 28 U.S.C. § 1332 of a civil action arising out of the controversy between the parties, in that the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     Venue is proper in this Court under 9 U.S.C. § 4, in that this is the United States District Court having jurisdiction over the contractually specified site of arbitration, because the Respondents contractually agreed to jurisdiction and venue of actions brought by Petitioner in this judicial district, and under 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

### The Agreement and The Parties' Arbitration Agreement

11.     On or about June 11, 1998, BAB entered into a written franchise agreement with the Steinmans pursuant to which the Steinmans agreed to operate a franchised Big Apple Bagels store in Shalimar, Florida.  (A copy of the Agreement is attached to the Declaration of Michael K. Murtaugh in support of this petition ("Murtaugh Decl.") as Exhibit A.)

12.     On or about August 4, 1998, the Steinmans assigned their interest under the Franchise Agreement (the "Assignment") to Steinman & Steinman, Inc., ("Steinman & Steinman") but agreed to remain primarily liable to BAB for all obligations and covenants of the franchisee under the Franchise Agreement.  A true copy of the Assignment is attached to the Murtaugh Decl. as Exhibit B.

13.    On or about August 4, 1998, the shareholders of Steinman & Steinman, Inc., the Steinmans and Mara Henderson, delivered a Guaranty and Assumption of Obligation of the Franchise Agreement (the "Guaranty") to BAB, pursuant to which they agreed to be personally bound by every provision of the Franchise Agreement and liable for its breach.  A true copy of the Guaranty is attached to the Murtaugh Decl. as Exhibit C.

14.    Under Section 17 of the Franchise Agreement, the parties explicitly agreed that they would submit all disputes arising out of or relating to the Franchise Agreement to arbitration in Chicago, Illinois before the American Arbitration Association in accordance with its Commercial Arbitration Rules.  Section 17.1 of the Agreement provides, in pertinent part, as follows:

> **<u>Mandatory and Binding Arbitration</u>**
>
> (i) *All disputes, controversies or claims arising out of or relating to this Agreement shall be submitted for arbitration to the Chicago, Illinois office of the American Arbitration Association on demand of either party.*  Such arbitration proceeding shall be conducted in Chicago, Illinois and shall be heard by one arbitrator in accordance with the then-current Commercial Rules of the American Arbitration Association.  All matters in the scope of the Federal Arbitration Act (9 U.S.C. §§ 1 *et seq.*) shall be governed by it.
>
> (ii) The arbitrator shall have the right to award or include in his award any relief which he deems proper in the circumstance, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief and attorneys' fees and costs, in accordance with paragraph 17.d, provided that the arbitrator shall not have the authority to award exemplary or punitive damages, nor shall he have jurisdiction over any dispute relating to the ownership, validity or registration of any name or Mark licensed hereunder.
>
> ***
>
> (iii) The parties agree to be bound by the provisions of any limitation on the period of time by which claims must be brought. The parties further agree that, in connection with any such

arbitration proceeding, each shall submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as to the claim to which it relates.  Any such claim which is not submitted or filed in such proceeding shall be barred.

*** 

(iv)  *This provision shall continue in force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.*

(v)  Notwithstanding the above and foregoing, Franchisor shall have the right to apply directly to a court of competent jurisdiction for a temporary restraining order, preliminary injunction or other emergency relief which may be available to protect the name, Marks or System licensed hereunder, without the necessity of first filing an arbitration demand (emphasis added).

15.    Section 17.d of the Franchise Agreement provides that "if Franchisor is required to enforce this Agreement in an arbitration or judicial proceeding or appeal thereof, the party prevailing in such proceeding shall be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accounting, legal and attorneys' fees."

16.    The parties' written arbitration agreement is valid, has not been revoked and is enforceable upon such grounds as exist at law or in equity.

17.    The parties' written arbitration agreement appears in a contract evidencing a transaction involving interstate commerce, being a franchise granted by an Illinois corporation to residents of Florida to operate the franchise in Florida.  The parties' relationship is evidence by the Franchise Agreement, which provides for, among other things, a continuous stream of royalty payments from Respondents to BAB in Illinois.

18.    BAB is not in default in proceeding with such arbitration by failing, neglecting, or refusing the arbitrate under the parties' written agreement to arbitrate.

### Respondents' Failure to Arbitrate Their Disputes

19.     Steinman & Steinman's amended complaint in the State Court Action, a copy of which is attached as Murtaugh Decl., Exhibit D, attempts to state a causes of action for declaratory judgment (Count I) and injunctive relief (Count II) to prevent BAB from enforcing a post-termination noncompete agreement and a buy-out provision permitting it to acquire the assets of the Steinman & Steinman business in accordance with a contractually specified formula. Steinman & Steinman's claims are both based on BAB's supposed material breaches of the Franchise Agreement and because BAB's supposedly fraudulently induced Steinman & Steinman to enter into the Franchise Agreement. Steinman & Steinman also is seeking a declaration that an alleged landlord's lien and an alleged mechanic's lien were ineffective; however, those claims are unrelated to Steinman & Steinman's claims against BAB and to BAB's breach of Franchise Agreement claims against Respondents.

20.     The allegations of Respondents' Amended Complaint (and proposed second amended complaint) in the State Court Action all arise out of or relate to the Franchise Agreement, and therefore fall within the scope of the parties' written arbitration agreement.[2]

21.     Within days of being served with process and in the face of an imminent hearing on Petitioner's request for an injunction, BAB moved to stay the State Court Action pursuant to 9 U.S.C. § 3 and Section 682.03, Florida Statutes. A true copy of BAB's motion to stay proceedings pending arbitration is attached as Murtaugh Decl., Exhibit E.

---

[2] On June 24, 2008, Steinman & Steinman filed a motion for leave to file a second amended complaint adding the Steinmans and Henderson as plaintiffs. The proposed Second Amended Complaint would add three additional claims against BAB: violation of the Florida Franchise and Misrepresentation Act (Count II), violation of the Florida Deceptive and Unfair Trade Practices Act (Count III), and violation of the Florida Antitrust Act (Count IV). Counts II and III of the proposed second amended complaint are based on alleged misrepresentations by BAB inducing entry into the Franchise Agreement, and Count IV alleges that the restrictions in the post-expiration, noncompetition agreement are an unenforceable restraint on trade. Thus, all those claims also arise out of or relate to the Franchise Agreement.

22.     On or about June 18, 2008, BAB initiated an arbitration proceeding in Chicago, Illinois against Steinman & Steinman, the Steinmans and Henderson, seeking damages and injunctive relief for their breaches of the Franchise Agreement.  A true copy of the demand for arbitration is attached as Murtaugh Decl., Exhibit F.

23.     In response to BAB's filing of its motion to stay proceedings pending arbitration in the State Court Action and its arbitration demand, Steinman & Steinman, in an attempt to avoid their obligation to arbitrate, filed a series of frivolous motions in the State Court Action which are, or may be, pertinent to this Petition to Compel.  Attached as Murtaugh Decl., Exhibit G is a true copy of Steinman & Steinman's "Motion to Strike Unsigned Arbitration Provision as Unconscionable and to Stay Arbitration."  Attached as Murtaugh Decl., Exhibit H is a true copy of Steinman & Steinman's "Motion to Strike Personal Jurisdiction Provision in Unsigned Document."  Attached as Murtaugh Decl., Exhibit I is Steinman & Steinman's "Motion to Strike Unsigned Venue Provision."  Attached as Murtaugh Decl., Exhibit J is Steinman & Steinman's "Motion to Strike Choice of Law Provision."

24.     Each of the foregoing motions is part of Respondents' attempt to avoid their clear contractual obligation to arbitrate disputes with BAB under the Franchise Agreement, and each is based on the utterly frivolous allegation that the Franchise Agreement was not signed, even though in Steinman & Steinman's complaint and amended complaint, both verified by Respondent Marc Steinman, it was alleged that "Steinman and BAB entered into the Franchise Agreement on or about June 10, 1998" and even though both complaints asserted claims against BAB for breach of the very same agreement..  Only now that they wish to disown the agreement to arbitrate, have Respondents switched gears and falsely allege that the Franchise Agreement was never signed.

## Specific Relief to Compel Arbitration

25.     Respondents' commencement of the State Court Action and their attempt to litigate their disputes with BAB in that forum, and their baseless and frivolous efforts in the State Court Action to deny the existence of the agreement to arbitrate and stay the arbitration filed by BAB, constitutes a failure, neglect and/or refusal on their part to arbitrate in accordance with the parties' written arbitration agreement.

26.     Under Section 4 of the FAA, the Northern District of Illinois is the only district court which may compel arbitration in Chicago, Illinois, as provided in the parties' agreement to arbitrate.

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioner BAB Systems, Inc. respectfully prays for the following relief against Respondents:

A.     An order pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, made in the manner provided by law for the making and hearing of motions, compelling arbitration in accordance with the terms of the parties' arbitration agreement;

B.     An award of reasonable attorneys' fees, expenses and costs incurred by BAB in this action; and

C.     Such other relief as the Court deems just and proper.

BAB SYSTEMS, INC.

s/ Marc P. Seidler

Marc P. Seidler (02544202)
John A. Hughes (06275159)
**DLA PIPER US LLP**
203 North LaSalle Street, Ste. 1900
Chicago, Illinois 60601
Phone No.: 312-368-2160
Fax No.: 312-251-2194

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BAB SYSTEMS, INC., an Illinois corporation, | ) | 08CV3737<br>JUDGE LINDBERG<br>MAGISTRATE JUDGE COLE |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| STEINMAN & STEINMAN, INC., a Florida corporation, Marc Steinman and Lee Steinman, individually and as personal representatives of the Estate of Marvin Steinman and Mara Henderson, | ) | |
| Defendants, | ) | |

TC

## DECLARATION OF MICHAEL K. MURTAUGH

I, Michael K. Murtaugh, declare as follows:

1.      I am over the age of 21 years and make this declaration of my own personal knowledge in support of the Petition to Compel Arbitration filed in this cause by plaintiff BAB Systems, Inc. ("BAB"). If called upon to testify in this matter, I would testify as set forth in my affidavit.

2.      I am Vice President, General Counsel and a Director of BAB. I have been a Director of BAB since January 1993 and Vice President and General Counsel since January 1994. BAB's business is franchising stores which sell freshly baked bagels and muffins, cream cheeses, coffee and coffee drinks, and other food and beverage items.

3.      BAB is an Illinois corporation. It was organized and established under the laws of the State of Illinois in December 1992 and has conducted the business of franchising under the name "Big Apple Bagels," since 1993. BAB's offices, at which all of the Company's executives

and nearly all of its employees are based, is at 500 Lake Cook Road, Suite 475, in Deerfield, Illinois. It is BAB's principal, and only, place of business.

4.      On June 11, 1998, Mark Steinman, Marvin Steinman and Lee Steinman entered into a franchise agreement with BAB (the "Franchise Agreement") to operate an existing Big Apple Bagels franchised store at 1191-B Eglin Parkway in Shalimar, Florida, which they purchased from a BAB franchisee.   Subsequently, the Steinmans assigned the Franchise Agreement to plaintiff Steinman & Steinman, Inc. (the "Assignment") and guaranteed Steinman & Steinman's payment and performance of each of the obligations of franchisee under the Franchise Agreement (the "Guaranty").   Attached hereto as Exhibits A, B and C, respectively, are the Franchise Agreement, the Assignment and the Guaranty.

5.      Steinman & Steinman operated a Big Apple Bagels store at 1191-B Eglin Parkway in Shalimar, Florida for ten years.   In early 2008, as the initial term of the Franchise Agreement was drawing to a close, BAB learned that Steinman & Steinman did not intend to renew the Franchise Agreement, and BAB began a dialog with Steinman & Steinman and its legal counsel concerning the disposition of the store on expiration of the Franchise Agreement on June 11, 2008, including BAB's intention to try to find a replacement franchisee and to exercise its post-expiration right to purchase the assets of the business for a price determined in accordance with the Franchise Agreement.

6.      Notwithstanding the parties' agreement to arbitrate their disputes, the day before the Franchise Agreement was to expire Respondents commenced an action in Florida state court, entitled *Steinman & Steinman, Inc. v. BAB Systems, Inc., et al.*, Case No. 2008-CA-3206 (First Judicial Circuit Court, Okaloosa County, Florida) (the "State Court Action"), claiming, in substance, that BAB was not entitled to enforce a covenant not to compete and an option to

purchase the assets of Respondents' Big Apple Bagels franchised business, upon its expiration on June 11, 2008, because BAB allegedly had made misrepresentations in connection with the execution of the Agreement in 1998 and breached certain obligations under the Agreement continuously during its term.

7.    Subsequent to the filing of the State Court Action, Steinman & Steinman added its landlord, Shalimar Plaza, LLC, and an equipment vendor, Fife Refrigeration, Inc., as party defendant, alleging that the landlord and vendor claimed lien rights on equipment located in the former Big Apple Bagels store.  While BAB believes that the claims against the landlord and vendor are shams, and that they were named as defendants specifically to defeat diversity of citizenship jurisdiction which would have permitted the removal of the State Court Action, BAB does not seek to arbitrate any claims involving the "lien claimants," nor to stay the State Court Action as to those defendants to the extent that Steinman & Steinman wishes to adjudicate the validity of the alleged lien claims.  A true copy of the Amended Complaint is attached hereto as Exhibit D.

8.    Shortly after filing the State Court Action, Steinman & Steinman obtained an ex parte temporary injunction against BAB, and a hearing was set on the extension of that motion for June 24, 2008.  In the face of the imminent temporary injunction hearing, on or about June 18, 2008, BAB filed a motion to stay the State Court Action, a copy of which is attached hereto as Exhibit E.

9.    As a result of Steinman & Steinman's refusal to recognize BAB's post-expiration rights under the Franchise Agreement, and its filing of the State Court Action, BAB filed a demand for arbitration with the American Arbitration Association against Steinman & Steinman, Inc., Marc Steinman, Lee Steinman and Mara Henderson, seeking arbitration in Chicago, Illinois

of BAB's claims against them for breach of their post-expiration obligations under the Franchise Agreement. A true copy of BAB's demand for arbitration is attached hereto as Exhibit F.

10.    In response to BAB's filing of its motion to stay proceedings pending arbitration in the State Court Action and its demand for arbitration, Steinman & Steinman, in an attempt to avoid the agreement to arbitrate, filed a series of motions in the State Court Action, each of which was based on the false allegation that various provisions of the Franchise Agreement were not enforceable because Steinman & Steinman did not sign the Franchise Agreement containing the arbitration clause, venue provision, choice of law provision and submission to jurisdiction. Attached hereto as Exhibit G is a true copy of Steinman & Steinman's "Motion to Strike Unsigned Arbitration Provision as Unconscionable and to Stay Arbitration." Attached hereto as Exhibit H is a true copy of Steinman & Steinman's "Motion to Strike Personal Jurisdiction Provision in Unsigned Document." Attached hereto as Exhibit I is a true copy of Steinman & Steinman's Motion to Strike Unsigned Venue Provision. Attached hereto as Exhibit J is a true copy of Steinman & Steinman's "Motion to Strike Choice of Law Provision."

11.    Although the copy of the Franchise Agreement that Steinman & Steinman attached to its pleadings in the State Court Action is unsigned, the original Franchise Agreement was signed by the parties, and a copy of that document, as well as the Assignment of the Franchise Agreement to Steinman & Steinman, pursuant to which it agreed to be bound by all of the provisions of the Franchise Agreement, and the Steinman and Henderson's Guaranty are attached to my Declaration as referenced above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 30, 2008.

Michael K. Murtaugh

## BAB SYSTEMS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement") with effective date of ___June 11___
_____, 1998 (acceptance date by Franchisor), by and between **BAB Systems, Inc., an Illinois corporation** ("Franchisor"), whose principal address is 8501 W. Higgins Road, Suite 320, Chicago, Illinois 60631, and **Marc Steinman, Marvin Steinman and Lee Steinman** ("Franchisee"), whose principal address is **381 Santa Rosa Boulevard, C-704, Fort Walton Beach, Florida 32548**.

## RECITALS:

A.   Franchisor operates a franchise distribution system pursuant to a trademark licensing agreement with BAB Holdings, Inc. ("Licensor"), an Illinois corporation, to own and operate bagel stores ("BAB Production Stores," "BAB Satellite/Kiosk Stores," and "BAB Carts," as defined in Paragraph B of these Recitals) for retail distribution. These Stores will be operated under the trademark and service mark "Big Apple Bagels," plus design, and such other trademarks, service marks and commercial symbols ("Marks") as will be authorized from time to time by Franchisor, including, but not limited to "Brewster's" used in connection with coffee products, and "My Favorite Muffin" products used in connection with muffins sold in the Stores. Brewster's Franchise Corporation and My Favorite Muffin Too, Inc. ("MFM") are affiliates of Franchisor. Such Stores will also be operated in accordance with certain required formats, systems, methods of distribution, standards and procedures, and trade dress, all of which may be improved, further developed or otherwise modified from time to time by Franchisor ("System").

B.     A "BAB Production Store" is a store which has the capacity for the production, baking, sale, retail distribution, and on-site consumption of bagels, and the production, sale, and retail distribution of cream cheeses. A "BAB Satellite/Kiosk Store" is a store which is generally larger than 250 square feet and has the capacity for limited production of bagels (but will not have a large mixer or a bagel divider/former), in addition to retail distribution and on-site consumption of bagels and cream cheeses. A "BAB Cart" is a mobile transportable unit which has a limited menu, no seating, and is dependent on a BAB Production Store owned by the Franchisee of the BAB Cart, for its supply of proprietary products. Bagels will not be produced at the BAB Cart. A BAB Production Store, BAB Satellite/Kiosk Store, and BAB Cart will be referred to generically, collectively or individually as "BAB Systems Store," "Store," "Unit," or Outlet."

C.   Franchisor grants to certain persons who meet Franchisor's qualifications a franchise ("Franchise") to own and operate a BAB Systems Store utilizing the Marks and System.

D.   Franchisee has applied for a license to own and operate a BAB Systems Store at the location described in Rider A to this Agreement. Such application has been approved by Franchisor in reliance upon all of the representations made therein. Franchisee represents to Franchisor, as an inducement to Franchisor's entry into this Agreement, that Franchisee has made no misrepresentations in obtaining the Franchise herein granted.

**EXHIBIT**

tabbies

A

E.  The grant of the right of Franchisee to distribute products through non-retail channels of distribution is strictly at the discretion of Franchisor, and shall be by execution of the Wholesale Program Addendum to the franchise agreement.

1.  **GRANT OF FRANCHISE.**

    a.  **Grant.**  Subject to the provisions of this Agreement, Franchisor hereby grants to Franchisee a franchise ("Franchise") to operate a:

        **XX**        BAB Production Store

        _____        BAB Satellite/Kiosk Store

        _____        BAB Cart

("Store") in or at the following general location (when the exact location is determined, the parties will complete Rider A):

        **Shalimar Plaza**
        **1191-Beglin Parkway**
        **Shalimar, Florida 32579**

and to use the Marks and the System in the operation thereof.  Termination or expiration of this Agreement shall constitute a termination or expiration of the Franchise.  Franchisee agrees that he will at all times faithfully, honestly and diligently perform his obligations hereunder, and that he will continuously exert his best efforts to promote and enhance the business of the Store and the goodwill of the Marks.

    b.  **Restrictions Upon Franchisee's Channels of Distribution.**  Franchisee is restricted solely to the retail sale of products sold under this Agreement.  Franchisee is expressly prohibited from engaging in the wholesale distribution of products under this Agreement, unless Franchisee and Franchisor have entered into a Wholesale Program Addendum.  The rights herein granted to Franchisee are specifically limited to the operation of business from the Store location.  Franchisee shall not solicit for business, promote the business, and/or offer and sell products sold under this Agreement through the use of a toll-free number, catalog, or the Internet or any other computer on-line service.

    c.  **Rights Reserved By Franchisor.**  Except as otherwise provided herein, Franchisor (on behalf of itself and its affiliates) retains the right, in its sole discretion and without granting any rights to Franchisee:

        i.  to operate, or to grant other persons the right to operate, Stores at such locations and on such terms and conditions as Franchisor deems appropriate; and

        ii.  to sell the products and services authorized for Stores under the Marks or

other trademarks, service marks and commercial symbols through similar or dissimilar channels of distribution and pursuant to such terms and conditions as Franchisor deems appropriate.

2.    **TERM AND RENEWAL.**

a.    **Term.** If this Agreement is for the grant of a BAB Production Store Franchise, the term of this Agreement (the "Term") shall commence on the date of this Agreement and expire at the earlier of: (i) ten (10) years from such date or (ii) on the expiration date of the lease (including renewal) for the premises of the BAB Production Store, unless sooner terminated as provided in Sections 14 and 15 hereof.   If this Agreement is for the grant of a BAB Satellite/Kiosk Store Franchise, the term of this Agreement shall commence on the date of this Agreement and expire at the earlier of:  (i) ten (10) years from such date; (ii) on the expiration date of the lease (including renewal) for the premises of the BAB Satellite/Kiosk Store, or (iii) on the expiration or termination of the Franchise Agreement of Franchisee's Production Store, unless sooner terminated as provided in Sections 14 and 15 hereof.  See the BAB Cart Addendum regarding the term and renewal of the BAB Cart Franchise.

b.    **Renewal.**

i.    For a BAB Production Store Franchise, a BAB Satellite/Kiosk Store Franchise, or a BAB Cart Franchise, Franchisee may, at his option, renew the Franchise for two additional ten (10) year terms or for a term equal to the renewal term of the lease for the premises of the Store, whichever is shorter, unless sooner terminated as provided in Sections 14 and 15 hereof, provided that:

(a)    Franchisee has given Franchisor written notice of his election to renew not less than six (6) months nor more than twelve (12) months prior to the end of the then-current term.  An election by Franchisee to renew the lease or sublease for the premises of the Store or to execute a new lease or sublease for such premises shall be deemed an election by Franchisee to renew the franchise for the then-current term of such lease or sublease;

(b)    Franchisee is not at such time in material breach of any of his obligations under this Agreement or any other agreement between Franchisee and Franchisor or any of its affiliates;

(c)    Franchisee has substantially complied with all the terms and conditions of this Agreement and has met the operating and quality standards and procedures prescribed by Franchisor for BAB Systems Stores during the Term;

(d)    Franchisee has satisfied all monetary obligations owed to Franchisor, its affiliates and designated suppliers, and has timely met these obligations throughout the Term;

(e)      Franchisee has agreed to upgrade the Store to Franchisor's then-current standards of decor, equipment, and product offerings;

(f)      Franchisee has paid Franchisor the renewal fee of Two Thousand Five Hundred Dollars ($2,500.00);

(g)      Franchisee complies with Franchisor's then-current qualification and training requirements; and

(h)      Franchisee executes a general release, in a form prescribed by Franchisor, of any claims against Franchisor and its officers, directors, agents and employees.

ii.      Renewal of this Agreement shall be effectuated by the execution by Franchisor and Franchisee of the then current form of standard franchise agreement and all other agreements and legal instruments and documents then customarily used by Franchisor in the granting of Franchises for BAB Systems Stores, which may contain substantially different provisions from this Agreement, including higher or lower royalty fees and Marketing Fund contributions, except that no initial franchise fee shall be payable upon any such renewal.

## 3.    LOCATION AND DEVELOPMENT OF STORE

a.      **Location and Lease.**

i.      Franchisee may operate the Store only at the location specified in Paragraph 1.a. and Rider A to this Agreement and may not relocate the Store except with Franchisor's prior written consent. If the site for the Store has not been located by Franchisee at the time of execution of this Agreement, Franchisee agrees to locate and submit to Franchisor for approval, within ninety (90) days after the date of execution of this Agreement, a site suitable for the operation of a BAB Systems Store and acceptable to Franchisor. Franchisee must use a licensed real estate broker who specializes in commercial real estate. Franchisee must locate the site for his Store and submit a complete site report to Franchisor in accordance with Franchisor's Real Estate Site Manual. Franchisor shall assist Franchisee in the selection and shall not unreasonably withhold its approval of a site that meets its standard site selection criteria for demographic characteristics, traffic patterns, parking, character of neighborhood, competition from other businesses within the area, the proximity to the site and other commercial characteristics, and the size, appearance and other physical characteristics of the site.

ii.      Franchisee shall submit the lease for the premises of the Store to Franchisor prior to its execution for Franchisor's examination and approval. The lease for the premises of the Store shall state that the premises shall be used only for a BAB Systems Store and contain substantially the following provisions:

"Anything contained in this lease to the contrary notwithstanding, Lessor agrees that, without its consent, this lease and the right, title and interest of the Lessee thereunder, may be assigned by the Lessee to BAB Systems, Inc., an Illinois Corporation, or its designee, provided that said BAB Systems, Inc. or its designee shall execute such documents evidencing its agreement to thereafter keep and perform, or cause to be kept or performed, all of the obligations of the Lessee arising under this lease from and after the time of such assignment."

"Lessor agrees that Lessor shall, upon written request of BAB Systems, Inc., disclose to said corporation, all reports, information or data in Lessor's possession with respect to sales made in, upon or from the leased premises."

"Lessor shall give written notice to BAB Systems, Inc., an Illinois corporation (concurrently with the giving of such notice to Lessee), of any default by Lessee under the lease and the said BAB Systems, Inc. shall have, after the expiration of the period during which the Lessee may cure such default, an additional thirty (30) days to cure, at its sole option, any such default."

    iii.    Franchisee agrees that he will not execute a lease which has for any reason been disapproved by Franchisor. Franchisee shall deliver a copy of the signed lease to Franchisor within fifteen (15) days of execution thereof.

    iv.    Franchisee shall execute a Collateral Assignment of Lease, attached hereto as Rider B, by which Franchisee assigns to Franchisor all of his right, title and interest as tenant under the lease for the Store premises. The assignment is for collateral purposes and may be exercised only upon a default by Franchisee under his lease or under this Agreement. Franchisor's approval of Franchisee's lease is conditioned on receipt of the signed Collateral Assignment.

    v.    Franchisee's execution of a lease for a site for the Store shall constitute acceptance by Franchisee of such site and location and of the terms of such lease, sublease or purchase.

b.    **Store Development.** Franchisee agrees that prior to obtaining possession of the site for the Store, he shall secure all financing required to fully develop the Store. Franchisee further agrees that, promptly after obtaining possession of the site for the Store, he will: (a) cause to be prepared and submit for approval by Franchisor a site plan [Franchisor shall then provide basic drawings and specifications [including requirements for dimensions, exterior design, materials, interior layout, equipment, fixtures, furniture, signs, and decorating) required for the development of a BAB Systems Store; Franchisee is required to take these drawings and specifications to an approved architect who will modify them, if

required, to meet applicable ordinances, building codes or permit requirements (Franchisor must approve any such modifications to the drawings and specifications)]; (b) obtain all required zoning changes, all required building, utility, health, sanitation and sign permits and any other required permits and licenses; (c) purchase or lease equipment, fixtures, furniture and signs as hereinafter provided; (d) complete the construction and/or remodeling, equip, furnish and decorate the Store in full and strict compliance with plans and specifications approved by Franchisor and all applicable ordinances, building codes and permit requirements; and (e) obtain all customary contractors' sworn statements and partial and final waivers of lien for construction, remodeling, decorating and installation services. Once the Store is established and approved by BAB, no changes in the interior or exterior design of the Store or the equipment or fixtures used within may be made without prior written consent of BAB.

c.      **Equipment, Fixtures, Furniture, Cash Registers and Signs**. Franchisee agrees to use in the operation of the Store only those brands and models of equipment, fixtures, furniture, cash registers, fax machines, exterior and interior signs, decor items and tableware that Franchisor has approved for use in BAB Systems Stores as meeting its requirements for performance, warranties, design and appearance. Franchisee may purchase or lease original and replacement equipment, fixtures, furniture, cash registers, fax machines, signs, decor items or tableware meeting such specifications from any source approved by Franchisor (which may include Franchisor and/or its affiliates). If Franchisee proposes to purchase or lease any item of equipment, fixtures, furniture, cash registers, fax machines, signs, decor items or tableware not theretofore approved by Franchisor as meeting its specifications, Franchisee shall first notify Franchisor, and Franchisor may require submission of sufficient specifications, photographs, drawings and/or other information and samples to determine whether such items meet its specifications. Franchisor shall have the right to charge Franchisee a reasonable fee to cover Franchisor's costs incurred in making such determination. Franchisor shall advise Franchisee within a reasonable time whether such item meets its specifications. Franchisor shall provide Franchisee with one cash register which meets Franchisor's specifications which cost shall be included in the initial franchise fee. Franchisee shall use said cash register in the operation of the Store.

No vending machines, unapproved newspapers or periodicals, juke boxes or other music producing machines, gum or candy machines, games, pinball machines or other mechanical devices (including pay telephones and cigarette vending machines) shall be installed or operated at the Store without Franchisor's prior written consent.

d.    **Store Refurbishing**.

    i.    Subject to the terms and conditions hereinafter set forth, Franchisee agrees to effect such refurbishing of the Store (in addition to regular maintenance and repair) as Franchisor from time to time reasonably requires to maintain or improve the appearance and efficient operation of the Store, to comply with Franchisor's then-current standards for a BAB Systems Store, and/or to accommodate new products and services that BAB requires Franchisee to offer. Refurbishing may include: (a) the substitution or addition of new or improved equipment; (b) the substitution or addition of new or improved fixtures, furniture and signs; (c) replacement of worn out or obsolete equipment, fixtures, furniture and signs; (d) redecorating; (e) repair of the interior and exterior of the premises; and (f) structural modifications and remodeling of the premises.

    ii.    Franchisee's obligation to refurbish the Store as hereinabove provided shall be subject to the following terms and conditions: (a) Franchisee shall not be required to make aggregate expenditures for refurbishing described in items (b) through (f) of Paragraph 3.d.i. above in excess of two percent (2%) of the cumulative Gross Revenues of the Store of the four preceding years to the date of any such required refurbishing; (b) Franchisee shall not be required to effect any refurbishing of the Store during the last twelve (12) months of the initial or any renewal term of the Franchise except in connection with a renewal of the Franchise; and (c) the substitution or addition of new or improved equipment shall be completed within six (6) months of Franchisee's receipt of notice thereof from Franchisor. All other refurbishing shall be completed within twelve (12) months of Franchisee's receipt of notice thereof from Franchisor.

e.    **Store Opening**. Franchisee shall complete development of the Store, obtain all licenses required by Franchisor for the operation of the Store and have the Store ready to open and commence the conduct of its business by the earlier of

    i.    four (4) months after Franchisee obtains possession of such site or

    ii.    four (4) months from the date of this Agreement if Franchisee has possession of such site on the date hereof, or

    iii.    ten (10) months from the date of this Agreement.

If Franchisee fails to commence the conduct of business by the deadline set forth above in this Subparagraph 3.e., then this Agreement and the Franchise granted hereby may, at the sole option of Franchisor, be terminated upon the giving of written notice to Franchisee by Franchisor.

f.    **Grand Opening Program**. Franchisee shall conduct a grand opening program for the Store during the first ninety (90) days after the opening of the Store. Upon execution of this Agreement, Franchisee shall deposit with the Franchisor a Grand Opening Deposit in the amount of Three Thousand Dollars ($3,000.00). The

grand opening program shall conform to Franchisor's requirements and shall utilize the media and advertising formats designated by Franchisor. Upon the Franchisee submitting verification to Franchisor of his grand opening expenditures, Franchisor will reimburse Franchisee or pay approved invoices.

g.    **Relocation of Store.**

  i.    If Franchisee's lease for the premise of the Store terminates without fault of Franchisee, or expires and is unable to be renewed by Franchisee on substantially the same terms and conditions, or if in the judgment of Franchisor and Franchisee there is a change in the character of the location of the Store sufficiently detrimental to its business potential to warrant its relocation, Franchisor shall grant permission for relocation of the Store to a location approved by Franchisor. Any such relocation shall be at Franchisee's sole expense, and shall not be undertaken without Franchisor's prior written consent. Franchisor shall have the right to charge Franchisee for services Franchisor renders to Franchisee in connection with such relocation. Franchisor shall also have the right to require Franchisee to upgrade the relocated Store to conform to Franchisor's then current image, standards, and specifications for construction and equipment for all new BAB Systems Stores.

  ii.    In the event of a relocation of the Store, Franchisee shall promptly remove from the former Store premises any and all signs, fixtures, furniture, posters, furnishing, equipment, menus, advertising materials, stationery, supplies, forms and other articles which display any of the Marks and distinctive features or designs associated with the System. Any articles which display any of the Marks or any distinctive features or designs associated with the System which are not used by Franchisee at the new Store location shall be disposed of by Franchisee as directed by Franchisor following notice to Franchisor to the effect such articles will not be used at the new Store. Furthermore, Franchisee shall, at Franchisee's expense, immediately make such modifications or alterations as may be necessary to distinguish the former Store premises so clearly from its former appearance and from other BAB Systems Stores so to prevent any possibility of confusion by the public (including, without limitation, removal of all distinctive physical and structural features identifying BAB Systems Stores and removal of all distinctive signs and emblems). Franchisee shall, at Franchisee's expense, make such specific additional changes as Franchisor may reasonably request for this purpose. If Franchisee fails to initiate immediately or complete such alterations within such period of time as Franchisor deems appropriate, Franchisee agrees that Franchisor or its designated agents may enter the premises of the former Store and adjacent areas at any time to make such alterations as Franchisor deems appropriate to distinguish Franchisee's former Store premises, without liability for trespass. Franchisee expressly acknowledges that failure to make such alterations will cause irreparable injury to Franchisor and hereby consents to entry, at Franchisee's expense, of any ex parte order by any court of competent jurisdiction authorizing Franchisor or its agents to take such action, if Franchisor seeks such an

order. Compliance with the foregoing shall be a condition subsequent to Franchisor's approval of any relocation request by Franchisee, and in the event complete de-identification of the former Store premises is not properly and completely undertaken, Franchisor may then revoke its permission for relocation and declare a default under this Agreement.

4.    **TRAINING AND GUIDANCE.**

a.    **Training.** Franchisor shall furnish to Franchisee and one additional person designated by Franchisee an initial training program in all phases of the operations of a BAB Systems Store, including unit operations, bookkeeping, inventory management, and local Store marketing. Such training program shall be for a minimum of ten (10) days at Franchisor's training facility and a Store location. Franchisor shall also furnish on-site training at Franchisee's Store around the time of the Store opening. Franchisee shall complete the initial training programs to the satisfaction of Franchisor. If Franchisor provides refresher and supplemental training programs, Franchisee is required to attend such training. Franchisee shall be responsible for the travel and living expenses (including local transportation expenses) incurred while attending the initial training program and any refresher training programs.

b.    **Guidance and Assistance.** Franchisor shall furnish guidance to Franchisee with respect to: (1) specifications, standards and operating procedures utilized by BAB Systems Stores, and any modifications thereof; (2) purchasing approved equipment, furniture, cash registers, signs, operating materials and supplies; (3) methods of food preparation and sale and improvements thereon; and (4) the establishment and maintenance of administrative, bookkeeping, accounting and general operating and management procedures. Such guidance shall, in the discretion of Franchisor, be furnished in or supplemented by Franchisor's operations manual (the "Operations Manual"), bulletins, written reports and recommendations, other written materials, and/or telephonic consultations or consultations at the offices of Franchisor or at Franchisee's office. Franchisor shall advise Franchisee from time to time of operational concerns at or in Franchisee's Store as disclosed by reports submitted to or inspections made by Franchisor. Franchisor shall make no separate charge to Franchisee for such operating assistance, provided that Franchisor may make reasonable charges for forms and other materials supplied to Franchisee and for operating assistance made necessary in the judgment of Franchisor as a result of Franchisee's failure to comply with any provision of this Agreement or any specification, standard or operating procedure prescribed by Franchisor or operating assistance requested by Franchisee in excess of that normally provided by Franchisor.

c.    **Operations Manual.** Franchisor will loan to Franchisee during the term of the Franchise one copy of the Operations Manual. The Operations Manual shall contain mandatory and suggested specifications, standards, and operating procedures prescribed from time to time by Franchisor for a BAB Systems Store and information relative to other obligations of Franchisee hereunder. The Operations Manual may be modified from time to time to reflect changes in the specifications, standards and operating procedures of BAB Systems Stores. Franchisee shall keep his copy of the Operations Manual current by immediately

inserting all modified pages furnished by Franchisor for the Operations Manual and received by Franchisee. In the event of a dispute relative to the contents of the Operations Manual, the master copies maintained by Franchisor at its principal office shall be controlling. Franchisee may not at any time copy any part of the Operations Manual or remove it from his place of business.

d.    <u>Submittal of Location to Mrs. Field's</u>.    In the event Franchisor approves Franchisee's location for the sale of Mrs. Field's products, Franchisor will submit Franchisee's location to Mrs. Field's for its evaluation whether it will offer Franchisee a license agreement for the sale of Mrs. Field's baked goods at Franchisee's Store.    If Franchisee's location is approved by Mrs. Field's, Franchisee has the option of entering into or declining to enter into said license agreement.

5.    <u>MARKS.</u>

a.    <u>Ownership and Goodwill of Marks</u>.    Franchisee acknowledges that Licensor owns the Marks and that Franchisor has been authorized by Licensor to use the Marks in connection with its franchise program. Franchisee's right to use the Marks is derived solely from this Agreement and is limited to the conduct of business pursuant to and in compliance with this Agreement and all applicable specifications, standards and operating procedures prescribed by Franchisor from time to time during the Term. Any unauthorized use of the Marks by Franchisee shall constitute an infringement of the rights of Franchisor and Licensor in and to the Marks. Franchisee agrees that all usage of the Marks by Franchisee and any goodwill established thereby shall inure to the exclusive benefit of Franchisor and Licensor, and Franchisee acknowledges that this Agreement does not confer any goodwill or other interests in the Marks upon Franchisee. Franchisee shall not, at any time during the term of this Agreement or after its termination or expiration, contest the validity or ownership of any of the Marks or assist any others in contesting the validity or ownership of any of the Marks. All provisions of this Agreement applicable to the Marks shall apply to any additional trademarks, service marks, logo forms and commercial symbols hereafter authorized for use by and licensed to Franchisee pursuant to this Agreement.

b.    <u>Limitations on Use of Marks</u>. Franchisee agrees to use the Marks as the sole identification of the Store, provided that Franchisee shall identify itself as the independent owner thereof in the manner prescribed by Franchisor. Franchisee shall not use any Mark as part of any corporate or trade name or with any prefix, suffix or other modifying words, nicknames, terms, designs or symbols, or in any modified form (including, without limitation, any local or special adaptations or artistic variations of any of the Marks), nor may Franchisee use any Mark in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized in writing by Franchisor. Franchisee shall not for his own account register the Marks on the Internet or any other computer on-line service, create and maintain his own web site on the Internet using the Marks, or use the Marks on the Internet in any other manner. Franchisee agrees to display the Marks prominently and in the manner prescribed by Franchisor on signs, forms, and other materials and articles. Further, Franchisee agrees to give such notices of trademark or service mark ownership or registration and

copyrights as Franchisor specifies and to obtain such fictitious or assumed name registrations as may be required under applicable law. Any and all uses of any of the Marks shall include such information and samples as Franchisor may require. Franchisee may not use "Big Apple Bagels" or "BAB" or a derivative thereof in its corporate, assumed, or other formal name.

c.    **Notification of Infringements and Claims.**  Franchisee shall notify Franchisor immediately in writing of any apparent infringement of or challenge to Franchisee's use of any Mark, or claim by any person other than Franchisor or its affiliates of any rights in any Mark or any similar trade name, trademark, or service mark of which Franchisee becomes aware.  Franchisee shall not communicate with any person other than Franchisor and its counsel in connection with any such infringement, challenge or claim.  Franchisor has sole discretion to take such action as it deems appropriate and to control exclusively any litigation, U. S. Patent and Trademark Office proceeding or any other administrative proceeding arising out of any infringement, challenge or claim or otherwise relating to any Mark.  Franchisee agrees to execute any and all instruments and documents, render such assistance and do such acts and things as may, in the opinion of counsel for Franchisor, be necessary or advisable to protect and maintain the interests of Franchisor in any such litigation, U.S. Patent and Trademark Office proceeding or other administrative proceedings or otherwise to protect and maintain the interests of Franchisor in the Marks.

d.    **Discontinuance of Use of Marks.**  If it becomes advisable at any time, in Franchisor's sole discretion, for Franchisor and/or Franchisee to modify or discontinue use of any Mark, and/or use one or more substitute trademarks or service marks, Franchisee agrees to comply therewith within a reasonable time after notice thereof by Franchisor and Franchisor's sole obligation shall be to reimburse Franchisee for his out-of-pocket expenses of complying with these obligations.

e.    **Indemnification of Franchisee.**  Franchisor agrees to indemnify Franchisee against and to reimburse Franchisee for all direct, but not consequential (including, but not limited to, loss of revenue and/or profits), damages for which Franchisee is held liable in any proceeding arising out of the use of any Mark pursuant to and in compliance with this Agreement, and for all costs reasonably incurred by Franchisee in the defense of any such claim brought against it or in any such proceeding in which it is named as a party, provided that Franchisee has timely notified Franchisor of such claim or proceeding and has otherwise complied with this Agreement, and that Franchisor shall have the right to defend any such claim.  If Franchisor defends such claim, Franchisor shall have no obligation to indemnify or reimburse Franchisee with respect to any fees or disbursements of any attorney retained by Franchisee.

6.   **PROPRIETARY INFORMATION.**

    a.    <u>The Proprietary Information</u>.  Franchisor possesses certain proprietary information, consisting of the recipes, methods, techniques, formats, specifications, procedures, information, systems, and knowledge of and experience in the operation and marketing of BAB Systems Stores ("the Proprietary Information").   Any and all information, processes or techniques which Franchisor designates as confidential or proprietary shall be deemed Proprietary Information.  Franchisor may disclose the Proprietary Information to Franchisee through furnishing Franchisee sample drawings and specifications for development and operation of the Store, training programs, the Operations Manual and through guidance furnished to Franchisee during the term of this Agreement.  Franchisee shall fully and promptly disclose to Franchisor all ideas, concepts, methods and techniques relating to the development and/or operation of a bagel store conceived or developed by Franchisee and/or his employees during the term of this Agreement.  Franchisee agrees that Franchisor shall have the perpetual right to use and authorize other BAB Systems Stores to use such ideas, concepts, methods and techniques and if incorporated into Franchisor's System for the development and/or operation of BAB Systems Stores, such ideas, concepts, methods and techniques will become the sole and exclusive property of Franchisor without further consideration to Franchisee.

    b.    <u>Limitations on Franchisee's Use</u>.  Franchisee acknowledges and agrees that it will not acquire any interest in the Proprietary Information, other than the right to utilize the same in the development and operation of the Store pursuant to this Agreement and in accordance with the terms of this Agreement or other agreements between Franchisee and Franchisor or its affiliates, and that the use or duplication of the Proprietary Information in any other business would constitute an unfair method of competition.  Franchisee hereby agrees that Franchisee and its affiliates, officers, directors, partners and all owners of any interest in Franchisee and/or the Store:  (a) will not use the Proprietary Information in any other business or capacity; (b) will maintain the absolute confidentiality of the Proprietary Information during and after the Term; (c) will not make unauthorized copies of any portion of the Proprietary Information disclosed in written, visual, auditory or other tangible form; and (d) will adopt and implement all reasonable procedures prescribed from time to time by Franchisor to prevent unauthorized use or disclosure of the Proprietary Information including, without limitation, restrictions on disclosure thereof to employees and the use of nondisclosure and noncompetition clauses in employment agreements with employees and agents in the form prescribed by Franchisor.  In connection with this obligation, Franchisee shall notify Franchisor of the name and address of each affiliate, officer, director, partner, supervisory employee and owner of Franchisee and shall update such information whenever necessary.   Such notification shall contain and have annexed thereto a copy of the Confidentiality and Non-Competition Agreement executed by the individual at the time he or she acquires an interest in or becomes associated with or employed by Franchisee in which such individual consents to be bound by the restrictive covenants contained in said Agreement and to Franchisor's and Franchisee's enforcement of such covenants.  The obligations of Franchisee pursuant to this Paragraph 6.b. shall survive the termination or

expiration of this Agreement.

7. **RELATIONSHIP OF THE PARTIES**.

    a.   **Independent Contractors**. It is understood and agreed by the parties that this Agreement does not create a fiduciary relationship between them, that Franchisor and Franchisee shall be independent contractors and that nothing in this Agreement is intended to make either party a general or special agent, legal representative, subsidiary, joint venturer, partner, employee or servant of the other for any purpose.

    b.   **Franchisee's Obligations**. Franchisee shall conspicuously identify himself in all dealings with customers, suppliers, public officials and others as the owner of the Store under a Franchise granted from Franchisor, and shall place such notices of independent ownership on such forms, stationery, advertising and other materials as Franchisor may require from time to time. Franchisor has not authorized or empowered Franchisee to use the Marks except as provided by this Agreement, and Franchisee shall not employ any Mark in signing any contract, check, purchase agreement, negotiable instrument or other legal obligation without the prior written consent of Franchisor or employ any Mark in a manner that may result in liability of Franchisor for any indebtedness or obligation of Franchisee.

    c.   **Negation of Liability**. Neither Franchisor nor Franchisee shall make any express or implied agreements, guaranties or representations or incur any debt in the name of or on behalf of the other or represent that their relationship is other than that of franchisor and franchisee. Neither Franchisor nor Franchisee shall be obligated by or have any liability under any agreements or representations made by the other. Franchisor shall have no liability or obligation for any damages to any person or property directly or indirectly arising out of the development or operation of the Store, whether or not caused by Franchisee's negligent or willful action or failure to act. Franchisor shall have no liability for any sales, use, excise, gross receipts, property or other taxes of Franchisee or the Store.

    d.   **Indemnification**. Franchisee agrees to indemnify Franchisor and its subsidiaries, affiliates, stockholders, directors, officers, employees, agents and assignees against and to reimburse them for all obligations, damages, and taxes set forth in this Agreement for which they are held liable and for all costs reasonably incurred by them in the defense of any claims brought against them or in any action in which they are named as a party, including without limitation, reasonable attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses as a result of or related in any way to the operation of the Store, except to the extent caused by Franchisor's negligent or willful action or failure to act. Franchisor has the right to defend any such claim against it. Franchisee shall also indemnify and hold Franchisor and its officers, directors, employees and agents harmless from any and all claims, demands or liabilities arising from the offer or sale of securities, whether asserted by a purchaser of any security or by a governmental agency. Franchisor has the right to defend any such claims.

    e.   **Survival**. The indemnities and assumptions of liabilities and obligations herein

shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

8. **FRANCHISE AND OTHER FEES.**

    a.    **Initial Franchise Fee.** Franchisee agrees to pay to Franchisor, upon execution of this Agreement, an initial franchise fee as follows:

        i.    Franchisee (not pursuant to an Area Development Agreement):

            (1)    BAB Production Store:

                    __XX__  **$4,000.00 Transfer Fee.**

                    _____$25,000.00 for first BAB Production Store

                    _____$20,000.00 for second and subsequent BAB Production Stores

            (2)    BAB Satellite/Kiosk Store:

                    _____$15,000.00 for BAB Satellite/Kiosk Store

            (3)    BAB Cart:

                    _____$5,000.00 for BAB Cart

        ii.    Developer (pursuant to an Area Development Agreement):

            (1)    BAB Production Store:

                    _____$25,000.00 for first BAB Production Store

                    _____$15,000.00 for second and subsequent BAB Production Stores

            (2)    BAB Satellite/Kiosk Store:

                    _____$10,000.00 for BAB Satellite/Kiosk Store

            (3)    BAB Cart:

                    _____$5,000.00 for BAB Cart

The initial franchise fee shall be fully earned by Franchisor upon its payment and, except as otherwise provided herein, is nonrefundable.

    b.    **Royalty Fee.** Franchisee agrees to pay to Franchisor a weekly royalty fee in the amount of five percent (5%) of the Gross Revenues of the Store (as defined in Paragraph 8.c. hereof). The royalty fee shall be payable on or before each

Wednesday for the preceding Reporting Week (Monday through Sunday).

c.   **Definition of "Gross Revenues."**  As used in this Agreement, the term "Gross Revenues" shall mean the entire amount of all gross sales and business receipts, including direct or indirect barter transactions, wholesale accounts (both on and off premises) arising out of the operation of the Store, or through or by means of the business conducted in connection therewith, whether for cash or credit, but excluding: (1) sales, use, or service taxes collected from customers and paid to the appropriate taxing authority; and (2) all bona fide customer refunds and approved rebates, discounts and allowances.  Franchisee agrees that his cash register will be polled by Franchisor to verify Gross Revenues.  Franchisor will provide the modem, but Franchisee is responsible for telephone line installation and the monthly telephone charges.

d.   **Interest on Late Payments.**  All royalty fees, Marketing Fund contributions and other amounts which Franchisee owes to Franchisor or its affiliate shall bear interest after their due date at the lower of 2% per month, or the highest contract rate allowed by local law.  Franchisee acknowledges that this Paragraph shall not constitute Franchisor's agreement to accept such payments after same are due or a commitment by Franchisor to extend credit to, or otherwise finance, Franchisee's operation of the Store.  Further, Franchisee acknowledges that his failure to pay all such amounts when due shall constitute grounds for termination of this Agreement, as provided in Section 15 hereof, notwithstanding the provisions of this Paragraph.

e.   **Application of Payments.**  Notwithstanding any designation by Franchisee, Franchisor shall have sole discretion to apply any payments by Franchisee to any past due indebtedness of Franchisee for royalty fees, Marketing Fund contributions, purchases from Franchisor or its affiliates, interest or other indebtedness.

f.   **Bank Draft Plan.**  In the event Franchisee receives three (3) notices from Franchisor that Franchisee is late in making any payments due under this Agreement, Franchisor shall have the right to require Franchisee to make any and all payments due Franchisor through a Bank Draft Plan on a bank account Franchisee is required to establish and maintain for the purpose of making payments to Franchisor.  If Franchisor exercises this right, Franchisee shall execute such documents as may be required from time to time by Franchisor to permit Franchisor to withdraw from Franchisee's general operating checking account the amounts due Franchisor for the royalty fee and Marketing Fund contributions.

g.   **Document Name Change Fee.**  In the event Franchisee requests and Franchisor approves any alteration, addition, or modification in the name or identity of the Franchisee on this Agreement, Franchisee agrees to pay Franchisor a Document Name Change Fee in the amount of Two Hundred Fifty Dollars ($250.00).  Provided, however, this fee shall be waived the first time a transfer is made pursuant to Paragraph 13.b.(iv).

9.    **OPERATING STANDARDS.**

a. <u>Image of the Store</u>.  The presentation of an image in compliance with Franchisor's minimum standards and specifications to the public is an essential element of a successful franchise system.  Franchisee agrees to prohibit smoking in the Store.  Franchisee shall offer for sale all products and services that Franchisor, in its sole discretion, may from time to time require, and shall make such expenditures as may be necessary to enable it to fulfill such obligation, including, without limitation, the purchase or lease of new equipment or services, and the hiring and training of suitable personnel.  Franchisee further agrees that the Store will not, without prior written approval by Franchisor, provide and/or offer for sale any products or services not then authorized by Franchisor for BAB Systems Stores.  Franchisor reserves the right to revoke its approval of any products or suppliers previously authorized at any time upon written notice to Franchisee, provided that Franchisee may continue to offer and sell all remaining on-hand or ordered non-cancelable inventory of such products or from such suppliers as of the date of receipt of written notice from Franchisor.  Franchisor may, from time to time, conduct market research and testing to determine consumer trends and the salability of new food and beverage products and services.  Franchisee agrees to cooperate by participating in Franchisor's market research programs, test marketing of new services and products in the Store and providing Franchisor with timely reports and other relevant information regarding such market research.  In connection with any such test marketing, Franchisee shall purchase a reasonable quantity of tested products and effectively promote and make a reasonable effort to sell such products.

b. <u>Standards and Sources of Supplies</u>.

    i. Franchisee is required to obtain all his coffee from Franchisor or Franchisor's designated supplier.  Franchisee is also required to purchase from Franchisor's designated supplier a mandatory initial inventory of private label items, including, but not limited to, mugs, bagel cutters, cream cheese spreaders, and bread knives, which will be shipped and billed by Franchisor's designated supplier.  Franchisor also reserves the right to require that other items be purchased exclusively from Franchisor or its designees.

    ii. Other than products which must be purchased from Franchisor, its affiliates or its designated supplier pursuant to Paragraph 9.b.i. herein, Franchisee agrees that the Store will

        (1) use ingredients and prepare and offer for sale other beverages and food products

        (2) use cups, utensils, uniforms, menus, forms, packaging materials, labels and other supplies, and

        (3) offer for sale other products and services

    which conform to Franchisor's specifications and quality standards and/or are purchased from suppliers approved from time to time by Franchisor (which may include Franchisor and/or its affiliates).

    iii. Franchisee agrees to use in the operation of the Store only signs,

equipment, merchandise, materials and supplies that conform to Franchisor's minimum specifications and quality standards and/or are purchased from suppliers approved from time to time by Franchisor (which may include Franchisor and/or its affiliates).

iv.    Franchisor may, from time to time, modify the minimum standards and specifications and/or the list of approved brands and/or suppliers.  If Franchisee proposes to use or offer any food products or beverages, other products or services, ingredients or supplies (other than those which must be purchased pursuant to Paragraph 9.b.i.) which do not comply with Franchisor's then-current minimum standards or specifications or which are purchased from a supplier that has not been approved, Franchisee shall first notify Franchisor in writing and submit sufficient information, specifications and samples concerning such item or supplier for determination by Franchisor as to whether such item complies with Franchisor's specifications and standards, and/or whether the supplier meets Franchisor's approved supplier criteria.  Franchisor shall have the right to charge Franchisee a reasonable fee to cover Franchisor's costs incurred in making such determination. Franchisor shall, within a reasonable time, notify Franchisee whether or not such proposed item or supplier is approved. Franchisor may from time to time prescribe procedures for submission of requests for approval of items or suppliers and obligations which approved suppliers must assume (which may be incorporated into a written agreement to be executed by approved suppliers).   Franchisor may impose limits on the number of suppliers and/or brands for any ingredient or food or beverage product used or served by the Store.  Franchisor may collect a service fee on items purchased by Franchisee through national marketing contracts negotiated and maintained by Franchisor. Such service fee shall be established and paid to the Marketing Fund in the manner prescribed from time to time by Franchisor.

v.    Franchisee shall not offer and sell any branded products in the Store without the prior written consent of Franchisor.  Franchisee shall offer and sell branded products which have been approved by Franchisor only in the manner prescribed by Franchisor from time to time.  Franchisor reserves the right to revoke the approval of a previously authorized branded product.

vi.    Franchisee shall at all times maintain an inventory of approved food products, beverages and ingredients and other products sufficient in quantity and variety to realize the full potential of the Store.

vii.    Franchisee acknowledges and agrees that the Franchisor and its affiliate have proprietary products, including but not limited to coffee products, a muffin mixture, and other proprietary mixtures and products.  Franchisor reserves the right to require Franchisee to use such proprietary mixtures and products in the Store.

c.　**Operating Procedures.** Franchisee acknowledges that each and every detail of the appearance and operation of the Store in compliance with Franchisor's high standards is important to Franchisor and other BAB Systems Stores. Franchisee agrees to cooperate with Franchisor by maintaining such high standards in the operation of the Store. Franchisee agrees to comply with all mandatory specifications, standards and operating procedures relating to the function and operation of a BAB Systems Store including, without limitation, specifications, standards and operating procedures and rules relating to: (1) hours during which Franchisee shall operate the Store; (2) methods and procedures relating to the acquisition, storage and preparation of products offered by Franchisee in the operation of the Store; (3) advertising and promotion; (4) use of standard forms; (5) the handling of customer inquiries and complaints; and (6) use of approved cash register system. Franchisor reserves the right to approve all menu items and final copy of Franchisee's menu prior to printing. Mandatory specifications, standards and operating procedures prescribed from time to time by Franchisor in the Operations Manual, or otherwise communicated to Franchisee in writing, shall constitute provisions of this Agreement as if fully set forth herein. All references herein to this Agreement shall include all such mandatory specifications, standards and operating procedures.

d.　**Compliance with Laws and Good Business Practices.** Franchisee shall secure and maintain in force in its name all required licenses, permits and certificates relating to the operation of the Store. Franchisee shall operate the Store in full compliance with all applicable laws, ordinances and regulations including, without limitation, all government regulations relating to workers' compensation insurance, unemployment insurance and withholding and payment of federal and state income taxes, social security taxes and sales taxes. All advertising by Franchisee shall be completely factual, in good taste in the judgment of Franchisor, and shall conform to the highest standards of ethical advertising. Franchisee shall in all dealings with its customers, suppliers, employees, and public officials adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. Franchisee agrees to refrain from any business or advertising practice which may be injurious to Franchisor and the goodwill associated with the Marks and other BAB Systems Stores. In the event Franchisee shall fail to secure any license or permit required for the operation of the Store, Franchisor, at its option and in addition to its other rights and remedies hereunder, may obtain such license or permit on behalf of Franchisee and Franchisee shall fully cooperate with Franchisor in its efforts to obtain such license or permit on behalf of Franchisee and shall pay to Franchisor, on demand, all costs and charges incurred by Franchisor.

e.　**Management and Personnel of the Business.** Franchisee shall devote his full time and best efforts to the Store and shall not engage in any other business or other activity, directly or indirectly, that requires any significant management responsibility, time commitments, or otherwise may conflict with Franchisee's obligations hereunder, without the express written consent of Franchisor. The Store shall at all times be under the direct personal supervision of Franchisee, and shall at all times be under the full-time management of Franchisee or a qualified manager who has successfully completed Franchisor's training program. Franchisee or his manager shall hire all employees of the Store and shall be

exclusively responsible for the terms of their employment and compensation and for the proper training of such employees. If Franchisee requests Franchisor to train Franchisee's manager, Franchisee shall pay Franchisor its then-current Manager Training Fee. Franchisee shall establish at the Store for all employees a training program meeting the standards prescribed by Franchisor. Franchisee shall require all managers of the Store to execute Franchisor's then current form of Confidentiality and Non-Competition Agreement. Franchisee agrees to provide Franchisor a copy of an executed Confidentiality and Non-Competition Agreement for each manager of the Store. Franchisee shall require all employees to maintain a neat and clean appearance and to conform to the standards of dress specified by Franchisor from time to time. Franchisee shall not, during the term of this Agreement and for a period of two (2) years following termination or expiration of this Agreement for any reason, recruit or hire any employee of Franchisor or a BAB Systems Store operated by Franchisor, an affiliate of Franchisor or another franchisee of Franchisor without obtaining the prior written permission of Franchisor, such affiliate, or franchisee. If the Store at any time is not being managed by Franchisee or a qualified, trained, full-time manager, Franchisor may appoint a manager for the Store and charge a reasonable management fee during the period in which Franchisor manages the Store.

f.   **Exclusive Relationship.**   Franchisor has entered into this Agreement with Franchisee on the express condition that Franchisee and its owners will deal exclusively with Franchisor. Franchisee therefore agrees that during the term of this Agreement, except for the Store and other BAB Systems Stores operated under franchise agreements with Franchisor, neither Franchisee nor any of its owners shall (1) have any direct or indirect ownership interest in any Competitive Business located or operating anywhere in the world; (2) have any direct or indirect ownership interest in any entity which is granting franchises or licenses or establishing joint ventures for operation of Competitive Business anywhere in the world; or (3) perform services as a director, officer, manager, employee, consultant, representative, agent, lessor, lender, or otherwise for any Competitive Business or any business which is granting franchises or licenses or establishing joint ventures for the operation of Competitive Businesses anywhere in the world. The restrictions of this Paragraph shall not be applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on an over-the-counter market that represent three percent (3%) or less of the number of shares of that class of securities issued and outstanding. The term "Competitive Business" shall mean the sale of bagels, cream cheeses, muffins, and/or coffee to the public through retail or wholesale channels of distribution.

g.    **Insurance.**

    i.    During the term of the Franchise, Franchisee shall maintain in force, under policies of insurance issued by carriers approved by Franchisor, comprehensive general liability and property damage insurance against claims for bodily and personal injury, death and property damage caused by or occurring in conjunction with the operation of the Store, or otherwise in conjunction with the conduct of business by Franchisee pursuant to the Franchise Agreement, under one or more policies of insurance containing: . Workers Compensation including Employers Liability insurance in the limit of no less than $500,000; Comprehensive General Liability with a General Aggregate of no less than $1,000,000 which must include "Hired and Non-Owned" automobile liability coverage; and Products Liability of $1,000,000. In addition, if Franchisee uses a vehicle to deliver product or supplies, he must maintain Comprehensive Auto Liability of no less than $1,000,000. Franchisor may periodically increase the amounts of coverage required under such insurance policies and require different or additional kinds of insurance at any time, including excess liability insurance, to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards or other relevant changes in circumstances. Each insurance policy shall name BAB Systems, Inc., 8501 W. Higgins Road, Suite 320, Chicago, Illinois 60631 as an additional named insured with respect to policies secured, and shall provide for thirty (30) days' prior written notice to Franchisor of any material modification, cancellation or expiration of such policy.

    ii.    Prior to the opening of the Store and prior to the expiration of the term of each insurance policy, Franchisee shall furnish Franchisor with a copy of each insurance policy to be maintained by Franchisee for the immediately following term and evidence of the payment of the premium therefor. If Franchisee fails or refuses to maintain required insurance coverage, or to furnish satisfactory evidence thereof and the payment of the premiums therefor, Franchisor, at its option and in addition to its other rights and remedies hereunder, may obtain such insurance coverage on behalf of Franchisee and Franchisee shall fully cooperate with Franchisor in its effort to obtain such insurance policies, promptly execute all forms or instruments required to obtain or maintain such insurance and pay to Franchisor, on demand, any costs (including administrative) and premiums incurred by Franchisor.

    iii.    Franchisee's obligations to maintain insurance coverage as herein described shall not be affected in any manner by reason of any separate insurance maintained by Franchisor, nor shall the maintenance of such insurance relieve Franchisee of any obligations under Section 7 of this Agreement.

    iv.    If this Agreement is for a BAB Satellite/Kiosk Store or BAB Cart, the insurance requirements may be higher than for a BAB Production Store,

due to increased vehicle use.

h.  **Delivery of Products to BAB Satellite/Kiosk Store or BAB Cart.**  If this Agreement is for the grant of a BAB Satellite/Kiosk Store or BAB Cart, the bagels sold in Franchisee's Store will either be fresh baked bagels supplied by Franchisee's own BAB Production Store or the BAB Production Store of another local franchisee approved by BAB, or will be par-baked frozen bagels supplied by an approved supplier.  If Franchisee has a BAB Production Store that furnishes bagels to Franchisee's BAB Satellite/Kiosk Store or BAB Cart, Franchisee must facilitate the timely delivery of products requiring, among other items, additional vehicles, higher insurance coverages, and storage bins.

i.  **Participation in System-wide Internet Web Site.**  Franchisee acknowledges that the Internet is a powerful, expanding medium through which business is conducted.  As Franchisor develops strategies for taking advantage of the benefits the Internet may offer, Franchisee will be required to participate in such activity.  Franchisee therefore agrees that Franchisor may, upon sixty (60) days' prior written notice, require Franchisee to participate in, and contribute a proportionate share, of a web site established by BAB ("BAB Web Site") listed on the Internet or other listing on the Internet.  Franchisor shall, at its discretion, determine the content and use of the web site or other listing and shall establish the rules under which franchisees will participate.  Franchisor shall retain all rights relating to the web site or other listing and may alter or terminate the web site or other listing upon thirty (30) days' notice to the franchisees.  Franchisee's participation in the BAB Web Site shall be subject to the provisions of this Agreement.  Franchisee acknowledges that certain information obtained through its participation in the BAB Web Site may be considered proprietary and confidential information, including access codes and identification codes.  Franchisee's right to participate in the BAB Web Site or will terminate when this Agreement expires or terminates.  Franchisee shall be prohibited from establishing his own web site or other listing on the Internet using the Marks and/or System.

j.  **Cooperation in Displaying Franchisor's Franchise Literature.**  Franchisee agrees to cooperate with Franchisor in displaying Franchisor's franchise literature by keeping stocked display racks in Franchisee's Store with literature furnished by Franchisor.  At no charge to Franchisee, Franchisor will install the display racks and furnish the franchise literature.  Franchisee shall not obstruct the display racks and will notify Franchisor when the supply of franchise literature is low.  Franchisee will not be responsible for paying for any of the literature or for the installation of the display racks.

10.  **MARKETING AND PROMOTION.**

a.  **By Franchisor.**

i.  Recognizing the value of advertising to the goodwill and public image of BAB Systems Stores, Franchisor shall establish, maintain and administer a marketing fund (the "Marketing Fund") for such marketing and related programs as Franchisor may deem necessary or appropriate, in its sole discretion.  Franchisee shall contribute to the Marketing Fund an amount equal to two percent (2%) of the Gross Revenues of the Store.  Such Marketing Fund contributions shall be payable weekly together with the royalty fees due hereunder.  Franchisor shall have the right from time to time to increase Franchisee's Marketing Fund contributions hereunder to

an amount not to exceed the Marketing Fund contribution charged under Franchisor's then-current form of franchise agreement, but never to exceed 5% of Gross Revenues. Franchisor has a program to rebate a portion of Franchisee's contribution to the Marketing Fund, based upon Franchisee's expenditures on local advertising and promotion, as set forth in the Operations Manual.

ii.  Franchisor shall direct all marketing programs financed by the Marketing Fund, with sole discretion over the creative concepts, materials and endorsements used therein, and the geographic, market, and media placement and allocation thereof. Franchisee agrees that the Marketing Fund may be used to pay the costs of preparing and producing video, audio and written advertising materials; administering multi-regional advertising programs, including without limitation, purchasing direct mail and other media advertising and employing advertising agencies to assist therewith; and supporting public relations, market research and other advertising and marketing activities. The Marketing Fund shall furnish Franchisee with existing marketing, advertising and promotional formats and sample materials without charge. Franchisor will furnish Franchisee with multiple copies of marketing, advertising and promotional materials at its direct cost of producing them.

iii.  The Marketing Fund shall be accounted for separately from the other funds of Franchisor and shall not be used to defray any of Franchisor's general operating expenses, except for such reasonable salaries, administrative costs and overhead as Franchisor may incur in activities reasonably related to the administration of the Marketing Fund and its marketing programs (including without limitation, conducting market research, preparing advertising and marketing materials and collecting and accounting for contributions to the Marketing Fund). Franchisor may spend in any fiscal year an amount greater or less than the aggregate contribution of all BAB Systems Stores to the Marketing Fund in that year and the Marketing Fund may borrow from Franchisor or other lenders to cover deficits of the Marketing Fund or cause the Marketing Fund to invest any surplus for future use by the Marketing Fund. Franchisee authorizes Franchisor to collect for remission to the Marketing Fund any advertising or promotional monies or credits offered by any supplier based upon purchases by Franchisee. All interest earned on monies contributed to the Marketing Fund will be used to pay advertising costs of the Marketing Fund before other assets of the Marketing Fund are expended. A statement of monies collected and costs incurred by the Marketing Fund shall be prepared annually by Franchisor and shall be furnished to Franchisee upon written request.

iv.  Franchisee understands and acknowledges that the Marketing Fund is intended to maximize recognition of the Marks and patronage of BAB Systems Stores. Although Franchisor will endeavor to utilize the Marketing Fund to develop advertising and marketing materials and programs, and to place advertising that will benefit all BAB Systems Stores, Franchisor undertakes no obligation to ensure that expenditures by the Marketing Fund in or affecting any geographic area are proportionate

or equivalent to the contributions to the Marketing Fund by BAB Systems Stores operating in that geographic area or that any BAB Systems Stores will benefit directly or in proportion to its contribution to the Marketing Fund from the development of advertising and marketing materials or the placement of advertising.

v.     Franchisor reserves the right, in its sole discretion, to terminate or discontinue the Marketing Fund upon thirty (30) days' written notice to Franchisee.    All unspent monies on the date of termination or discontinuance shall be distributed to franchisees of Franchisor in proportion to their respective contributions to the Marketing Fund. Franchisor shall have the right to reinstate the Marketing Fund upon the same terms and conditions herein set forth upon thirty (30) days' prior written notice to Franchisee.

vi.     Franchisor assumes no direct or indirect liability or obligation to Franchisee or to the Marketing Fund with respect to any failure by any franchisees of Franchisor to make any contributions to the Fund.

b.     **By Franchisee.**

i.     Franchisee agrees to list his Store at his expense (and in addition to any other expenditures made for advertising or promotion hereunder) in each of the telephone directories distributed within his general market, in such business classifications as Franchisor prescribes from time to time.

ii.     In addition, on an ongoing basis, Franchisee will spend not less than two percent (2%) of Franchisee's Gross Revenues on local advertising and promotion.    Such expenditures shall be made directly by Franchisee, subject to approval and direction by Franchisor. Within fifteen (15) days of Franchisor's request, Franchisee shall furnish to Franchisor, in a manner approved by Franchisor, an accurate accounting of the expenditures on local advertising and promotion for the period requested. This requirement for local advertising and promotion expenditures shall commence immediately upon the Store opening.

iii.     Franchisee shall join any local advertising co-operative which has been or may be formed consisting of franchisees and/or Franchisor-owned or affiliate-owned Stores in his area. Franchisor assumes no direct or indirect liability or obligation to Franchisee or to any local co-operative with respect to the maintenance, direction, or administration of the co-operative, including without limitation, any failure by any franchisees to make any contributions to the co-operative. Any contributions to a local advertising cooperative will be credited toward the local advertising and promotional expenditure required by Paragraph 10.b.ii. above.

iv.     Prior to their use by Franchisee, samples of all local advertising and promotional materials not prepared or previously approved by Franchisor shall be submitted to Franchisor for approval. If written disapproval is not received by Franchisee within fifteen (15) days from the date of receipt by

Franchisor of such materials, Franchisor shall be deemed to have given the required approval. Franchisee shall not use any advertising or promotional material that Franchisor has disapproved.

11. **RECORDS AND REPORTS.**

a. **Accounting and Records.** During the Term, Franchisee agrees, at his expense: (1) to establish and maintain record keeping and accounting systems conforming to the requirements prescribed by Franchisor from time to time; and (2) to prepare and preserve for three (3) years from the date of their preparation full, complete and accurate books, records and accounts prepared pursuant to such accounting procedures as may be prescribed by Franchisor from time to time, copies of sales tax returns and copies of such portions of Franchisee's state and federal income tax returns as reflect the operation of the Store.

b. **Reports and Tax Returns.**

    i. **Furnished to Franchisor.** Franchisee shall furnish to Franchisor the following: (1) concurrently with the payment of the royalty fees, a report of the Gross Revenues of the Store for the preceding week; (2) by the thirtieth (30th) day of each quarter a profit and loss statement as of the end of the preceding quarter, a year-to-date profit and loss statement and a balance sheet as of the end of the preceding month; and (3) within ninety (90) days after the end of each fiscal year of the Store, an annual profit and loss statement and source and use of funds statement for the Store and a balance sheet for the Store as of the end of each fiscal year, reviewed by an independent certified public accountant, or, if requested by Franchisor, accompanied by an opinion of a certified public accountant or firm of certified public accountants selected by Franchisee and approved by Franchisor, which opinion may be qualified only to the extent reasonably acceptable to Franchisor. Further, Franchisee shall furnish to Franchisor copies of other reports designated by Franchisor and such other information and supporting records as Franchisor from time to time prescribes. All such financial statements, reports and information shall be on forms approved by Franchisor and shall be signed and verified by Franchisee. Franchisee agrees that his cash register will be polled (accessed by electronic means) by Franchisor to verify Gross Revenues.

    ii. **Availability for Inspection.** Franchisee shall maintain readily available for inspection by Franchisor, and shall furnish to Franchisor upon its request, exact copies of all state sales tax returns and such portions of Franchisee's federal and state income tax returns as reflect the operation of the Store. In addition, Franchisee at his expense shall furnish to Franchisor (and its accountant and/or other designee) for inspection or audit such forms, reports, records, financial statements and other information as Franchisor may require. Franchisee shall make such financial and other information available at such locations as Franchisor may reasonably request (including Franchisor's office) and shall afford Franchisor (and its accountant and/or other designee) full and free access thereto during regular business hours. Franchisor (and its accountant

and/or other designee) shall have the right to make extracts from the copies of all such documents and information.

c.    **Use of Data, Name, Photograph, and Biographical Information.**  Franchisee consents to the use of Franchisee's name, photograph, and biographical and financial data concerning the operation of Franchisee's business, as well as photographs of the interior and exterior of Franchisee's Store, in Franchisor's advertising and other literature promoting BAB Systems.

12.    **INSPECTIONS AND AUDITS.**

a.    **Examinations of Books and Records.**

i.    **Franchisor's Right to Examine and Audit.**  Franchisor shall have the right at any time during business hours, and without prior notice to Franchisee, to examine or audit or cause to be examined or audited the business records, bookkeeping and accounting records, bank statements, sales and income tax records and returns and other books and records of the Store and the books and records of any corporation, partnership or limited liability company ("LLC") which is the Franchisee under this Agreement.    Franchisee shall maintain all such books, records and supporting documents at all times at his business office.  Franchisee shall fully cooperate with representatives of Franchisor and accountants hired by Franchisor to conduct any such examination or audit.

ii.    **Audit Fees.**  In the event any such examination or audit shall disclose an understatement of Gross Revenues of the Store, Franchisee shall pay to Franchisor, within fifteen (15) days after receipt of the examination or audit report, the royalty fees and any Marketing Fund contributions due on the amount of such understatement, plus interest (at the rate and on the terms provided in Section 8.d. hereof) from the date originally due until the date of payment.  Further, in the event such examination or audit is made necessary by the failure of Franchisee to furnish reports, supporting records, financial statements or other documents or information, as herein required, or failure of Franchisee to furnish such reports, records, financial statements, documents or information on a timely basis, or if an understatement of the Gross Revenues of the Store for any period is determined by any such examination or audit to be two percent (2%) or greater, Franchisee shall reimburse Franchisor for the cost of such audit or examination, including, without limiting, the charges and disbursements of any independent accountants and the travel expenses, room and board (if any) and compensation of employees of Franchisor in connection with such audit or examination.  The foregoing remedies shall be in addition to all other remedies and rights of Franchisor hereunder or under applicable law.

iii.    **Right to Inspect the Store.**  To determine whether Franchisee is complying with this Agreement, Franchisor shall have the right at any time during business hours, and without prior notice to Franchisee, to inspect the Store.    Franchisee shall fully cooperate with representatives of Franchisor making any such inspection and shall permit representatives of

Franchisor to take photographs, movies or videotapes of the Store and to interview employees and customers of the Store.

13.   **TRANSFER**

a.   **By Franchisor.**  This Agreement is fully transferable by Franchisor and shall inure to the benefit of any transferee or other legal successor to the interests of Franchisor herein.

b.   **By Franchisee.**

   i.   **Franchisee May Not Transfer Without Approval of Franchisor.** Franchisee understands and acknowledges that the rights and duties created by this Agreement are personal to Franchisee (and its owners) and that Franchisor has granted the Franchise to Franchisee (and its owners) in reliance upon the individual or collective character, skill, aptitude, attitude, business ability and financial capacity of Franchisee (and its owners). Accordingly, neither this Agreement nor the Franchise (or any interest therein), nor any part or all of the ownership of Franchisee or of the assets of Franchisee or the Store (or any interest therein) may be transferred, sold, assigned, pledged, mortgaged or liened without the prior written approval of Franchisor, and any such transfer without such approval shall constitute a breach hereof and convey no rights to or interests in this Agreement, the Franchise, Franchisee, the Store or its assets.

   ii.   **Conditions for Approval of Transfer.**  If Franchisee and its owners are in full compliance with this Agreement, Franchisor shall not unreasonably withhold its approval of a transfer that meets all the applicable requirements of this Paragraph. The proposed transferee and its owners must be individuals of good moral character and otherwise meet Franchisor's then applicable standards for BAB Systems Store franchisees. Franchisor shall interview and evaluate the proposed transferee at Franchisor's principal place of business or at such other location that Franchisor designates. A transfer of ownership in the Store may only be made in conjunction with a transfer of the interest in Franchisee, or is one of a series of transfers which in the aggregate constitute the transfer of the Franchise or a controlling interest in Franchisee. All of the following conditions must be met prior to or concurrently with the effective date of the transfer (unless otherwise specified):

   (1)   the assignee, transferee or purchaser shall have been approved by Franchisor for financial responsibility, good moral character and suitability as an operator of a BAB Systems Store;

   (2)   Franchisee or the assignee shall pay to Franchisor prior to assignee attending the required training program a transfer fee of Five Thousand Dollars ($5,000.00);

   (3)   the assignee, transferee or purchaser shall not be engaged as a

licensor, franchisor, independent operator or franchisee of any chain or network which is similar in nature to or in competition with Franchisor, except that the assignee, transferee or purchaser may be an existing franchisee of Franchisor or its affiliate;

(4)   Franchisee shall have paid all outstanding debts and obligations to Franchisor and its affiliates, including the royalty fees and all amounts due the Marketing Fund, and to its designated suppliers;

(5)   Franchisee and its owners shall execute a release of any and all claims against Franchisor, and Franchisor's officers, directors, agents, employees and affiliates, arising out of or related to this Agreement, which release shall contain language and be of the form prescribed by Franchisor;

(6)   the assignee, transferee or purchaser (and its owners) shall, at Franchisor's sole discretion, have executed and agreed to be bound by: (i) an assignment and assumption agreement satisfactory to the Franchisor, whereby the assignee assumes the obligations of Franchisee under this Agreement; or (ii) Franchisor's then-current form of franchise agreement, for a term equal to the remaining term of the franchise, but which may provide for a different rate for royalty fees and Marketing Fund contributions required hereunder;

(7)   if required, the lessor of the premises of the Store has consented to Franchisee's assignment or sublease of said premises to the proposed assignee;

(8)   Franchisor shall have approved the material terms and conditions of such assignment and shall have determined that the price and terms of payment are not so burdensome as to adversely affect the future operations of the Store by the assignee; and

(9)   Franchisee shall have entered into an agreement with Franchisor agreeing to subordinate to such assignee's obligations to Franchisor, including, without limitation, any royalty fees, any Marketing Fund contributions, and any obligations of such assignee to make installment payments of the purchase price to Franchisee.

(10)  the assignee, transferee or purchaser shall complete to Franchisor's satisfaction, at transferee's expense and upon such terms and conditions as Franchisor may reasonably require, any training programs then in effect for franchisees at such time and place designated by Franchisor;

(11)  if the transfer is of a Satellite/Kiosk Store, the transferee must have a BAB Production Store.

iii.   In the event Franchisee shall request consent to a transfer of this Agreement or a controlling interest in Franchisee and for any reason such

transfer is not completed or consummated, Franchisor shall be entitled to reimbursement of its reasonable expenses incurred in connection with such proposed transfer in the manner and in accordance with the procedures set forth herein, including, without limitation, expenses related to investigating, processing and training any proposed transferee.

iv.     **Transfer to a Wholly-owned Corporation.**  If Franchisee is in full compliance with this Agreement, Franchisor shall not unreasonably withhold its approval of a transfer in the case of a proposed assignment or transfer of this Agreement and the Franchise to a corporation, partnership or LLC which conducts no business other than the Store, which is actually managed by Franchisee and in which Franchisee maintains management control and owns and controls at least fifty-one percent (51%) of the general partnership interest or the equity and voting power of all issued and outstanding capital stock, provided that all owners of such corporation, partnership or LLC agree jointly and severally to guarantee the obligations of Franchisee under this Agreement and to be bound by the provisions of this Agreement in the form prescribed by Franchisor. Transfers of shares or interest representing 50% or more of the ownership in such corporation, partnership or LLC will be subject to the provisions of Paragraph 13.b.ii., except that the transfer fee required under Paragraph 13.b.ii.(2) shall be waived.  Franchisee shall notify Franchisor in writing of the name and address of each and every shareholder, partner, officer, member, director and supervisory employees of any such corporation, partnership or LLC and any changes thereto.

c.     **Death or Disability of Franchisee.**

i.     **Transfer of Interest.**  Upon the death or permanent disability of Franchisee or the owner of a controlling interest in Franchisee, the executor, administrator, conservator, guardian or other personal representative of such person shall transfer his interest in this Agreement and the Franchise, or such interest in Franchisee, to a third party approved by Franchisor.  Such disposition of this Agreement and the Franchise, or such interest in Franchisee (including without limitation, transfer by bequest or inheritance), shall be completed within a reasonable time, not to exceed six (6) months from the date of death or permanent disability and shall be subject to all the terms and conditions applicable to transfers contained in this Section 13.  Failure to so transfer the interest in this Agreement and the Franchise or such interest in Franchisee within said period of time shall constitute a breach of this Agreement.

ii.     **Operation After Death or Permanent Disability.**  Upon the death or permanent disability of Franchisee or the owner of a controlling interest in Franchisee, the executor, administrator, conservator, guardian or other personal representative of such person shall appoint a manager to operate the Store within a reasonable time, not to exceed thirty (30) days from the date of death or permanent disability of such person.  The appointment of such manager shall be subject to the prior written approval of Franchisor and, if requested by Franchisor, such manager shall attend and complete

Franchisor's training program for franchisees. Such manager shall execute Franchisor's then-current form of Confidentiality and Non-Competition Agreement. If in the judgment of Franchisor, the Store is not being managed properly after the death or permanent disability of Franchisee or the owner of a controlling interest in Franchisee, Franchisor shall have the right to appoint a manager for the Store. All funds from the operation of the Store during the management by Franchisor's appointed manager will be kept in a separate bank account, and all expenses of the Store including compensation, other costs, and travel and living expenses of Franchisee's manager will be charged to this account. Franchisor shall have the right to charge a reasonable management fee (in addition to the royalty fee and Marketing Fund contributions payable under this Agreement) during the period in which Franchisor manages the Store as herein provided.

iii.    **Definition of Permanent Disability.** Franchisee or the owner of a controlling interest in Franchisee will be deemed to have a "permanent disability" if his usual, active participation in the Store as contemplated by this Agreement is for any reason curtailed for a continuous period of three (3) months.

d.    **Effect of Consent to Transfer.** Franchisor's consent to a transfer of this Agreement and the Franchise, or any interest in Franchisee or the Store or its assets, shall not constitute a waiver of any claims it may have against Franchisee (or its owners), nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms or conditions of this Agreement by the transferee.

e.    **Franchisor's Right of First Refusal.** If Franchisee or its owners shall at any time determine to sell an interest in this Agreement, the Franchise, the Store or an ownership interest in Franchisee, Franchisee or its owners shall obtain a bona fide, executed written offer from a responsible and fully disclosed purchaser and shall immediately submit an exact copy of the offer to Franchisor. Franchisor shall have the right, exercisable by written notice delivered to Franchisee or its owners within thirty (30) days from the date of delivery of an exact copy of such offer to Franchisor, to purchase such interest for the price and on the terms and conditions contained in such offer, provided that Franchisor may substitute cash for any form of payment proposed in such offer. Franchisor's credit shall be deemed equal to the credit of any proposed purchaser. Franchisor shall have not less than sixty (60) days from the date of exercise of its right of first refusal to prepare for closing. Franchisor shall be entitled to purchase such interest subject to all customary representations and warranties given by the seller of the assets of a business or voting stock of an incorporated business, as applicable, including without limitation, representations and warranties as to ownership, condition and title to stock and/or assets. If Franchisor does not exercise its right of first refusal, Franchisee or its owners may complete the sale to such purchaser pursuant to and on the exact terms of such offer, subject to Franchisor's approval of the transfer, as provided in Paragraphs 13.b.i. and 13.b.ii. If the sale to such purchaser is not completed within ninety (90) days after delivery of such offer to Franchisor, or if there is a material change in the terms of the sale, Franchisor shall have an additional right of first refusal for thirty (30) days on the same terms

and conditions as are applicable to the initial right of first refusal.

14. **TERMINATION BY FRANCHISEE.** If Franchisee is in substantial compliance with this Agreement and Franchisor materially breaches this Agreement and fails to cure such breach within thirty (30) days after written notice thereof is delivered to Franchisor, or if such breach cannot reasonably be cured within such thirty (30) day period, and Franchisor fails to commence a bona fide program to cure such breach within such thirty (30) day period, and continues to complete such cure, then Franchisee may terminate the Franchise effective ten (10) days after delivery to Franchisor of written notice of termination. A termination of this Agreement for any other reason than breach of this Agreement by Franchisor, and failure to cure such breach within the time period specified herein, shall be deemed a termination by Franchisee without cause.

15. **TERMINATION BY FRANCHISOR.**

    a.    Franchisor shall have the right to terminate this Agreement effective upon delivery of notice to Franchisee, and without an opportunity to cure, if:

        i.    Franchisee fails, except for delays which are beyond Franchisee's reasonable control, to have a site selected and approved by Franchisor within ninety (90) days following execution of this Agreement, or if Franchisee fails to have the Store open for business within four (4) months from the date of possession by Franchisee of the approved site, or within ten (10) months from the date of this Agreement;

        ii.    Franchisee abandons, surrenders, transfers control of, loses the right to occupy the premises of the Store, or fails to actively operate the Store;

        iii.    Franchisee assigns or transfers this Agreement or any interest therein or in the Franchise, the Store, or the assets of the Store without compliance with the provisions of this Agreement;

        iv.    Franchisee is adjudged bankrupt, becomes insolvent or makes a general assignment for the benefit of creditors;

        v.    Franchisee or any of its owners is convicted of or pleads no contest to a felony or is convicted or pleads no contest to any crime or offense that is likely to adversely affect the reputation of the Store or the goodwill associated with the Marks;

        vi.    Franchisee's operation of the Store would result in a threat or danger to the public health and safety;

        vii.    Franchisee fails on three (3) or more separate occasions within any twelve (12) consecutive month period to submit when due financial statements, reports or other data, information or supporting records; to pay when due the royalty fees, Marketing Fund contributions, amounts due for purchases from Franchisor or its affiliates or other payments due to Franchisor or its affiliates; or otherwise fails to comply with this Agreement, whether or not such failures to comply are corrected after notice thereof is given to

Franchisee;

viii. Franchisee or any of its owners fails to comply with the covenants contained in Paragraph 9.f. of this Agreement;

ix. Franchisee or any of its owners discloses or divulges the contents of the Operations Manual or other trade secret or other confidential information provided to Franchisee by Franchisor contrary to provisions of this Agreement, or makes any unauthorized use of the Marks;

x. Franchisee fails to satisfactorily complete the Production or Satellite/Kiosk Store training program in which event none of the initial franchise fee shall be refunded to Franchisee;

xi. Upon the death or permanent incapacity of Franchisee or owner of a controlling interest in Franchisee, an approved transfer is not effected as provided in Section 13 of this Agreement;

xii. Franchisee fails to timely pay any lender to whom Franchisor has guaranteed Franchisee's obligations, or Franchisor if Franchisee has entered into a financing arrangement with Franchisor:

(1) more than three (3) times if the defaults are cured, or

(2) one (1) time if the default is not cured

during the financing term; or

xiii. Franchisee fails to timely pay any vendors or supplier more than 3 times during the term of the franchise.

b. Franchisor shall have the further right to terminate this Agreement, effective upon the delivery of notice of termination to Franchisee, if Franchisee fails to pay when due any monies owed to Franchisor, or its affiliates or designated suppliers and does not correct such failure within ten (10) days after written notice thereof is given to Franchisee, or fails to comply with any other provision of this Agreement or any mandatory specification, standard or operating procedure prescribed by Franchisor and does not correct such failure within thirty (30) days after written notice of such failure to comply is given to Franchisee.

c. A default under this Agreement shall also constitute a default under any and all other agreements entered into between Franchisor and Franchisee (or related entities), with the right to terminate the other agreement(s) in accordance with the provisions of those agreement(s).

16. **RIGHTS OF FRANCHISOR AND OBLIGATIONS OF FRANCHISEE UPON TERMINATION OR EXPIRATION OF THE FRANCHISE**

a. **Payment of Amounts Owed to Franchisor.** Franchisee agrees to pay to Franchisor within fifteen (15) days after the effective date of termination or expiration of the Franchise, or such later date that the amounts due to Franchisor are determined, such royalty fees, Marketing Fund contributions, amounts owed for purchases by Franchisee from Franchisor, its affiliates, or designated suppliers, interest due on any of the foregoing and all other amounts owed to Franchisor, its affiliates, or designated suppliers which are then unpaid.

b. **Marks.** Franchisee agrees that after the termination or expiration of the Franchise he will: (1) not directly or indirectly at any time or in any manner identify himself or any business as a current or former BAB Systems Store, or as a franchisee or licensee of or as otherwise associated with Franchisor, use any Mark or any colorable imitation thereof in any manner or for any purpose or utilize for any purpose any trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with Franchisor; (2) return to Franchisor or destroy all forms and materials containing any Mark or otherwise identifying or relating to a BAB Systems Store; (3) return to Franchisor all inventory bearing the Marks at Franchisee's cost; (4) take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to his use of any Mark; (5) change the telephone number of the Store and instruct all telephone directory publishers to modify all telephone directory listings of the Store associated with any Marks when the directories are next published; (6) if requested by Franchisor, transfer to Franchisor or Franchisor's designee the telephone number of the Store and all telephone directory listings associated with the Marks; and (7) furnish to Franchisor, within thirty (30) days after the effective date of termination or expiration, evidence satisfactory to Franchisor of Franchisee's compliance with the foregoing obligations. Upon request by Franchisor, Franchisee will furnish Franchisor photographs of the Store as evidence of the removal of Franchisor's Marks and trade dress.

c. **Confidential Information.** Franchisee agrees that, upon termination or expiration of the Franchise, he will immediately cease to use any Confidential Information of Franchisor disclosed to or otherwise learned or acquired by Franchisee in any business or otherwise and return to Franchisor all copies of the Operations Manual and any other confidential materials which have been loaned or made available to him by Franchisor.

d. **Covenant Not to Compete.** Upon termination of this Agreement by Franchisor in accordance with its terms and conditions or by Franchisee without good cause, or upon expiration of this Agreement, Franchisee and its owners agree that for a period of two (2) years, commencing on the effective date of termination or expiration or the date on which Franchisee ceases to operate the Store, whichever is later, neither Franchisee nor its owners shall (1) have any direct or indirect ownership interest in any Competitive Business located or operating within two (2) miles of the Store or within two (2) miles of any other franchisee of Franchisor, or of any company-owned or affiliate-owned BAB Systems Store; or

(2) have any direct or indirect ownership interest in any entity which has granted or during such two (2) year period grants franchises or licenses for the operation of Competitive Businesses within two (2) miles of the Store or within two (2) miles of any other franchisee of Franchisor, or of any company-owned or affiliate-owned BAB Systems Store; or (3) perform services as a director, officer, manager, employee, consultant, representative, agent, lender, lessor, or otherwise for any Competitive Business located within two (2) miles of the Store or within two (2) miles of any other franchisee of Franchisor, or of any company-owned or affiliate-owned BAB Systems Store. The restrictions of this Section shall not be applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent three percent (3%) or less of the number of shares of that class of securities issued and outstanding. To the extent that any provision of this Paragraph 16.d. or Paragraph 9.f. hereof is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but could be enforceable by reducing any or all thereof, Franchisee and Franchisor agree that same shall be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought. Competitive Business shall mean the sale of bagels, cream cheeses, muffins, and/or coffee to the public through retail or wholesale channels of distribution.

e.    **Continuing Obligations.**  All obligations of Franchisor and Franchisee which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.

f.    **Franchisor's Option To Purchase.**

  i.    If this Agreement expires (without renewal) or is terminated by Franchisor in accordance with its provisions or by Franchisee without cause, then Franchisor shall have the option, exercisable by giving written notice thereof within sixty (60) days from the date of such expiration or termination, to purchase from Franchisee all the tangible assets (including, without limitation, inventory of saleable products, equipment, fixtures, furniture, signs, cash registers, fax machines, computers, leasehold improvements and any other assets of the Store owned by Franchisee, but excluding any unamortized portion of the initial franchise fee, cash, goodwill, short-term investments and accounts receivable) of the Store (collectively, the "Purchased Assets") and to an assignment of Franchisee's lease for (a) the premises of the Store (or, if an assignment is prohibited, a sublease for the full remaining term and on the same terms and conditions as Franchisee's lease) and (b) any other tangible assets used in connection with the Store.  Franchisor shall have the unrestricted right to assign this option to purchase and assignment of leases separate and apart from the remainder of this Agreement.

  ii.    The purchase price for the Store (except for the signage, the purchase price of which is $100) shall be either, at Franchisor's option: (a) the Book Value (as defined below) of the Purchased Assets, or (b) the fair market

value of the Purchased Assets, which will be calculated by averaging three appraisals conducted by appraisers, one of whom is selected by Franchisor, one of whom is selected by Franchisee, and one of whom is selected by the two appraisers. The fees and costs of the appraisers shall be shared equally by Franchisor and Franchisee. "Book Value" shall mean the net book value of the Purchased Assets, as disclosed by the balance sheet of the last monthly statement of the Store required to have been submitted to Franchisor pursuant to Paragraph 11.b. hereof prior to such termination or expiration, provided, however, that: (1) each depreciable asset shall be valued as if it had been depreciated on a "straight-line" basis from the date of its acquisition over its Useful Life (defined below) without provision for salvage value; and (2) Franchisor may exclude from the Purchased Assets any inventory, equipment, fixtures, furniture, signs, cash registers, fax machines, computers, or leasehold improvements of the Store that have not been acquired in compliance with this Agreement. No value shall be attributed to goodwill of the Store, the assignment of lease (or sublease) for the premises of the Store, or the assignment of any lease for any other tangible assets used in connection with the Store, and Franchisor shall not be required to pay any separate consideration for any such assignment or sublease.

iii.    For purposes of this Paragraph 16.f., "Useful Life" shall be as follows:

Furniture, fixtures, signs: 7 years
Equipment (including electronic equipment): 5 years
Leasehold improvements: 10 years

iv.    If Franchisee has not furnished Franchisor a balance sheet of the last monthly statement of the Store, Franchisor may establish Book Value of the Purchased Assets based on Franchisee's initial cost, depreciated on a "straight-line" basis as described above. If evidence of Franchisee's initial cost for any Purchased Asset is not proven by actual receipts, Franchisor will assign an initial cost based on its best information for like items being sold at the time Franchisee opened his Store.

v.    The purchase price, as determined above, shall be paid in cash at the closing of the purchase, which shall take place no later than sixty (60) days after the delivery of Franchisor's notice of its election to purchase the Store, at which time Franchisee shall: (1) deliver instruments transferring good and merchantable title to the assets purchased, free and clear of all liens, encumbrances and liabilities to Franchisor or its designee, with all sales and other transfer taxes paid by Franchisee; (2) transfer or assign all licenses or permits which may be assigned or transferred; (3) assign to Franchisor or its designee Franchisee's leasehold interest in the premises of the Store or, if an assignment is prohibited, sublease same to Franchisor or its nominee for the full remaining term and on the same terms and conditions as Franchisee's lease, including renewal and/or purchase options; and (4) assign to Franchisor or its designee any leases for any other tangible assets used in connection with the Store: In the event that Franchisee cannot deliver clear title to all of the Purchased Assets as aforesaid, or in the event there shall be other unresolved issues, the closing

of the sale shall, at Franchisor's option, be accomplished through an escrow. Further, Franchisee and Franchisor shall, prior to closing, comply with the Bulk Sales provisions of the Uniform Commercial Code as enacted or previously in force in the state where the Store is located. Franchisor shall have the right to set off against and reduce the purchase price by any and all amounts owed by Franchisee to Franchisor or any of its affiliates.

vi.   If Franchisor exercises the foregoing option to purchase the Store, Franchisor shall have the right pending the closing of such purchase to appoint a manager to maintain the operation of the Store in accordance with the relevant provisions of 9.e. hereof. Alternatively, Franchisor may require Franchisee to close the Store during such time period without removing any assets of the Store.

17.   **ENFORCEMENT.**

a.   <u>Severability and Substitution of Valid Provisions</u>. Except as expressly provided to the contrary herein, each section, paragraph, term, and provision of this Agreement, and any portion thereof, shall be considered severable and if for any reason any such provision of this Agreement is held to be invalid, contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which Franchisor is a party, that ruling shall not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise intelligible, which shall continue to be given full force and effect and bind the parties hereto. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and Franchisor shall have the right, in its sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable. Such modifications to this Agreement shall be effective only in such jurisdiction, unless Franchisor elects to give them greater applicability, and shall be enforced as originally made and entered into in all other jurisdictions.

b.    **Waiver of Obligations.**

    i.    Franchisor and Franchisee may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice thereof to the other or such other effective date stated in the notice of waiver. Any waiver granted by Franchisor shall be without prejudice to any other rights Franchisor may have, will be subject to continuing review by Franchisor and may be revoked, in Franchisor's sole discretion, at any time and for any reason, effective upon delivery to Franchisee of ten (10) days' prior written notice. Franchisor and Franchisee shall not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including, without limitation, the right to demand exact compliance with every term, condition and covenant herein or to declare any breach thereof to be a default and to terminate the Franchise prior to the expiration of its term) by virtue of any custom or practice of the parties at variance with the terms hereof; any failure, refusal or neglect of Franchisor or Franchisee to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder including, without limitation, any mandatory specification, standard or operating procedure; any waiver, forbearance, delay, failure or omission by Franchisor to exercise any right, power or option, whether of the same, similar or different nature, with respect to any other BAB Systems Store; or the acceptance by Franchisor of any payments from Franchisee after any breach by Franchisee of this Agreement.

    ii.    Franchisor makes no warranties or guaranties upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by granting any waiver, approval or consent to Franchisee, or by reason of any neglect, delay or denial of any request therefor. Any waiver granted by Franchisor shall be without prejudice to any other rights Franchisor may have, will be subject to continuing review by Franchisor, and may be revoked, in Franchisor's sole discretion, at any time and for any reason, effective upon delivery to Franchisee of ten (10) days' prior written notice.

    iii.    Neither Franchisor nor Franchisee shall be liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform its obligations results from: (1) transportation shortages, inadequate supply of labor, material or energy, or the voluntary foregoing of the right to acquire or use any of the foregoing in order to accommodate or comply with the orders, requests, regulations, recommendations or instructions of any federal, state or municipal government or any department or agency thereof; (2) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state, or municipal government or any department or agency thereof; (3) acts of God; (4) acts or omissions of the other party; (5) fires, strikes, embargoes, war, or riot; or (6) any other similar event or cause. Any delay resulting from any of said causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable.

c.  **Rights of Parties are Cumulative.**  The rights of Franchisor and Franchisee hereunder are cumulative and no exercise or enforcement by Franchisor or Franchisee of any right or remedy hereunder shall preclude the exercise or enforcement by Franchisor or Franchisee of any other right or remedy hereunder or which Franchisor or Franchisee is entitled by law to enforce.

d.  **Costs and Attorneys' Fees.**  If a claim for amounts owed by Franchisee to Franchisor is asserted in any arbitration or judicial proceeding or appeal thereof, or if Franchisor or Franchisee is required to enforce this Agreement in an arbitration or judicial proceeding or appeal thereof, the party prevailing in such proceeding shall be entitled to reimbursement of its costs and expenses including, but not limited to, reasonable accounting, legal and attorneys' fees.

e.  **Governing Law/Consent to Jurisdiction.**  All matters relating to arbitration shall be governed by the Federal Arbitration Act (9 U.S.C. §1 et. seq.).  Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other federal law, this Agreement and the Franchise shall be governed by the laws of the State of Illinois.  Franchisee agrees that Franchisor may institute any action against Franchisee to enforce the provisions of this Agreement in any state or federal court of general jurisdiction in the State of Illinois, and Franchisee irrevocably submits to the exclusive jurisdiction of such courts and waives any objection he may have to either the jurisdiction or venue of such court.

f.  **Waiver of Jury Trial.**  Each party irrevocably waives trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either party.

g.  **Limitations of Claims.**  Except for claims against Franchisee concerning the under-reporting of gross revenue, any and all claims arising out of or relating to this agreement or the relationship among the parties hereto shall be barred unless an action or legal or arbitration proceeding is commenced within one (1) year from the date Franchisee or Franchisor knew of the facts giving rise to such claims.

h.  **Binding Effect.**  This Agreement is binding upon the parties hereto, and their respective executors, administrators, heirs, assigns and successors in interest.

i.  **Modification.**  This Agreement shall not be modified except by written agreement signed by both Franchisee and Franchisor.  Notwithstanding the preceding sentence, Franchisor may modify the Operations Manual pursuant to Paragraph 4.c.

j.  **Construction.**  The preambles and riders are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral, electronic, or written understandings or agreements between Franchisor and Franchisee relating to the subject matter of this Agreement.  Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto.  Except where this Agreement

expressly obligates Franchisor reasonably to approve or not unreasonably to withhold its approval of any action or request by Franchisee, Franchisor has the absolute right to refuse any request by Franchisee or to withhold its approval of any action or omission by Franchisee. The headings of the several sections and paragraphs hereof are for convenience only and do not define, limit or construe the contents of such sections or paragraphs. The term "attorneys' fees" shall include, without limitation, reasonable legal fees, whether incurred prior to, in preparation for or in contemplation of the filing of any written demand or claim, action, hearing or proceeding to enforce the obligations of this Agreement. The term "affiliate" as used herein is applicable to any company directly or indirectly owned or controlled by Franchisor, under common control with Franchisor or any principal of Franchisor. References to a "controlling interest" in Franchisee shall mean more than fifty percent (50+%) or more of the voting control of Franchisee. The term "Franchisee" as used herein is applicable to one or more persons, a corporation, a partnership, or LLC, as the case may be, and the singular usage includes the plural and the masculine and neuter usages include the other and the feminine. If two or more persons are at any time Franchisee hereunder, whether or not as partners or joint venturers, their obligations and liabilities to Franchisor shall be joint and several. This Agreement shall be executed in multiple copies, each of which shall be deemed an original.

k.    <u>Time is of the Essence</u>. Time is of the essence of this Agreement.

l.    <u>Mandatory and Binding Arbitration</u>.

   i.    All disputes, controversies or claims arising out of or relating to this Agreement shall be submitted for arbitration to the Chicago, Illinois office of the American Arbitration Association on demand of either party. Such arbitration proceedings shall be conducted in Chicago, Illinois and shall be heard by one arbitrator in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association. All matters within the scope of the Federal Arbitration Act (9 U.S.C. §§ 1 <u>et seq.</u>) shall be governed by it.

   ii.    The arbitrator shall have the right to award or include in his award any relief which he deems proper in the circumstances, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief and attorneys' fees and costs, in accordance with Paragraph 17.d., provided that the arbitrator shall not have the authority to award exemplary or punitive damages, nor shall he have jurisdiction over any dispute relating the ownership, validity or registration of any name or Mark licensed hereunder. The award and decision of the arbitrator shall be conclusive and binding upon all parties hereto and judgment upon the award may be entered in any court of competent jurisdiction. Each party waives any right to contest the validity or enforceability of such award. The parties agree to be bound by the provisions of any limitation on the period of time by which claims must be brought. The parties further agree that, in connection with any such arbitration proceeding, each shall submit or file any claim which would constitute a compulsory counterclaim (as defined by rule 13 of the Federal

Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed in such proceeding shall be barred.

iii.   Franchisor and Franchisee agree that arbitration shall be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between Franchisor and Franchisee shall not be consolidated with any other arbitration proceeding involving Franchisor and any other person, corporation, partnership or LLC.

iv.   This provision shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

v.   Notwithstanding the above and foregoing, Franchisor shall have the right to apply directly to a court of competent jurisdiction for a temporary restraining order, preliminary injunction or other emergency relief which may be available to protect the name, Marks or System licensed hereunder, without the necessity of first filing an arbitration demand.

18.   **NOTICES AND PAYMENTS.**  All written notices and reports permitted or required to be delivered by the provisions of this Agreement or of the Operations Manual shall be deemed so delivered at the time delivered by hand, one (1) business day after transmission by facsimile, telegraph or other electronic system, one (1) business day after being placed in the hands of a commercial courier service for overnight delivery, or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the parties as follows:

Franchisor:   8501 W. Higgins Road, Suite 320
              Chicago, Illinois 60631

Franchisee:   Marc Steinman, Marvin Steinman and Lee Steinman
              381 Santa Rosa Boulevard, C-704
              Fort Walton Beach, Florida 32548

or at the most current principal business address of which the notifying party has been notified. Any required payment or report not actually received by Franchisor during regular business hours on the date due (or postmarked by postal authorities at least two (2) days prior thereto) shall be deemed delinquent.

19.   **ACKNOWLEDGEMENTS.**  Franchisee acknowledges that he has read this Agreement and Franchisor's Uniform Franchise Offering Circular; and that he understands and accepts the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain Franchisor's high standards of quality and service and the uniformity of those standards at all BAB Systems Stores and thereby to protect and preserve the goodwill of the Marks and the System. Franchisee acknowledges that he has conducted an independent investigation of the business venture contemplated by this Agreement and recognizes that it involves business risks and that the success of the venture is largely dependent upon the business abilities of Franchisee. Franchisee further represents to Franchisor, as an inducement to its entry into this Agreement, that Franchisee has made no misrepresentations in obtaining the Franchise.

**IN WITNESS WHEREOF** the parties hereto have executed, sealed, and delivered this Agreement in __2__ counterparts effective on the day and year first above written.

Franchisor:
**BAB SYSTEMS, INC.**
an Illinois corporation

By: _____
Title: _____President_____
Date Accepted: ___June 11, 1998___

Franchisee:
**Corporate Signature:**

_____

a _____ corporation

By: _____
Title: _____
Date Signed: _____

**Individual Signatures:**

_____  5/16/98
Marc Steinman                Date

_____  5/16/98
Marvin Steinman              Date

_____  5-16-1998
Lee Steinman                 Date

## Rider A

TO THAT CERTAIN
BAB SYSTEMS FRANCHISE AGREEMENT
BY AND BETWEEN BAB SYSTEMS, INC.
AND Marc Steinman, Marvin Steinman and Lee Steinman
DATED _____June 11_____, 19 98
(the "Franchise Agreement")

The parties hereto agree that the BAB Systems Store to be operated by Franchisee pursuant to the Franchise Agreement shall be located at the following premises:

Shalimar Plaza
1191 Beglin Parkway
Shalimar, Florida  32579

Franchisee acknowledges and agrees that Franchisor's approval of the premises for the Store and any information communicated to Franchisee regarding the premises for the Store do not constitute a representation or warranty of any kind, expressed or implied, as to the suitability of the premises for a BAB Systems Store, of the economic terms of the lease or sublease, or for any other purpose. Franchisor's approval of the premises indicates only that Franchisor believes that the premises falls within the acceptable criteria established by Franchisor as of the time period encompassing the evaluation. Both Franchisee and Franchisor acknowledge that application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and premises and that, subsequent to Franchisor's approval of a site and premises, demographic and/or economic factors, including competition from other businesses, included in or excluded from Franchisor's criteria could change, thereby altering the potential of a site and premises. The uncertainty and instability of such criteria are beyond Franchisor's control and Franchisee must agree that Franchisor will not be responsible for the failure of a site and premises approved by Franchisor to meet expectations as to potential revenue or operational criteria. Franchisee further acknowledges and agrees that his acceptance of a franchise for the operation of a BAB Systems Store at the above premises is based on his own independent investigation of the suitability of the premises.

BAB SYSTEMS, INC.
an Illinois Corporation

By _____
Title: _____

Franchisee:  Marc Steinman

Franchisee:  Marvin Steinman

Franchisee:  Lee Steinman

C:\DOC\C716\3104\FRANAGR\FA98.008

4/9/98 10:59AM

**Rider B**

TO THAT CERTAIN
BAB SYSTEMS FRANCHISE AGREEMENT
BY AND BETWEEN BAB SYSTEMS, INC.
AND Marc Steinman, Marvin Steinman and Lee Steinman
DATED _____June 11_____, 19 98
(the "Franchise Agreement")

## COLLATERAL ASSIGNMENT OF LEASE

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby assigns, transfers and sets over unto BAB SYSTEMS, INC., an Illinois corporation ("Assignee") all of Assignor's right, title and interest as tenant in, to and under that certain lease, a copy of which is attached hereto (the "Lease") respecting premises commonly known as **Shalimar Plaza, 1191-Beglin Parkway, Shalimar, Florida 32579** (the "Premises"). This Assignment is for collateral purposes only and except as specified herein, Assignee shall have no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee shall take possession of the premises demised by the Lease pursuant to the terms hereof and shall expressly agree in writing to assume the obligations of Assignor thereunder.

In the event Assignor owns the land and/or building in which the Store is located, Assignor does hereby grant an option to Assignee or its designee to lease such premises on a triple-net basis for the remainder of the then-current term of the Franchise Agreement, at a reasonable commercial rental rate, as determined by a licensed commercial real estate broker selected by Assignee.

Assignor represents and warrants to Assignee that it has full power and authority to so assign the Lease and its interest therein and that Assignor has not previously, and is not obligated to, assign or transfer any of its interest in the Lease or the premises demised thereby.

Upon a default by Assignor under the Lease or under the franchise agreement for a BAB Systems Store to be operated at the Premises, between Assignee and Assignor (the "Franchise Agreement"), or in the event of a default by Assignor under any document or instrument securing said Franchise Agreement, Assignee shall have the right and is hereby empowered to take possession of the Premises, expel Assignor therefrom, and, in such event, Assignor shall have no further right, title or interest in the Lease.

Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee. Throughout the term of the Franchise Agreement and any renewals thereof, Assignor agrees that it shall elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days prior to the last day that said option must be exercised, unless Assignee otherwise agrees in writing, and upon failure of Assignor to so elect to extend or renew the Lease as aforesaid, Assignor hereby appoints Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and stead of Assignor for the sole purpose of effecting such extension or renewal.

**IN WITNESS WHEREOF,** the parties hereto have set their hands and seals this _6th_ day of _May_ , 19 _98_ .

Assignor: **Marc Steinman**

Assignor: **Marvin Steinman**

Assignor: **Lee Steinman**

## ASSIGNMENT TO CORPORATION OR PARTNERSHIP
## FOR BENEFIT OF FRANCHISEE
TC

THIS AGREEMENT is made and entered into effective as of the __4__ day of __August__ 1998, by and among BAB Systems, Inc., an Illinois corporation having its principal place of business at 8501 W. Higgins Road, Suite 320, Chicago, Illinois, 60631 ( the "COMPANY") and **Marc Steinman, Marvin Steinman, and Lee Steinman of 381 Santa Rosa Boulevard, C-704, Fort Walton Beach, Florida 32548** (individually and collectively "ASSIGNOR"), and **Steinman & Steinman, Inc.** ("ASSIGNEE"), *wherein* the parties agree as follows:

1.    **Agreements Assigned.**  ASSIGNOR hereby sells, assigns, and conveys to ASSIGNEE all interest in and to that certain **Franchise Agreement** made and entered into **June 11, 1998,** for the development and/or operation of a BIG APPLE BAGELS store located at or in **Shalimar Plaza, 1191-B Eglin Parkway, Shalimar, Florida 32579** (the "AGREEMENTS"), to have and to hold said interest for the term of the AGREEMENTS and any renewal thereof consistent with its terms and conditions.  The COMPANY hereby grants its permission for the assignment of the AGREEMENTS upon the terms and conditions herein set forth.

2.    **Rights and Obligations.**  ASSIGNEE'S rights under the AGREEMENTS shall be subject to the terms thereof, and ASSIGNEE shall and does hereby agree to duly assume, keep, and perform all of ASSIGNOR'S obligations and covenants as Franchisee under the AGREEMENTS.

3.    **Assignor Primary Liability.**  ASSIGNOR shall at all times remain primarily liable to the COMPANY for the performance and keeping of all obligations and covenants required to be kept or performed by the Franchisee or Developer under the AGREEMENTS, including payment of all monies owed the COMPANY and its affiliates, and ASSIGNEE hereby agrees to indemnify and hold ASSIGNOR harmless from all claims, causes of action, actions and judgment which may be made, had, commenced or entered against ASSIGNOR on account of the AGREEMENTS arising after the date hereof.

4.    **Control Person.**  ASSIGNOR hereby designates **Marc Steinman and Lee Steinman** individually and collectively, as the "control person" of ASSIGNEE.  For purposes of this Agreement, the control person shall be the person who has the authority to actively direct the affairs of the ASSIGNEE, the relinquishment with ASSIGNEE, either voluntarily or involuntarily, by the control person without the prior written approval of the COMPANY shall constitute a material breach of the AGREEMENTS and this Assignment permitting the COMPANY, at its sole option, to terminate the AGREEMENTS; provided, however, that in the event of death or disability of the control person that the provisions of Section 13.c of the Franchise Agreement shall control to the same extent as if the control person were the franchisee under the AGREEMENTS.

IN WITNESS WHEREOF,  the parties hereto, intending to be legally bound hereby, have executed this Agreement effective as of the date first above written.

ASSIGNOR: _____          COMPANY: BAB SYSTEMS, INC.
            Marc Steinman

ASSIGNOR: _____          By: _____
            Marvin Steinman                            Michael W. Evans, President

ASSIGNOR: _____
            Lee Steinman

ASSIGNEE: Steinman & Steinman, Inc.

By: _____
      Marc Steinman, President

By _____
    Lee Steinman, Treasurer

**EXHIBIT**

tabbies

B

## **Rider C**

### TO THE BAB SYSTEMS, INC. FRANCHISE AGREEMENT

### GUARANTY AND ASSUMPTION OF OBLIGATIONS

THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS is given this ___4___ day of ___August___, 1998, by **Marc Steinman, Mara Henderson, Marvin Steinman and Lee Steinman.**

In consideration of, and as an inducement to, the execution of that certain BAB SYSTEMS, INC. Franchise Agreement of even date herewith (the "Agreement") by BAB Systems, Inc. (the "Franchisor"), each of the undersigned hereby personally and unconditionally (a) guarantees to Franchisor, and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that **Steinman & Steinman, Inc.** ("Franchisee") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including without limitation the provisions of Paragraph 9.f. and 16.d.

Each of the undersigned waives: (1) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (2) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (3) protest and notice of default to any party with respect to the indebtedness or nonperformance of obligations hereby guaranteed; (4) any right he may have to require that an action be brought against Franchisee or any other person as a condition of liability; and (5) any and all other notices and legal or equitable defenses to which he may be entitled.

Each of the undersigned consents and agrees that: (1) his direct and immediate liability under this guaranty shall be joint and several; (2) he shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; and (4) such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend his guaranty, which shall be continuing and irrevocable during the term of the Agreement.

**EXHIBIT**

tabbies

C

**IN WITNESS WHEREOF**, each of the undersigned has hereunto affixed his signature on the same day and year as the Agreement was executed.

PERCENTAGE OF
OWNERSHIP
OF FRANCHISEE

GUARANTOR(S)

_____          _____25_____ %
Marc Steinman

_____          _____25_____ %
Mara Henderson

_____          _____25_____ %
Marvin Steinman

_____          _____25_____ %
Lee Steinman

_____          _____ %

08CV3737
JUDGE LINDBERG
MAGISTRATE JUDGE COLE

## IN THE FIRST JUDICIAL CIRCUIT COURT IN AND FOR
## OKALOOSA COUNTY, FLORIDA    TC

STEINMAN & STEINMAN, INC.,
a Florida corporation,

     Plaintiff,

vs.



Case No.:2008-CA-3206-S

BAB SYSTEMS, INC.,
an Illinois corporation;
SHALIMAR PLAZA, LLC, a Florida LLC and
FIFE REFRIGERATION, INC., a Florida Corporation.

     Defendant.

_____/



### AMENDED VERIFIED COMPLAINT

Plaintiff Steinman & Steinman, Inc., d/b/a Big Apple Bagels ("Steinman") , by and through

its undersigned counsel, sues Defendant BAB Systems, Inc. ("BAB") and alleges:

    1.    This is an action for declaratory judgment pursuant to Section 86.021, *Florida*

*Statutes*, and injunctive relief.

### JURISDICTION AND VENUE

    2.    The amount in controversy exceeds $15,000.00, exclusive of costs, interest and

attorney's fees.

    3.    Steinman is a Florida corporation organized under the laws of the State of Florida,

with its principal place of business in Shalimar, Okaloosa County, Florida.

    4.    BAB is an Illinois corporation that regularly conducts business within the State of

Florida.

    5.    Pursuant to Section 48.193, *Florida Statutes*, this Court has personal jurisdiction over

BAB because BAB regularly conducts business in and derives revenue from Okaloosa County, and



**EXHIBIT**

D

because BAB is in breach of a contract that requires performance of certain obligations by BAB in Okaloosa County, Florida. These actions and obligations give rise to the claims asserted and relief sought herein.

      6.     Shalimar Plaza, LLC, ("Landlord") is a Florida LLC that owns and manages real property in Okaloosa County, Florida identified as Shalimar Plaza. Landlord leases Steinman the real property in  Shalimar Plaza where Steinman's business, business interests, and restaurant equipment is located.

      7.     Fife Refrigeration, Inc. ("Fife"), is a Florida Corporation with its principal place of business in Okaloosa County, Florida. Fife is a creditor of Steinman claiming a purported interest in the premises and restaurant equipment located at Shalimar Plaza.

      8.     Pursuant to Sections 47.011 and 47.051, *Florida Statutes*, venue is proper in Shalimar, Okaloosa County, Florida because the instant cause of action occurred in Okaloosa County, Florida.

      9.     Steinman has satisfied, or is excused from, any conditions precedent to bringing the instant action.

### GENERAL ALLEGATIONS

      10.    On or about June 10, 1998, Steinman and BAB entered into the franchise contract (the "Contract") attached hereto as Exhibit "A."

      11.    The term of the Contract was 10 years, and it terminates on June 10, 2008.

      12.    Pursuant to the Contract, Steinman had the rights to operate a Big Apple Bagel franchise, which is located at 1191 North Eglin Parkway, Shalimar Plaza, Shalimar, Florida, subject to the requirements in the Contract.

13.     To operate the establishment at 1191 North Eglin Parkway, Steinman entered into a direct lease agreement between Steinman and Landlord for Suite B at Shalimar Plaza, in which BAB has no claim or interest.

14.     To operate the establishment, Steinman purchased and paid as required for all equipment located in Suite B, Shalimar Plaza, and such equipment is owned by Steinman.

15.     At all times relevant to this action, Steinman timely paid all royalty and marketing fees due to BAB and otherwise complied with all terms of the Contract.

16.     Upon information and belief, BAB made misrepresentations to Steinman regarding the viability of the business model required under the Contract and the profitability of a Big Apple Bagel franchise that induced Steinman to enter into the Contract.

17.     Since Steinman began running its franchise in 1998, it has sustained a net loss from utilizing the business model required by BAB.

18.     During the term of the Contract, BAB acknowledged that its business model was unsustainable, yet it continued to require Steinman to operate its franchise utilizing the model and to continue making royalty and marketing fee payments per the terms of the Contract.

19.     Steinman would not have entered into this Contract if it had known the business was unsustainable and not profitable.

20.     During the term of the Contract, BAB has continuously and materially breached the terms of the contract by failing to provide marketing support, despite timely payment of marketing fees during the term of the Contract.

21.     During the term of the Contract, BAB has continuously and materially breached the terms of the Contract by failing to provide adequate operational support to the franchise, as required by the Contract, despite timely payment of all royalty fees during the term of the Contract.

3

22.    Upon information and belief, the only site visits and support provided by BAB during the term of the Contract were inadequate, and in breach of the operational assistance provision in the Contract.

23.    Upon information and belief, BAB provided no operational support following tropical storms and hurricanes that damaged Steinman's business, yet it still required payment of royalty and marketing fees.

24.    During the term of the Contract, BAB continuously and materially breached the Contract by failing to provide volume discount purchase agreements with materials suppliers as required by the Contract.

25.    Because of BAB's misrepresentations concerning the business model and profitability of its Big Apple Bagel franchises, which fraudulently induced Steinman into the Contract, BAB's rights under the Contract are terminated and unenforceable.

26.    Because of BAB's continuing material breaches of the terms in the Contract, its rights under the Contract are terminated and unenforceable.

27.    Upon information and belief, there are no Big Apple Bagel franchises within 300 miles of Shalimar, Florida. Therefore, BAB has no legitimate business interest in enforcing the non-compete provision in the contract.

28.    On information and belief, notwithstanding BAB's repeated material breaches of the contract, BAB seeks to enforce the terms of the Contract including but not limited to:

(a)    Purchasing and removing equipment at a depreciated value;

(b)    Assuming the business operations at the location; and

(c)    Replacing Steinman with another franchisee on the premises.

4

29.     Upon information and belief, BAB's actions have jeopardized Steinman's relationship with Landlord and Fife, which caused Landlord and Fife to take actions and positions adverse to Steinman's regarding the premises, restaurant equipment and business. Therefore, Landlord and Fife are indispensable parties to this action.

**COUNT I**
**ACTION FOR DECLARATORY JUDGMENT**

30.     Paragraphs 1-29 are incorporated by reference as if fully set forth herein.

31.     It is Steinman's position that the Contract expired on June 10, 2008, and that BAB committed repeated material breaches of the Contract, which renders the contract null, void and unenforceable.

32.     It is Steinman's position that BAB fraudulently induced Steinman into signing the Contract by making illusory promises that it knew were false regarding the business model for and profitability of Big Apple Bagels, as set out in paragraphs 16 through19.

33.     It is Steinman's position that during the course of the contract, BAB was in continuous material breach of  the contract by not providing the franchisee support for which Steinman always timely paid throughout the term of the contract as set out in paragraphs 20 through 24.

34.     It is Steinman's position that it is no longer obligated to pay BAB any fees or royalties due under the Contract based upon BAB's material breach of the Contract and fraudulent inducement of Steinman into the Contract.

35.     It is Steinman's position that BAB's right to buyout or takeover Steinman's franchise at a depreciated value has terminated based upon BAB's material breach of the Contract, BAB's fraudulent inducement of Steinman into the Contract and the expiration of the Contract.

36.    It is Steinman's position that the buyout provision in the Contract is unenforceable and that Steinman, not BAB, owns the restaurant equipment located at Shalimar Plaza because BAB did not sell Steinman the equipment, never owned any interest in the equipment and never paid Steinman any consideration for the equipment.

37.    On May 9, 2008, as a result of BAB's actions, Fife recorded a mechanic's lien on Steinman's real property at 1191-B Shalimar Plaza and the restaurant equipment and fixtures therein. This lien is recorded at Book 2845, Page 1121 of the official records of Okaloosa County, Florida. A copy of this lien is attached hereto as Exhibit "B."

38.    It is Steinman's position that it, not Fife, has all legal rights to the premises at 1191-B Shalimar Plaza and owns restaurant equipment located therein because Steinman has complied with all requirements for its purchase and has paid Fife for any and all services upon request.

39.    On June 11, 2008, as a result of BAB's letter dated June 9, 2008, attached hereto as Exhibit "C," Landlord responded with a letter to both Steinman and BAB, which claimed a landlord's lien interest in the restaurant equipment and fixtures located at the premises. A copy of the lease and Landlord's letter are attached hereto as Composite Exhibit "D."

40.    It is Steinman's position that it, not Landlord, maintains all rights to the premises and the full interest in the restaurant equipment and fixtures at Shalimar Plaza, because Steinman has timely paid any and all rents due under its lease with Landlord.

41.    It is Steinman's position that the non-compete provision is unreasonable and that there is no legitimate business reason in enforcing it, as BAB's nearest franchise is over 300 miles away. Therefore, no competition exists in the local market.

42.    Upon information and belief, BAB disputes each position asserted by Steinman in paragraphs 31 through 41.

6

43.     Upon information and belief, Fife disputes Steinman's position asserted in paragraph 38.

44.     Upon information and belief, Landlord disputes Steinman's position asserted in paragraph 40.

45.     As a result, there is doubt and controversy over the status of the Contract and Lease and the parties' rights thereunder.

46.     As a result, there is doubt and controversy regarding the parties' rights and interests in the restaurant equipment and the superiority of same.

WHEREFORE, Steinman requests that this Court enter a judgment in its favor, which declares that:

(a)     BAB materially breached the Contract by continuously failing to provide Steinman the franchisee support required of BAB under the contract;

(b)     BAB fraudulently induced Steinman into the Contract with illusory promises;

(c)     The Contract expired on June 10, 2008, extinguishing all obligations and rights arising therefrom;

(d)     Because of BAB's continuing material breach, fraudulent inducement and the fact that the Contract expired on June 10, 2008, the Contract is null, void and unenforceable;

(e)     Because the contract is unenforceable, BAB may neither buyout nor takeover Steinman's franchise at a discounted price nor enforce the non-compete agreement

(f)     Landord's lien is ineffective;

(g)     Fife's mechanic's lien is ineffective; and

(h)     Steinman's possesses all legal interest in the real property, business and restaurant equipment located at 1191-B Shalimar Plaza, and its interest is superior to any claimed by BAB, Fife or Landlord.

## COUNT II
## ACTION FOR INJUNCTIVE RELIEF

47.     Paragraphs 1-46 are incorporated by reference as if fully set forth herein.

48.    On June 9, 2008, BAB contacted Steinman's landlord to initiate a course of action to dispossess Steinman of its business, real property, restaurant equipment and other assets located at Shalimar Plaza, wherein the Big Apple Bagel franchise that was the subject of the Contract was located.   See Exhibit "C."

49.    BAB stated that it will attempt to physically dispossess Steinman of these rights and business on June 11, 2008, and prevent Steinman from exercising any rights of ownership over its business.

50.    Because Steinman is the lessee for the real property in Shalimar Plaza and the Contract terminated on June 10, 2008, Steinman has a clear legal right to the business, real property, business assets and restaurant equipment located at Shalimar Plaza.

51.    Steinman has a clear legal right to the real property, business assets and restaurant equipment located at Shalimar Plaza because BAB fraudulently induced Steinman into the Contract and was in continuous material breach of the Contract, which terminated BAB's rights thereunder.

52.    Injunctive relief is necessary because there is no adequate remedy at law to protect Steinman's interest in its business, real property, business assets and restaurant equipment located at Shalimar Plaza that was the subject of the Contract.

53.    Steinman will suffer irreparable and irreversible harm if BAB is allowed to dispossess it of its interest in the real property, business assets and restaurant equipment located at Shalimar Plaza and subsequently shut down its business.

54.    Steinman will suffer irreparable irreversible harm by loss of goodwill and business reputation if Defendant is to dispossess it of its business.

55.    Allowing injunctive relief supports the public interest because it prevents BAB from benefitting from its breach of the Contract and  tortious conduct in inducing Steinman to enter into the Contract.

8

56.    Allowing injunctive relief supports the public interest because it precludes BAB from being unjustly enriched by taking over restaurant equipment for which it never paid any consideration or otherwise had an interest.

WHEREFORE, Steinman respectfully requests the Court enter an Order:

(a)    Temporarily and permanently enjoining BAB from dispossessing Steinman of its business, real property, business assets and restaurant equipment located at Shalimar Plaza by any means; and

(b)    Awarding Steinman any other relief the Court deems necessary.

I hereby certify that the foregoing is true and correct to the best of my knowledge and I submit these statements and facts under penalties of perjury.

STEINMAN & STEINMAN, INC.

By: MARC STEINMAN
Its: President

STATE OF FLORIDA
COUNTY OF OKALOOSA

I hereby certify that the foregoing was executed by MARC STEINMAN on behalf of Steinman & Steinman, Inc., who is personally known to me or who has presented _____ as identification this 1st day of June , 2008.



NOTARY PUBLIC

Lawrence Keefe
Florida Bar No. 603809
Zachary A. VanDyke
Florida Bar No. 020580
Anchors Smith Grimsley
909 Mar Walt Drive, Suite 1014
Fort Walton Beach, FL 32547
Phone: 850/863-4064 / Fax: 850/862-1138
E-mail: lkeefe@asglegal.com
        zvandyke@asglegal.com
Attorneys for Plaintiff Steinman &
Steinman, Inc.

9

LEASE

THIS INDENTURE OF LEASE, entered into this 1st day of May, 2007, by and between Shalimar Plaza, LLC, hereinafter referred to as "Landlord" and Steinman and Steinman, Inc. doing business as Big Apple Bagels hereinafter referred to as "Tenant".

WITNESSETH THAT:

In consideration of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord hereby leases to Tenant, and Tenant hereby takes from Landlord, the Premises, as defined in Section 1.1.(b).

TO HAVE AND TO HOLD the Premises for the Term, defined in Section 1.1 (c).

ARTICLE I

DEFINITIONS AND ENUMERATION OF EXHIBITS

1.1.   In addition to other terms which are elsewhere defined in this lease, the following terms when used in this lease shall have the meanings set forth in this section, and only such meanings, unless such meanings are expressly limited or expanded elsewhere herein

(a)  SHOPPING CENTER: (i) The real estate depicted or described on Exhibit "A", hereto attached; (ii) such contiguous real estate as Landlord may from time to time designate in writing as being included in Shopping Center; (iii) the buildings and improvements constructed on such real estate substantially in accordance with Exhibits "B" and "C", attached hereto, together with all alterations and additions thereto; and (iv) such improvements as may be constructed on such real estate after the Rental Commencement Date. Landlord reserves the right to change the number and location of buildings, building dimensions, and the Common Areas, provided that reasonable access to the Premises and the parking facilities provided within the Shopping Center shall not be materially impaired.

(b)  THE PREMISES: That portion of Shopping Center which is outlined in red on the floor plan, or plans, marked Exhibit "B", hereto attached. The Premises are deemed to contain approximately 2130 square feet of Gross Rentable Area, being approximately 24 feet of frontage and approximately 90 feet of depth extending to the center line of the party walls and to the exterior faces of all other walls, but reserving and excepting to Landlord the use of the roof and exterior walls (other than store fronts) and the right to install, maintain, use, repair, and replace pipes, ducts, conduits, wires, and appurtenant fixtures, leading through the Premises in locations which will not materially interfere with Tenant's use thereof.

(c)  READY FOR OCCUPANCY: When Landlord's Work on the Premises as described in Exhibit "C", hereto attached, has been substantially completed (except for minor finishing operations or items necessarily awaiting performance of Tenant's Work).

(d)  RENTAL COMMENCEMENT DATE:   May 1, 2007.

(e)  LEASE TERM OR TERM: The period of time commencing with the date of this lease and terminating two (2) years and zero (0) months after the Rental Commencement Date (April 30, 2009), unless such terminating date is other than the last day of a calendar month, in which event this lease shall terminate on the last day of the calendar month in which such date falls.

(f)  SCHEDULED COMPLETION DATE: Intentionally left blank.

(g)  MINIMUM GUARANTEED RENTAL: $25,560.00 per annum, payable $2,130.00 per month.

(h)  PERCENTAGE RENTAL RATE: zero (0) %

(i)  ADVANCE DEPOSIT: $ 0.00  applied as _____

(j)  SECURITY DEPOSIT: $

(k)  TENANT'S TRADE NAME:  Big Apple Bagels

(l)  TENANT'S WORK: Intentionally left blank

(m)  LANDLORD'S WORK: Intentionally left blank

(n)  LANDLORD'S MAILING ADDRESS: 105 Auburn Road, Fort Walton Beach, Florida 32547

(o)  TENANT'S MAILING ADDRESS: 1191-B Eglin Parkway, Shalimar FL 32579-1252 or such other address as may from time to time be designated by Tenant in a written notice to Landlord.

(p)  USE OF PREMISES:  The premises may be used on for sale of Bagels and related products (bagel chips, bagel sandwiches, bage pretzels); tenant may also sell muffins, cinnamon rolls, espresso and related drinks (cappuccino, latte, mocha, etc.); whole bean and ground coffee sales.  Upon prior approval of Landlord, Tenant may reasonably modify the use of the premises, including Tenant's trade name and Tenant's signage.  Such prior approval of Landlord will not be unreasonably withheld.

(q)  LANDLORD'S CONTRIBUTION TO TENANT'S WORK: n/a

(r)  COMMON AREAS:  Those areas of the Shopping Center, including all parking areas which are from time to time open for joint use by the tenants of Shopping Center or by the public including, without limiting the generality of the foregoing, driveways, truck ways delivery passages, walkways, concourses, malls, planted areas, landscaped areas, and public restrooms and common truck loading and receiving areas which are not leased to or reserved for individual tenants.

(s)  GROSS RENTABLE AREA: Floor area designed for tenant occupancy and exclusive use, measured from the exterior of outside walls and store fronts and from the center of party walls.

Initial here

Exhibit A

Page 1 of 20

WITNESS WHEREOF, the parties have caused this lease to be executed by their duly authorized officers and their corporate seals, if applicable, to be hereunto affixed the day and year first above written.

Signed, sealed and delivered by LANDLORD

29 day of _____May_____, 2007

_____Janice E. Allen_____
Witness

FOR: Shalimar Plaza, LLC, LANDLORD

BY: _____
~~Paul A. Whitworth, or~~  Jack Herms

ITS: ~~Managing Member~~ Management Member

CORPORATE  SEAL

Signed, sealed and delivered by TENANT

29 day of _____May_____, 2007

_____Jill H. Vegan_____
Witness

FOR: Steinman and Steinman, Inc., d/b/a Big Apple
Bagels
TENANT

BY: _____
Marc Steinman

ITS: Owner

CORPORATE  SEAL

GUARANTY

FOR VALUE RECEIVED and in consideration for and as an inducement to Landlord making the within lease with Tenant, the undersigned guarantees to Landlord, its heirs, successors and assigns, the full performance and observance of all the covenants, conditions and agreements therein provided to be performed and observed by Tenant without requiring any notice of non-payment, non-performance, or proof, or notice, or demand thereby to charge the undersigned therefore, all of which the undersigned hereby expressly waives and expressly agrees that the validity of this agreement and its obligations of the guarantor hereunder shall in no way be terminated, affected or impaired for reason of the assertion y Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provision of the within lease. The undersigned guarantor further covenants and agrees that this guaranty shall remain and continue in full force and effect as to any renewal, modification or extension of this lease.

Dated: ___05/29/07___, 2007

_____
Marc Steinman, Guarantor

_____
GUARANTOR

WITNESS:

_____Janice    Jack Herms_____

[NOTARY SEAL]
JANICE E. ALLEN
MY COMMISSION # DD 455149
EXPIRES: July 27, 2009
Bonded Thru Notary Public Underwriters

State of FLORIDA

County of OKALOOSA

On this 29 day of _____May_____, 2007
Personally came to me known and known to me to be the individual described in and who executed the foregoing guaranty and acknowledged to me that he executed the same.

_____Janice E. Allen_____

Notary Public
My Commission Expires:

 Initial here

EXHIBIT "G"

Special Stipulations

To the extent that the following Special Stipulations conflict with any of the printed provisions of this Lease, the Special
Stipulations shall control.

THE TENANT SHALL HAVE THE OPTION TO RENEW THIS LEASE FOR AN
ADDITIONAL TERM OF TWO (2) YEARS AT THE EXPIRATION OF THE INITIAL
TERM, UPON TERMS AND CONDITIONS TO BE MUTUALLY AGREED UPON
BY THE PARTIES.  IF NO MUTUAL AGREEMENT CAN BE REACHED FOR THE
RENEWAL TERMS AND CONDITIONS, THEN THIS LEASE SHLL END AND
THE TENANT SHALL VACATE THE PREMISES AT THE END OF THE INITIAL
LEASE TERM.

Initial here

# LEASE

THIS INDENTURE OF LEASE, entered into this _____ day of _____, 19___.

by and between  LEO A. WHITWORTH, JR.

hereinafter referred to as "Landlord" and  JON A. AND ELAINE E. WEEKS  D/B/A

BIG APPLE BAGELS

of  1727 BOLTON VILLAGE LANE, NICEVILLE, FLORIDA 32578

hereinafter referred to as "Tenant."

## WITNESSETH THAT:

In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord hereby leases to Tenant, and Tenant hereby takes from Landlord, the Premises, as defined in Section 1.1.(b).

TO HAVE AND TO HOLD the Premises for the Term, defined in Section 1.1 (e).

# ARTICLE I

## DEFINITIONS AND ENUMERATION OF EXHIBITS

1.1 In addition to other terms which are elsewhere defined in this lease, the following terms when used in this lease shall have the meanings set forth in this section, and only such meanings, unless such meanings are expressly limited or expanded elsewhere herein:

(a) SHOPPING CENTER: (i) The real estate depicted or described on Exhibit "A," hereto attached; (ii) such contiguous real estate as Landlord may from time to time designate in writing as being included in Shopping Center; (iii) the buildings and improvements constructed on such real estate substantially in accordance with Exhibits "B" and "C", attached hereto, together with all alterations and additions thereto; and (iv) such improvements as may be constructed on such real estate after the Rental Commencement Date. Landlord reserves the right to change the number and location of buildings, building dimensions, and the Common Areas, provided that reasonable access to the Premises and the parking facilities provided within the Shopping Center shall not be materially impaired.

(b) THE PREMISES: That portion of Shopping Center which is outlined in red on the floor plan, or plans, marked Exhibit "B," hereto attached. The Premises are deemed to contain approximately _____2130_____ square feet of Gross Rentable Area, being approximately _____24_____ feet of frontage and approximately _____90_____ feet of depth extending to the center line of the party walls and to the exterior faces of all other walls, but reserving and excepting to Landlord the use of the roof and exterior walls (other than store fronts) and the right to install, maintain, use, repair, and replace pipes, ducts, conduits, wires, and appurtenant fixtures, leading through the Premises in locations which will not materially interfere with Tenant's use thereof.

(c) READY FOR OCCUPANCY: When Landlord's Work on the Premises as described in Exhibit "C", hereto attached, has been substantially completed (except for minor finishing operations or items necessarily awaiting performance of Tenant's Work).

(d) RENTAL COMMENCEMENT DATE: Either (i) NOVEMBER 1, 1997 or DATE TENANT OPENS FOR BUSINESS (FIRST TO OCCUR), or (ii) thirty (30) days following the date on which the Premises are Ready for Occupancy or the date upon which Tenant opens the Premises to the public, whichever shall first occur.

(e) LEASE TERM OR TERM: The period of time commencing with the date of this lease and terminating  *FIVE (5)  years and ZERO (0)  months after the Rental Commencement Date, unless such terminating date is other than the last day of a calendar month, in which event this lease shall terminate on the last day of the calendar month in which such date falls.

(f) SCHEDULED COMPLETION DATE: _____N/A_____

(g) MINIMUM GUARANTEED RENTAL: $ _21,300.00 *_ per annum, payable $ _1,775.00_ per month.

(h) PERCENTAGE RENTAL RATE: ( _0_ %)

(i) ADVANCE DEPOSIT: $_1,775.00_ applied as _1st MONTH'S RENT_

(j) SECURITY DEPOSIT: _N/A_

(k) TENANT'S TRADE NAME: _BIG APPLE BAGELS_

(l) TENANT'S WORK: those items set forth on Exhibit "C" to be performed by Tenant.

(m) LANDLORD'S WORK: those items set forth in Exhibit "C" to be performed by Landlord.

(n) LANDLORD'S MAILING ADDRESS: _105 AUBURN AVENUE, FORT WALTON BEACH, FLORIDA 32568_

or such other address as may from time to time be designated by Landlord in a written notice to Tenant.

(o) TENANT'S MAILING ADDRESS: _1727 BOLTON VILLAGE LANE_
street
_NICEVILLE_          _OKALOOSA_          _FLORIDA 32578_
city          county          state/zip code
or such other address as may from time to time be designated by Tenant in a written notice to Landlord.

(p) USE OF PREMISES: The Premises may be used only for _BAGELS AND RELATED PRODUCTS (bagel chips, bagel sandwiches, bagel pretzels); tenant may also sell muffins, cinnamon rolls, expresso and related drinks (cappucino, latte, mocha, etc.); whole bean and ground coffee sales. /If Icehouse closes or discontinues selling cookies in shalimar plaza, tenant may then sell cookies._

PLEASE INITIAL

*SEE EXHIBIT "C" SPECIAL STIPULATION, FOR FIRST OPTION TERM
AND SECOND OPTION TERM.

## OFFICIAL STIPULATIONS

To the extent that the following Special Stipulations conflict with any of the printed provisions of this lease, the Special Stipulations shall control.

OPTIONS:

The Tenant shall have two (2) five (5) year options for renewal of their lease. The Tenant must provide written notice to the Landlord within One hundred twenty (120) days prior to the expiration of the original lease term and any renewal thereof of its intent to exercise the option.  Failure to provide such notice shall cancel any option rights hereunder.  Rent for option periods shall be as follows:

A.  FIRST OPTION TERM:  5 YEARS

| RENT | $/SQUARE FOOT | ANNUALLY | MONTHLY |
|------|---------------|----------|---------|
| YEAR 6-10 | $12.00 | $25,560.00 | $2,130.00 |

B.  SECOND OPTION TERM:  5 YEARS

| RENT | $/SQUARE FOOT | ANNUALLY | MONTHLY |
|------|---------------|----------|---------|
| YEAR 11-15 | $14.00 | $29,820.00 | $2,485.00 |

## EXHIBIT B

FRANCHISE AGREEMENT

between

BAB SYSTEMS, INC.

AND

FRANCHISEE:        **Marc Steinman, Marvin Steinman, and Lee Steinman**

DATED:        **June 11, 1998**

LOCATION OF STORE:    **Shalimar Plaza
1191-B Eglin Parkway
Shalimar, Florida 32579**

This Franchise Agreement is for a (check one):

    __ XX __        BAB Production Store

    _____        BAB Satellite/Kiosk Store

    _____        BAB Cart (Cart Addendum must be executed with this
                                Franchise Agreement)

NOTE: In this document, for convenience sake only, pronouns used in referring to the Franchisee are "he," "him," or "his." Franchisor does not in any manner wish to imply that only males are qualified, suitable, or appropriate for the Franchise described in this Franchise Agreement. Franchisor does not intend by its use of male pronouns to exclude females from consideration, and it encourages applicants of both genders.

# TABLE OF CONTENTS

**Section**                                                                    **Page**

GLOSSARY OF TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iii
RECITALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.    GRANT OF FRANCHISE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.    TERM AND RENEWAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
3.    LOCATION AND DEVELOPMENT OF STORE . . . . . . . . . . . . . . . 4
4.    TRAINING AND GUIDANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
5.    MARKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
6.    PROPRIETARY INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . 13
7.    RELATIONSHIP OF THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . 14
8.    FRANCHISE AND OTHER FEES . . . . . . . . . . . . . . . . . . . . . . . . . . 15
9.    OPERATING STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10.   MARKETING AND PROMOTION . . . . . . . . . . . . . . . . . . . . . . . . . 24
11.   RECORDS AND REPORTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
12.   INSPECTIONS AND AUDITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
13.   TRANSFER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
14.   TERMINATION BY FRANCHISEE . . . . . . . . . . . . . . . . . . . . . . . . 33
15.   TERMINATION BY FRANCHISOR . . . . . . . . . . . . . . . . . . . . . . . . 34
16.   RIGHTS OF FRANCHISOR AND OBLIGATIONS OF
      FRANCHISEE UPON TERMINATION OR
      EXPIRATION OF THE FRANCHISE . . . . . . . . . . . . . . . . . . . . . . . 36
17.   ENFORCEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
18.   NOTICES AND PAYMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
19.   ACKNOWLEDGEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Rider A - Location of Store
Rider B - Collateral Assignment of Lease
Rider C - Guaranty and Assumption of Obligations
Rider D - State Addendum (if applicable)

## Glossary of Terms

The following terms are defined in this Agreement in the Sections or Paragraphs noted:

Affiliate ......................................................................................................17.j.

Attorneys' fees 17.j.

BAB Cart ...............................................................................Recitals, Paragraph B

BAB Production Store .........................................................Recitals, Paragraph B

BAB Satellite/Kiosk Store ..................................................Recitals, Paragraph B

BAB Systems Store...............................................................Recitals, Paragraph B

Book Value ........................................................................................... 16.f.ii

Brewster's ........................................................................... Recitals, Paragraph A

Competitive Business........................................................................................ 9.f.

Controlling interest..........................................................................................17.j.

Franchise ...........................................................Recitals, Paragraph C, 1.a.

Franchisee ...............................................................................1.a., 17.j.

Gross Revenues....................................................................................... 8.c.

Licensor ............................................................................ Recitals, Paragraph A

LLC .......................................................................................12.a.i.

Marketing Fund..............................................................................10.a.

Marks ................................................................................... Recitals, Paragraph A

My Favorite Muffin............................................................. Recitals, Paragraph A

Operations Manual.......................................................................................4.b.

Outlet ..................................................................................Recitals, Paragraph B

Permanent disability................................................................................14.c.iii.

Proprietary Information...............................................................................6.a.

Premises ..................................................................................... Rider B

Purchased Assets..................................................................................... 16.f.i

Reporting Week ..................................................................................8.b.

Store ....................................................................................Recitals, Paragraph B

System ................................................................................... Recitals, Paragraph A

Term ........................................................................................2.a.

Unit ......................................................................................Recitals, Paragraph B

Useful Life ..................................................................................... 16.f.iii

Wholesale Program ...........................................................Recitals, Paragraph E

BAB SYSTEMS, INC.
FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement") with effective date of __  __  __ .
__  __  _____, 1998 (acceptance date by Franchisor), by and between BAB Systems,
Inc., an Illinois corporation ("Franchisor"), whose principal address is 8501 W. Higgins Road, Suite
320, Chicago, Illinois 60631, and **Marc Steinman, Marvin Steinman and Lee Steinman**
("Franchisee"), whose principal address is **381 Santa Rosa Boulevard, C-704, Fort Walton
Beach, Florida 32548.**

## RECITALS:

A. Franchisor operates a franchise distribution system pursuant to a trademark licensing
agreement with BAB Holdings, Inc. ("Licensor"), an Illinois corporation, to own and operate bagel
stores ("BAB Production Stores," "BAB Satellite/Kiosk Stores," and "BAB Carts," as defined in
Paragraph B of these Recitals) for retail distribution. These Stores will be operated under the
trademark and service mark "Big Apple Bagels," plus design, and such other trademarks, service
marks and commercial symbols ("Marks") as will be authorized from time to time by Franchisor,
including, but not limited to "Brewster's" used in connection with coffee products, and "My
Favorite Muffin" products used in connection with muffins sold in the Stores. Brewster's Franchise
Corporation and My Favorite Muffin Too, Inc. ("MFM") are affiliates of Franchisor. Such Stores
will also be operated in accordance with certain required formats, systems, methods of distribution,
standards and procedures, and trade dress, all of which may be improved, further developed or
otherwise modified from time to time by Franchisor ("System").

B. A "BAB Production Store" is a store which has the capacity for the production,
baking, sale, retail distribution, and on-site consumption of bagels, and the production, sale, and
retail distribution of cream cheeses. A "BAB Satellite/Kiosk Store" is a store which is generally
larger than 250 square feet and has the capacity for limited production of bagels (but will not have a
large mixer or a bagel divider/former), in addition to retail distribution and on-site consumption of
bagels and cream cheeses. A "BAB Cart" is a mobile transportable unit which has a limited menu,
no seating, and is dependent on a BAB Production Store owned by the Franchisee of the BAB Cart,
for its supply of proprietary products. Bagels will not be produced at the BAB Cart. A
BAB Production Store, BAB Satellite/Kiosk Store, and BAB Cart will be referred to generically,
collectively or individually as "BAB Systems Store," "Store," "Unit," or Outlet."

C. Franchisor grants to certain persons who meet Franchisor's qualifications a franchise
("Franchise") to own and operate a BAB Systems Store utilizing the Marks and System.

D. Franchisee has applied for a license to own and operate a BAB Systems Store at the
location described in Rider A to this Agreement. Such application has been approved by
Franchisor in reliance upon all of the representations made therein. Franchisee represents to
Franchisor, as an inducement to Franchisor's entry into this Agreement, that Franchisee has made

no misrepresentations in obtaining the Franchise herein granted.

E. The grant of the right of Franchisee to distribute products through non-retail channels of distribution is strictly at the discretion of Franchisor, and shall be by execution of the Wholesale Program Addendum to the franchise agreement.

I.    **GRANT OF FRANCHISE.**

a.    **Grant.** Subject to the provisions of this Agreement, Franchisor hereby grants to Franchisee a franchise ("Franchise") to operate a:

  __XX__         BAB Production Store

  __ __          BAB Satellite/Kiosk Store

  ____           BAB Cart

("Store") in or at the following general location (when the exact location is determined, the parties will complete Rider A):

**Shalimar Plaza**
**1191-Beglin Parkway**
**Shalimar, Florida 32579**

and to use the Marks and the System in the operation thereof. Termination or expiration of this Agreement shall constitute a termination or expiration of the Franchise. Franchisee agrees that he will at all times faithfully, honestly and diligently perform his obligations hereunder, and that he will continuously exert his best efforts to promote and enhance the business of the Store and the goodwill of the Marks.

b.    **Restrictions Upon Franchisee's Channels of Distribution.** Franchisee is restricted solely to the retail sale of products sold under this Agreement. Franchisee is expressly prohibited from engaging in the wholesale distribution of products under this Agreement, unless Franchisee and Franchisor have entered into a Wholesale Program Addendum. The rights herein granted to Franchisee are specifically limited to the operation of business from the Store location. Franchisee shall not solicit for business, promote the business, and/or offer and sell products sold under this Agreement through the use of a toll-free number, catalog, or the Internet or any other computer on-line service.

c.    **Rights Reserved By Franchisor.** Except as otherwise provided herein, Franchisor (on behalf of itself and its affiliates) retains the right, in its sole discretion and

without granting any rights to Franchisee:

i.    to operate, or to grant other persons the right to operate, Stores at such locations and on such terms and conditions as Franchisor deems appropriate; and

ii.    to sell the products and services authorized for Stores under the Marks or other trademarks, service marks and commercial symbols through similar or dissimilar channels of distribution and pursuant to such terms and conditions as Franchisor deems appropriate.

2.    **TERM AND RENEWAL.**

a.    **Term.** If this Agreement is for the grant of a BAB Production Store Franchise, the term of this Agreement (the "Term") shall commence on the date of this Agreement and expire at the earlier of: (i) ten (10) years from such date or (ii) on the expiration date of the lease (including renewal) for the premises of the BAB Production Store, unless sooner terminated as provided in Sections 14 and 15 hereof. If this Agreement is for the grant of a BAB Satellite/Kiosk Store Franchise, the term of this Agreement shall commence on the date of this Agreement and expire at the earlier of: (i) ten (10) years from such date; (ii) on the expiration date of the lease (including renewal) for the premises of the BAB Satellite/Kiosk Store, or (iii) on the expiration or termination of the Franchise Agreement of Franchisee's Production Store, unless sooner terminated as provided in Sections 14 and 15 hereof. See the BAB Cart Addendum regarding the term and renewal of the BAB Cart Franchise.

b.    **Renewal.**

i.    For a BAB Production Store Franchise, a BAB Satellite/Kiosk Store Franchise, or a BAB Cart Franchise, Franchisee may, at his option, renew the Franchise for two additional ten (10) year terms or for a term equal to the renewal term of the lease for the premises of the Store, whichever is shorter, unless sooner terminated as provided in Sections 14 and 15 hereof, provided that:

(a)    Franchisee has given Franchisor written notice of his election to renew not less than six (6) months nor more than twelve (12) months prior to the end of the then-current term. An election by Franchisee to renew the lease or sublease for the premises of the Store or to execute a new lease or sublease for such premises shall be deemed an election by Franchisee to renew the franchise for the then-current term of such lease or sublease;

(b)    Franchisee is not at such time in material breach of any of his

obligations under this Agreement or any other agreement between Franchisee and Franchisor or any of its affiliates;

(c)    Franchisee has substantially complied with all the terms and conditions of this Agreement and has met the operating and quality standards and procedures prescribed by Franchisor for BAB Systems Stores during the Term;

(d)    Franchisee has satisfied all monetary obligations owed to Franchisor, its affiliates and designated suppliers, and has timely met these obligations throughout the Term;

(e)    Franchisee has agreed to upgrade the Store to Franchisor's then-current standards of decor, equipment, and product offerings;

(f)    Franchisee has paid Franchisor the renewal fee of Two Thousand Five Hundred Dollars ($2,500.00);

(g)    Franchisee complies with Franchisor's then-current qualification and training requirements; and

(h)    Franchisee executes a general release, in a form prescribed by Franchisor, of any claims against Franchisor and its officers, directors, agents and employees.

ii.    Renewal of this Agreement shall be effectuated by the execution by Franchisor and Franchisee of the then current form of standard franchise agreement and all other agreements and legal instruments and documents then customarily used by Franchisor in the granting of Franchises for BAB Systems Stores, which may contain substantially different provisions from this Agreement, including higher or lower royalty fees and Marketing Fund contributions, except that no initial franchise fee shall be payable upon any such renewal.

3.   **LOCATION AND DEVELOPMENT OF STORE**

    a.   **Location and Lease.**

        i.   Franchisee may operate the Store only at the location specified in Paragraph 1.a. and Rider A to this Agreement and may not relocate the Store except with Franchisor's prior written consent. If the site for the Store has not been located by Franchisee at the time of execution of this Agreement, Franchisee agrees to locate and submit to Franchisor for approval, within ninety (90) days after the date of execution of this Agreement, a site suitable for the operation of a BAB Systems Store and acceptable to Franchisor. Franchisee must use a licensed real estate broker who specializes in commercial real estate. Franchisee must locate the site for his Store and submit a complete site report to Franchisor in accordance with Franchisor's Real Estate Site Manual. Franchisor shall assist Franchisee in the selection and shall not unreasonably withhold its approval of a site that meets its standard site selection criteria for demographic characteristics, traffic patterns, parking, character of neighborhood, competition from other businesses within the area, the proximity to the site and other commercial characteristics, and the size, appearance and other physical characteristics of the site.

        ii.   Franchisee shall submit the lease for the premises of the Store to Franchisor prior to its execution for Franchisor's examination and approval. The lease for the premises of the Store shall state that the premises shall be used only for a BAB Systems Store and contain substantially the following provisions:

            "Anything contained in this lease to the contrary notwithstanding, Lessor agrees that, without its consent, this lease and the right, title and interest of the Lessee thereunder, may be assigned by the Lessee to BAB Systems, Inc., an Illinois Corporation, or its designee, provided that said BAB Systems, Inc. or its designee shall execute such documents evidencing its agreement to thereafter keep and perform, or cause to be kept or performed, all of the obligations of the Lessee arising under this lease from and after the time of such assignment."

            "Lessor agrees that Lessor shall, upon written request of BAB Systems, Inc., disclose to said corporation, all reports, information or data in Lessor's possession with respect to sales made in, upon or from the leased premises."

            "Lessor shall give written notice to BAB Systems, Inc., an

Illinois corporation (concurrently with the giving of such notice to Lessee), of any default by Lessee under the lease and the said BAB Systems, Inc. shall have, after the expiration of the period during which the Lessee may cure such default, an additional thirty (30) days to cure, at its sole option, any such default."

iii.    Franchisee agrees that he will not execute a lease which has for any reason been disapproved by Franchisor. Franchisee shall deliver a copy of the signed lease to Franchisor within fifteen (15) days of execution thereof.

iv.    Franchisee shall execute a Collateral Assignment of Lease, attached hereto as Rider B, by which Franchisee assigns to Franchisor all of his right, title and interest as tenant under the lease for the Store premises. The assignment is for collateral purposes and may be exercised only upon a default by Franchisee under his lease or under this Agreement. Franchisor's approval of Franchisee's lease is conditioned on receipt of the signed Collateral Assignment.

v.    Franchisee's execution of a lease for a site for the Store shall constitute acceptance by Franchisee of such site and location and of the terms of such lease, sublease or purchase.

b.    <u>Store Development.</u> Franchisee agrees that prior to obtaining possession of the site for the Store, he shall secure all financing required to fully develop the Store. Franchisee further agrees that, promptly after obtaining possession of the site for the Store, he will: (a) cause to be prepared and submit for approval by Franchisor a site plan [Franchisor shall then provide basic drawings and specifications [including requirements for dimensions, exterior design, materials, interior layout, equipment, fixtures, furniture, signs, and decorating) required for the development of a BAB Systems Store; Franchisee is required to take these drawings and specifications to an approved architect who will modify them, if required, to meet applicable ordinances, building codes or permit requirements (Franchisor must approve any such modifications to the drawings and specifications)]; (b) obtain all required zoning changes, all required building, utility, health, sanitation and sign permits and any other required permits and licenses; (c) purchase or lease equipment, fixtures, furniture and signs as hereinafter provided; (d) complete the construction and/or remodeling, equip, furnish and decorate the Store in full and strict compliance with plans and specifications approved by Franchisor and all applicable ordinances, building codes and permit requirements; and (e) obtain all customary contractors' sworn statements and partial and final waivers of lien for construction, remodeling, decorating and installation services. Once the Store is established and approved by BAB, no changes in the interior or exterior design of the Store or the equipment or fixtures used within may be made without prior written consent of BAB.

c.    **Equipment, Fixtures, Furniture, Cash Registers and Signs.** Franchisee agrees to use in the operation of the Store only those brands and models of equipment, fixtures, furniture, cash registers, fax machines, exterior and interior signs, decor items and tableware that Franchisor has approved for use in BAB Systems Stores as meeting its requirements for performance, warranties, design and appearance. Franchisee may purchase or lease original and replacement equipment, fixtures, furniture, cash registers, fax machines, signs, decor items or tableware meeting such specifications from any source approved by Franchisor (which may include Franchisor and/or its affiliates). If Franchisee proposes to purchase or lease any item of equipment, fixtures, furniture, cash registers, fax machines, signs, decor items or tableware not theretofore approved by Franchisor as meeting its specifications, Franchisee shall first notify Franchisor, and Franchisor may require submission of sufficient specifications, photographs, drawings and/or other information and samples to determine whether such items meet its specifications. Franchisor shall have the right to charge Franchisee a reasonable fee to cover Franchisor's costs incurred in making such determination. Franchisor shall advise Franchisee within a reasonable time whether such item meets its specifications. Franchisor shall provide Franchisee with one cash register which meets Franchisor's specifications which cost shall be included in the initial franchise fee. Franchisee shall use said cash register in the operation of the Store.

No vending machines, unapproved newspapers or periodicals, juke boxes or other music producing machines, gum or candy machines, games, pinball machines or other mechanical devices (including pay telephones and cigarette vending machines) shall be installed or operated at the Store without Franchisor's prior written consent.

d.    **Store Refurbishing.**

i.    Subject to the terms and conditions hereinafter set forth, Franchisee agrees to effect such refurbishing of the Store (in addition to regular maintenance and repair) as Franchisor from time to time reasonably requires to maintain or improve the appearance and efficient operation of the Store, to comply with Franchisor's then-current standards for a BAB Systems Store, and/or to accommodate new products and services that BAB requires Franchisee to offer. Refurbishing may include: (a) the substitution or addition of new or improved equipment; (b) the substitution or addition of new or improved fixtures, furniture and signs; (c) replacement of worn out or obsolete equipment, fixtures, furniture and signs; (d) redecorating; (e) repair of the interior and exterior of the premises; and (f) structural modifications and remodeling of the premises.

ii.    Franchisee's obligation to refurbish the Store as hereinabove provided shall be subject to the following terms and conditions: (a) Franchisee shall not be

required to make aggregate expenditures for refurbishing described in items (b) through (f) of Paragraph 3.d.i. above in excess of two percent (2%) of the cumulative Gross Revenues of the Store of the four preceding years to the date of any such required refurbishing; (b) Franchisee shall not be required to effect any refurbishing of the Store during the last twelve (12) months of the initial or any renewal term of the Franchise except in connection with a renewal of the Franchise; and (c) the substitution or addition of new or improved equipment shall be completed within six (6) months of Franchisee's receipt of notice thereof from Franchisor. All other refurbishing shall be completed within twelve (12) months of Franchisee's receipt of notice thereof from Franchisor.

e.    **Store Opening**.  Franchisee shall complete development of the Store, obtain all licenses required by Franchisor for the operation of the Store and have the Store ready to open and commence the conduct of its business by the earlier of

    i.    four (4) months after Franchisee obtains possession of such site or

    ii.    four (4) months from the date of this Agreement if Franchisee has possession of such site on the date hereof, or

    iii.    ten (10) months from the date of this Agreement.

If Franchisee fails to commence the conduct of business by the deadline set forth above in this Subparagraph 3.e., then this Agreement and the Franchise granted hereby may, at the sole option of Franchisor, be terminated upon the giving of written notice to Franchisee by Franchisor.

f.    **Grand Opening Program**.  Franchisee shall conduct a grand opening program for the Store during the first ninety (90) days after the opening of the Store. Upon execution of this Agreement, Franchisee shall deposit with the Franchisor a Grand Opening Deposit in the amount of Three Thousand Dollars ($3,000.00). The grand opening program shall conform to Franchisor's requirements and shall utilize the media and advertising formats designated by Franchisor. Upon the Franchisee submitting verification to Franchisor of his grand opening expenditures, Franchisor will reimburse Franchisee or pay approved invoices.

g.    <u>Relocation of Store</u>.

    i.    If Franchisee's lease for the premise of the Store terminates without fault of Franchisee, or expires and is unable to be renewed by Franchisee on substantially the same terms and conditions, or if in the judgment of Franchisor and Franchisee there is a change in the character of the location of the Store sufficiently detrimental to its business potential to warrant its relocation, Franchisor shall grant permission for relocation of the Store to a location approved by Franchisor. Any such relocation shall be at Franchisee's sole expense, and shall not be undertaken without Franchisor's prior written consent. Franchisor shall have the right to charge Franchisee for services Franchisor renders to Franchisee in connection with such relocation. Franchisor shall also have the right to require Franchisee to upgrade the relocated Store to conform to Franchisor's then current image, standards, and specifications for construction and equipment for all new BAB Systems Stores.

    ii.    In the event of a relocation of the Store, Franchisee shall promptly remove from the former Store premises any and all signs, fixtures, furniture, posters, furnishing, equipment, menus, advertising materials, stationery, supplies, forms and other articles which display any of the Marks and distinctive features or designs associated with the System. Any articles which display any of the Marks or any distinctive features or designs associated with the System which are not used by Franchisee at the new Store location shall be disposed of by Franchisee as directed by Franchisor following notice to Franchisor to the effect such articles will not be used at the new Store. Furthermore, Franchisee shall, at Franchisee's expense, immediately make such modifications or alterations as may be necessary to distinguish the former Store premises so clearly from its former appearance and from other BAB Systems Stores so to prevent any possibility of confusion by the public (including, without limitation, removal of all distinctive physical and structural features identifying BAB Systems Stores and removal of all distinctive signs and emblems). Franchisee shall, at Franchisee's expense, make such specific additional changes as Franchisor may reasonably request for this purpose. If Franchisee fails to initiate immediately or complete such alterations within such period of time as Franchisor deems appropriate, Franchisee agrees that Franchisor or its designated agents may enter the premises of the former Store and adjacent areas at any time to make such alterations as Franchisor deems appropriate to distinguish Franchisee's former Store premises, without liability for trespass. Franchisee expressly acknowledges that failure to make such alterations will cause irreparable injury to Franchisor and hereby consents to entry, at Franchisee's expense, of any ex parte order by any court of competent jurisdiction authorizing

Franchisor or its agents to take such action, if Franchisor seeks such an order. Compliance with the foregoing shall be a condition subsequent to Franchisor's approval of any relocation request by Franchisee, and in the event complete de-identification of the former Store premises is not properly and completely undertaken, Franchisor may then revoke its permission for relocation and declare a default under this Agreement.

4.　　**TRAINING AND GUIDANCE.**

a.　　**Training.** Franchisor shall furnish to Franchisee and one additional person designated by Franchisee an initial training program in all phases of the operations of a BAB Systems Store, including unit operations, bookkeeping, inventory management, and local Store marketing. Such training program shall be for a minimum of ten (10) days at Franchisor's training facility and a Store location. Franchisor shall also furnish on-site training at Franchisee's Store around the time of the Store opening. Franchisee shall complete the initial training programs to the satisfaction of Franchisor. If Franchisor provides refresher and supplemental training programs, Franchisee is required to attend such training. Franchisee shall be responsible for the travel and living expenses (including local transportation expenses) incurred while attending the initial training program and any refresher training programs.

b.　　**Guidance and Assistance.** Franchisor shall furnish guidance to Franchisee with respect to: (1) specifications, standards and operating procedures utilized by BAB Systems Stores, and any modifications thereof; (2) purchasing approved equipment, furniture, cash registers, signs, operating materials and supplies; (3) methods of food preparation and sale and improvements thereon; and (4) the establishment and maintenance of administrative, bookkeeping, accounting and general operating and management procedures. Such guidance shall, in the discretion of Franchisor, be furnished in or supplemented by Franchisor's operations manual (the "Operations Manual"), bulletins, written reports and recommendations, other written materials, and/or telephonic consultations or consultations at the offices of Franchisor or at Franchisee's office. Franchisor shall advise Franchisee from time to time of operational concerns at or in Franchisee's Store as disclosed by reports submitted to or inspections made by Franchisor. Franchisor shall make no separate charge to Franchisee for such operating assistance, provided that Franchisor may make reasonable charges for forms and other materials supplied to Franchisee and for operating assistance made necessary in the judgment of Franchisor as a result of Franchisee's failure to comply with any provision of this Agreement or any specification, standard or operating procedure prescribed by Franchisor or operating assistance requested by Franchisee in excess of that normally provided by Franchisor.

c.　　**Operations Manual.** Franchisor will loan to Franchisee during the term of the

Franchise one copy of the Operations Manual. The Operations Manual shall contain mandatory and suggested specifications, standards, and operating procedures prescribed from time to time by Franchisor for a BAB Systems Store and information relative to other obligations of Franchisee hereunder. The Operations Manual may be modified from time to time to reflect changes in the specifications, standards and operating procedures of BAB Systems Stores. Franchisee shall keep his copy of the Operations Manual current by immediately inserting all modified pages furnished by Franchisor for the Operations Manual and received by Franchisee. In the event of a dispute relative to the contents of the Operations Manual, the master copies maintained by Franchisor at its principal office shall be controlling. Franchisee may not at any time copy any part of the Operations Manual or remove it from his place of business.

d.    <u>Submittal of Location to Mrs. Field's</u>.    In the event Franchisor approves Franchisee's location for the sale of Mrs. Field's products, Franchisor will submit Franchisee's location to Mrs. Field's for its evaluation whether it will offer Franchisee a license agreement for the sale of Mrs. Field's baked goods at Franchisee's Store. If Franchisee's location is approved by Mrs. Field's, Franchisee has the option of entering into or declining to enter into said license agreement.

5.    <u>MARKS</u>.

a.    <u>Ownership and Goodwill of Marks</u>. Franchisee acknowledges that Licensor owns the Marks and that Franchisor has been authorized by Licensor to use the Marks in connection with its franchise program. Franchisee's right to use the Marks is derived solely from this Agreement and is limited to the conduct of business pursuant to and in compliance with this Agreement and all applicable specifications, standards and operating procedures prescribed by Franchisor from time to time during the Term. Any unauthorized use of the Marks by Franchisee shall constitute an infringement of the rights of Franchisor and Licensor in and to the Marks. Franchisee agrees that all usage of the Marks by Franchisee and any goodwill established thereby shall inure to the exclusive benefit of Franchisor and Licensor, and Franchisee acknowledges that this Agreement does not confer any goodwill or other interests in the Marks upon Franchisee. Franchisee shall not, at any time during the term of this Agreement or after its termination or expiration, contest the validity or ownership of any of the Marks or assist any others in contesting the validity or ownership of any of the Marks. All provisions of this Agreement applicable to the Marks shall apply to any additional trademarks, service marks, logo forms and commercial symbols hereafter authorized for use by and licensed to Franchisee pursuant to this Agreement.

b.    <u>Limitations on Use of Marks</u>. Franchisee agrees to use the Marks as the sole identification of the Store, provided that Franchisee shall identify itself as the independent owner thereof in the manner prescribed by Franchisor. Franchisee shall

not use any Mark as part of any corporate or trade name or with any prefix, suffix or other modifying words, nicknames, terms, designs or symbols, or in any modified form (including, without limitation, any local or special adaptations or artistic variations of any of the Marks), nor may Franchisee use any Mark in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized in writing by Franchisor. Franchisee shall not for his own account register the Marks on the Internet or any other computer on-line service, create and maintain his own web site on the Internet using the Marks, or use the Marks on the Internet in any other manner. Franchisee agrees to display the Marks prominently and in the manner prescribed by Franchisor on signs, forms, and other materials and articles. Further, Franchisee agrees to give such notices of trademark or service mark ownership or registration and copyrights as Franchisor specifies and to obtain such fictitious or assumed name registrations as may be required under applicable law. Any and all uses of any of the Marks shall include such information and samples as Franchisor may require. Franchisee may not use "Big Apple Bagels" or "BAB" or a derivative thereof in its corporate, assumed, or other formal name.

c.    **Notification of Infringements and Claims.** Franchisee shall notify Franchisor immediately in writing of any apparent infringement of or challenge to Franchisee's use of any Mark, or claim by any person other than Franchisor or its affiliates of any rights in any Mark or any similar trade name, trademark, or service mark of which Franchisee becomes aware. Franchisee shall not communicate with any person other than Franchisor and its counsel in connection with any such infringement, challenge or claim. Franchisor has sole discretion to take such action as it deems appropriate and to control exclusively any litigation, U. S. Patent and Trademark Office proceeding or any other administrative proceeding arising out of any infringement, challenge or claim or otherwise relating to any Mark. Franchisee agrees to execute any and all instruments and documents, render such assistance and do such acts and things as may, in the opinion of counsel for Franchisor, be necessary or advisable to protect and maintain the interests of Franchisor in any such litigation, U.S. Patent and Trademark Office proceeding or other administrative proceedings or otherwise to protect and maintain the interests of Franchisor in the Marks.

d.    **Discontinuance of Use of Marks.** If it becomes advisable at any time, in Franchisor's sole discretion, for Franchisor and/or Franchisee to modify or discontinue use of any Mark, and/or use one or more substitute trademarks or service marks, Franchisee agrees to comply therewith within a reasonable time after notice thereof by Franchisor and Franchisor's sole obligation shall be to reimburse Franchisee for his out-of-pocket expenses of complying with these obligations.

e.    **Indemnification of Franchisee.** Franchisor agrees to indemnify Franchisee against and to reimburse Franchisee for all direct, but not consequential (including, but not limited to, loss of revenue and/or profits), damages for which Franchisee is held

-12-

liable in any proceeding arising out of the use of any Mark pursuant to and in compliance with this Agreement, and for all costs reasonably incurred by Franchisee in the defense of any such claim brought against it or in any such proceeding in which it is named as a party, provided that Franchisee has timely notified Franchisor of such claim or proceeding and has otherwise complied with this Agreement, and that Franchisor shall have the right to defend any such claim. If Franchisor defends such claim, Franchisor shall have no obligation to indemnify or reimburse Franchisee with respect to any fees or disbursements of any attorney retained by Franchisee.

6.    **PROPRIETARY INFORMATION.**

   a.    **The Proprietary Information.** Franchisor possesses certain proprietary information, consisting of the recipes, methods, techniques, formats, specifications, procedures, information, systems, and knowledge of and experience in the operation and marketing of BAB Systems Stores ("the Proprietary Information"). Any and all information, processes or techniques which Franchisor designates as confidential or proprietary shall be deemed Proprietary Information. Franchisor may disclose the Proprietary Information to Franchisee through furnishing Franchisee sample drawings and specifications for development and operation of the Store, training programs, the Operations Manual and through guidance furnished to Franchisee during the term of this Agreement. Franchisee shall fully and promptly disclose to Franchisor all ideas, concepts, methods and techniques relating to the development and/or operation of a bagel store conceived or developed by Franchisee and/or his employees during the term of this Agreement. Franchisee agrees that Franchisor shall have the perpetual right to use and authorize other BAB Systems Stores to use such ideas, concepts, methods and techniques and if incorporated into Franchisor's System for the development and/or operation of BAB Systems Stores, such ideas, concepts, methods and techniques will become the sole and exclusive property of Franchisor without further consideration to Franchisee.

   b.    **Limitations on Franchisee's Use.** Franchisee acknowledges and agrees that it will not acquire any interest in the Proprietary Information, other than the right to utilize the same in the development and operation of the Store pursuant to this Agreement and in accordance with the terms of this Agreement or other agreements between Franchisee and Franchisor or its affiliates, and that the use or duplication of the Proprietary Information in any other business would constitute an unfair method of competition. Franchisee hereby agrees that Franchisee and its affiliates, officers, directors, partners and all owners of any interest in Franchisee and/or the Store: (a) will not use the Proprietary Information in any other business or capacity; (b) will maintain the absolute confidentiality of the Proprietary Information during and after the Term; (c) will not make unauthorized copies of any portion of the Proprietary Information disclosed in written, visual, auditory or other tangible form; and (d) will adopt and implement all reasonable procedures prescribed from time to time by

d.    <u>Indemnification.</u>  Franchisee agrees to indemnify Franchisor and its subsidiaries, affiliates, stockholders, directors, officers, employees, agents and assignees against and to reimburse them for all obligations, damages, and taxes set forth in this Agreement for which they are held liable and for all costs reasonably incurred by them in the defense of any claims brought against them or in any action in which they are named as a party, including without limitation, reasonable attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses as a result of or related in any way to the operation of the Store, except to the extent caused by Franchisor's negligent or willful action or failure to act.  Franchisor has the right to defend any such claim against it.  Franchisee shall also indemnify and hold Franchisor and its officers, directors, employees and agents harmless from any and all claims, demands or liabilities arising from the offer or sale of securities, whether asserted by a purchaser of any security or by a governmental agency.  Franchisor has the right to defend any such claims.

e.    <u>Survival.</u>  The indemnities and assumptions of liabilities and obligations herein shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

8.    <u>**FRANCHISE AND OTHER FEES.**</u>

a.    <u>Initial Franchise Fee.</u>  Franchisee agrees to pay to Franchisor, upon execution of this Agreement, an initial franchise fee as follows:

   i.    Franchisee (not pursuant to an Area Development Agreement):

      (1)    BAB Production Store:

         **XX   $4,000.00 Transfer Fee.**

         _____$25,000.00 for first BAB Production Store

         _____$20,000.00 for second and subsequent BAB Production Stores

      (2)    BAB Satellite/Kiosk Store:

         _____$15,000.00 for BAB Satellite/Kiosk Store

      (3)    BAB Cart:

             _____$5,000.00 for BAB Cart

ii.    Developer (pursuant to an Area Development Agreement):

      (1)    BAB Production Store:

             _____$25,000.00 for first BAB Production Store

             _____$15,000.00 for second and subsequent BAB Production Stores

      (2)    BAB Satellite/Kiosk Store:

             _____$10,000.00 for BAB Satellite/Kiosk Store

      (3)    BAB Cart:

             \_\_ \_\_\_\_$5,000.00 for BAB Cart

The initial franchise fee shall be fully earned by Franchisor upon its payment and, except as otherwise provided herein, is nonrefundable.

b.    **Royalty Fee.** Franchisee agrees to pay to Franchisor a weekly royalty fee in the amount of five percent (5%) of the Gross Revenues of the Store (as defined in Paragraph 8.c. hereof). The royalty fee shall be payable on or before each Wednesday for the preceding Reporting Week (Monday through Sunday).

c.    **Definition of "Gross Revenues."** As used in this Agreement, the term "Gross Revenues" shall mean the entire amount of all gross sales and business receipts, including direct or indirect barter transactions, wholesale accounts (both on and off premises) arising out of the operation of the Store, or through or by means of the business conducted in connection therewith, whether for cash or credit, but excluding: (1) sales, use, or service taxes collected from customers and paid to the appropriate taxing authority; and (2) all bona fide customer refunds and approved rebates, discounts and allowances. Franchisee agrees that his cash register will be polled by Franchisor to verify Gross Revenues. Franchisor will provide the modem, but Franchisee is responsible for telephone line installation and the monthly telephone charges.

d.    **Interest on Late Payments.** All royalty fees, Marketing Fund contributions and other amounts which Franchisee owes to Franchisor or its affiliate shall bear interest

after their due date at the lower of 2% per month, or the highest contract rate allowed by local law. Franchisee acknowledges that this Paragraph shall not constitute Franchisor's agreement to accept such payments after same are due or a commitment by Franchisor to extend credit to, or otherwise finance, Franchisee's operation of the Store. Further, Franchisee acknowledges that his failure to pay all such amounts when due shall constitute grounds for termination of this Agreement, as provided in Section 15 hereof, notwithstanding the provisions of this Paragraph.

e.  **Application of Payments.**  Notwithstanding any designation by Franchisee, Franchisor shall have sole discretion to apply any payments by Franchisee to any past due indebtedness of Franchisee for royalty fees, Marketing Fund contributions, purchases from Franchisor or its affiliates, interest or other indebtedness.

f.  **Bank Draft Plan.**  In the event Franchisee receives three (3) notices from Franchisor that Franchisee is late in making any payments due under this Agreement, Franchisor shall have the right to require Franchisee to make any and all payments due Franchisor through a Bank Draft Plan on a bank account Franchisee is required to establish and maintain for the purpose of making payments to Franchisor.  If Franchisor exercises this right, Franchisee shall execute such documents as may be required from time to time by Franchisor to permit Franchisor to withdraw from Franchisee's general operating checking account the amounts due Franchisor for the royalty fee and Marketing Fund contributions.

g.  **Document Name Change Fee.**  In the event Franchisee requests and Franchisor approves any alteration, addition, or modification in the name or identity of the Franchisee on this Agreement, Franchisee agrees to pay Franchisor a Document Name Change Fee in the amount of Two Hundred Fifty Dollars ($250.00). Provided, however, this fee shall be waived the first time a transfer is made pursuant to Paragraph 13.b.(iv).

9.  **OPERATING STANDARDS.**

a.  **Image of the Store.**  The presentation of an image in compliance with Franchisor's minimum standards and specifications to the public is an essential element of a successful franchise system.  Franchisee agrees to prohibit smoking in the Store. Franchisee shall offer for sale all products and services that Franchisor, in its sole discretion, may from time to time require, and shall make such expenditures as may be necessary to enable it to fulfill such obligation, including, without limitation, the purchase or lease of new equipment or services, and the hiring and training of suitable personnel.  Franchisee further agrees that the Store will not, without prior written approval by Franchisor, provide and/or offer for sale any products or services not then authorized by Franchisor for BAB Systems Stores.  Franchisor reserves the right to revoke its approval of any products or suppliers previously

authorized at any time upon written notice to Franchisee, provided that Franchisee may continue to offer and sell all remaining on-hand or ordered non-cancelable inventory of such products or from such suppliers as of the date of receipt of written notice from Franchisor.   Franchisor may, from time to time, conduct market research and testing to determine consumer trends and the salability of new food and beverage products and services.   Franchisee agrees to cooperate by participating in Franchisor's market research programs, test marketing of new services and products in the Store and providing Franchisor with timely reports and other relevant information regarding such market research.   In connection with any such test marketing, Franchisee shall purchase a reasonable quantity of tested products and effectively promote and make a reasonable effort to sell such products.

b.   <u>Standards and Sources of Supplies.</u>

i.   Franchisee is required to obtain all his coffee from Franchisor or Franchisor's designated supplier.   Franchisee is also required to purchase from Franchisor's designated supplier a mandatory initial inventory of private label items, including, but not limited to, mugs, bagel cutters, cream cheese spreaders, and bread knives, which will be shipped and billed by Franchisor's designated supplier. Franchisor also reserves the right to require that other items be purchased exclusively from Franchisor or its designees.

ii.   Other than products which must be purchased from Franchisor, its affiliates or its designated supplier pursuant to Paragraph 9.b.i. herein, Franchisee agrees that the Store will

(1)   use ingredients and prepare and offer for sale other beverages and food products

(2)   use cups, utensils, uniforms, menus, forms, packaging materials, labels and other supplies, and

(3)   offer for sale other products and services

which conform to Franchisor's specifications and quality standards and/or are purchased from suppliers approved from time to time by Franchisor (which may include Franchisor and/or its affiliates).

iii.   Franchisee agrees to use in the operation of the Store only signs, equipment, merchandise, materials and supplies that conform to Franchisor's minimum specifications and quality standards and/or are purchased from suppliers approved from time to time by Franchisor (which may include Franchisor and/or its affiliates).

iv.   Franchisor may, from time to time, modify the minimum standards

and specifications and/or the list of approved brands and/or suppliers. If Franchisee proposes to use or offer any food products or beverages, other products or services, ingredients or supplies (other than those which must be purchased pursuant to Paragraph 9.b.i.) which do not comply with Franchisor's then-current minimum standards or specifications or which are purchased from a supplier that has not been approved, Franchisee shall first notify Franchisor in writing and submit sufficient information, specifications and samples concerning such item or supplier for determination by Franchisor as to whether such item complies with Franchisor's specifications and standards, and/or whether the supplier meets Franchisor's approved supplier criteria. Franchisor shall have the right to charge Franchisee a reasonable fee to cover Franchisor's costs incurred in making such determination. Franchisor shall, within a reasonable time, notify Franchisee whether or not such proposed item or supplier is approved. Franchisor may from time to time prescribe procedures for submission of requests for approval of items or suppliers and obligations which approved suppliers must assume (which may be incorporated into a written agreement to be executed by approved suppliers). Franchisor may impose limits on the number of suppliers and/or brands for any ingredient or food or beverage product used or served by the Store. Franchisor may collect a service fee on items purchased by Franchisee through national marketing contracts negotiated and maintained by Franchisor. Such service fee shall be established and paid to the Marketing Fund in the manner prescribed from time to time by Franchisor.

v.    Franchisee shall not offer and sell any branded products in the Store without the prior written consent of Franchisor. Franchisee shall offer and sell branded products which have been approved by Franchisor only in the manner prescribed by Franchisor from time to time. Franchisor reserves the right to revoke the approval of a previously authorized branded product.

vi.   Franchisee shall at all times maintain an inventory of approved food products, beverages and ingredients and other products sufficient in quantity and variety to realize the full potential of the Store.

vii.  Franchisee acknowledges and agrees that the Franchisor and its affiliate have proprietary products, including but not limited to coffee products, a muffin mixture, and other proprietary mixtures and products. Franchisor reserves the right to require Franchisee to use such proprietary mixtures and products in the Store.

c.    <u>Operating Procedures</u>. Franchisee acknowledges that each and every detail of the appearance and operation of the Store in compliance with Franchisor's high standards is important to Franchisor and other BAB Systems Stores. Franchisee agrees to cooperate with Franchisor by maintaining such high standards in the operation of the Store. Franchisee agrees to comply with all mandatory specifications, standards and operating procedures relating to the function and operation of a BAB Systems Store including, without limitation, specifications, standards and operating procedures and rules relating to: (1) hours during which Franchisee shall operate the Store; (2) methods and procedures relating to the acquisition, storage and preparation of products offered by Franchisee in the operation of the Store; (3) advertising and promotion; (4) use of standard forms; (5) the handling of customer inquiries and complaints; and (6) use of approved cash register system. Franchisor reserves the right to approve all menu items and final copy of Franchisee's menu prior to printing. Mandatory specifications, standards and operating procedures prescribed from time to time by Franchisor in the Operations Manual, or otherwise communicated to Franchisee in writing, shall constitute provisions of this Agreement as if fully set forth herein. All references herein to this Agreement shall include all such mandatory specifications, standards and operating procedures.

d.    <u>Compliance with Laws and Good Business Practices</u>. Franchisee shall secure and maintain in force in its name all required licenses, permits and certificates relating to the operation of the Store. Franchisee shall operate the Store in full compliance with all applicable laws, ordinances and regulations including, without limitation, all government regulations relating to workers' compensation insurance, unemployment insurance and withholding and payment of federal and state income taxes, social security taxes and sales taxes. All advertising by Franchisee shall be completely factual, in good taste in the judgment of Franchisor, and shall conform to the highest standards of ethical advertising. Franchisee shall in all dealings with its customers, suppliers, employees, and public officials adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. Franchisee agrees to refrain from any business or advertising practice which may be injurious to Franchisor and the goodwill associated with the Marks and other BAB Systems Stores. In the event Franchisee shall fail to secure any license or permit required for the operation of the Store, Franchisor, at its option and in addition to its other rights and remedies hereunder, may obtain such license or permit on behalf of Franchisee and Franchisee shall fully cooperate with Franchisor in its efforts to obtain such license or permit on behalf of Franchisee and shall pay to Franchisor, on demand, all costs and charges incurred by Franchisor.

e.    <u>Management and Personnel of the Business</u>. Franchisee shall devote his full time and best efforts to the Store and shall not engage in any other business or other activity, directly or indirectly, that requires any significant management responsibility, time commitments, or otherwise may conflict with Franchisee's

obligations hereunder, without the express written consent of Franchisor. The Store shall at all times be under the direct personal supervision of Franchisee, and shall at all times be under the full-time management of Franchisee or a qualified manager who has successfully completed Franchisor's training program. Franchisee or his manager shall hire all employees of the Store and shall be exclusively responsible for the terms of their employment and compensation and for the proper training of such employees. If Franchisee requests Franchisor to train Franchisee's manager, Franchisee shall pay Franchisor its then-current Manager Training Fee. Franchisee shall establish at the Store for all employees a training program meeting the standards prescribed by Franchisor. Franchisee shall require all managers of the Store to execute Franchisor's then current form of Confidentiality and Non-Competition Agreement. Franchisee agrees to provide Franchisor a copy of an executed Confidentiality and Non-Competition Agreement for each manager of the Store. Franchisee shall require all employees to maintain a neat and clean appearance and to conform to the standards of dress specified by Franchisor from time to time. Franchisee shall not, during the term of this Agreement and for a period of two (2) years following termination or expiration of this Agreement for any reason, recruit or hire any employee of Franchisor or a BAB Systems Store operated by Franchisor, an affiliate of Franchisor or another franchisee of Franchisor without obtaining the prior written permission of Franchisor, such affiliate, or franchisee. If the Store at any time is not being managed by Franchisee or a qualified, trained, full-time manager, Franchisor may appoint a manager for the Store and charge a reasonable management fee during the period in which Franchisor manages the Store.

f.   <u>Exclusive Relationship</u>.   Franchisor has entered into this Agreement with Franchisee on the express condition that Franchisee and its owners will deal exclusively with Franchisor. Franchisee therefore agrees that during the term of this Agreement, except for the Store and other BAB Systems Stores operated under franchise agreements with Franchisor, neither Franchisee nor any of its owners shall (1) have any direct or indirect ownership interest in any Competitive Business located or operating anywhere in the world; (2) have any direct or indirect ownership interest in any entity which is granting franchises or licenses or establishing joint ventures for operation of Competitive Business anywhere in the world; or (3) perform services as a director, officer, manager, employee, consultant, representative, agent, lessor, lender, or otherwise for any Competitive Business or any business which is granting franchises or licenses or establishing joint ventures for the operation of Competitive Businesses anywhere in the world. The restrictions of this Paragraph shall not be applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on an over-the-counter market that represent three percent (3%) or less of the number of shares of that class of securities issued and outstanding. The term "Competitive Business" shall mean the sale of bagels, cream cheeses, muffins, and/or coffee to the public through retail or wholesale channels of distribution.

g.   **Insurance.**

    i.    During the term of the Franchise, Franchisee shall maintain in force, under policies of insurance issued by carriers approved by Franchisor, comprehensive general liability and property damage insurance against claims for bodily and personal injury, death and property damage caused by or occurring in conjunction with the operation of the Store, or otherwise in conjunction with the conduct of business by Franchisee pursuant to the Franchise Agreement, under one or more policies of insurance containing: Workers Compensation including Employers Liability insurance in the limit of no less than $500,000; Comprehensive General Liability with a General Aggregate of no less than $1,000,000 which must include "Hired and Non-Owned" automobile liability coverage; and Products Liability of $1,000,000. In addition, if Franchisee uses a vehicle to deliver product or supplies, he must maintain Comprehensive Auto Liability of no less than $1,000,000. Franchisor may periodically increase the amounts of coverage required under such insurance policies and require different or additional kinds of insurance at any time, including excess liability insurance, to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards or other relevant changes in circumstances. Each insurance policy shall name BAB Systems, Inc., 8501 W. Higgins Road, Suite 320, Chicago, Illinois 60631 as an additional named insured with respect to policies secured, and shall provide for thirty (30) days' prior written notice to Franchisor of any material modification, cancellation or expiration of such policy.

    ii.    Prior to the opening of the Store and prior to the expiration of the term of each insurance policy, Franchisee shall furnish Franchisor with a copy of each insurance policy to be maintained by Franchisee for the immediately following term and evidence of the payment of the premium therefor. If Franchisee fails or refuses to maintain required insurance coverage, or to furnish satisfactory evidence thereof and the payment of the premiums therefor, Franchisor, at its option and in addition to its other rights and remedies hereunder, may obtain such insurance coverage on behalf of Franchisee and Franchisee shall fully cooperate with Franchisor in its effort to obtain such insurance policies, promptly execute all forms or instruments required to obtain or maintain such insurance and pay to Franchisor, on demand, any costs (including administrative) and premiums incurred by Franchisor.

    iii.    Franchisee's obligations to maintain insurance coverage as herein described shall not be affected in any manner by reason of any separate insurance maintained by Franchisor, nor shall the maintenance of such insurance

relieve Franchisee of any obligations under Section 7 of this Agreement.

iv.    If this Agreement is for a BAB Satellite/Kiosk Store or BAB Cart, the insurance requirements may be higher than for a BAB Production Store, due to increased vehicle use.

h.    <u>Delivery of Products to BAB Satellite/Kiosk Store or BAB Cart.</u>    If this Agreement is for the grant of a BAB Satellite/Kiosk Store or BAB Cart, the bagels sold in Franchisee's Store will either be fresh baked bagels supplied by Franchisee's own BAB Production Store or the BAB Production Store of another local franchisee approved by BAB, or will be par-baked frozen bagels supplied by an approved supplier. If Franchisee has a BAB Production Store that furnishes bagels to Franchisee's BAB Satellite/Kiosk Store or BAB Cart, Franchisee must facilitate the timely delivery of products requiring, among other items, additional vehicles, higher insurance coverages, and storage bins.

i.    <u>Participation in System-wide Internet Web Site.</u>    Franchisee acknowledges that the Internet is a powerful, expanding medium through which business is conducted. As Franchisor develops strategies for taking advantage of the benefits the Internet may offer, Franchisee will be required to participate in such activity. Franchisee therefore agrees that Franchisor may, upon sixty (60) days' prior written notice, require Franchisee to participate in, and contribute a proportionate share, of a web site established by BAB ("BAB Web Site") listed on the Internet or other listing on the Internet. Franchisor shall, at its discretion, determine the content and use of the web site or other listing and shall establish the rules under which franchisees will participate. Franchisor shall retain all rights relating to the web site or other listing and may alter or terminate the web site or other listing upon thirty (30) days' notice to the franchisees. Franchisee's participation in the BAB Web Site shall be subject to the provisions of this Agreement. Franchisee acknowledges that certain information obtained through its participation in the BAB Web Site may be considered proprietary and confidential information, including access codes and identification codes. Franchisee's right to participate in the BAB Web Site or will terminate when this Agreement expires or terminates. Franchisee shall be prohibited from establishing his own web site or other listing on the Internet using the Marks and/or System.

j.    <u>Cooperation in Displaying Franchisor's Franchise Literature.</u>    Franchisee agrees to cooperate with Franchisor in displaying Franchisor's franchise literature by keeping stocked display racks in Franchisee's Store with literature furnished by Franchisor. At no charge to Franchisee, Franchisor will install the display racks and furnish the franchise literature. Franchisee shall not obstruct the display racks and will notify Franchisor when the supply of franchise literature is low. Franchisee will not be responsible for paying for any of the literature or for the installation of the display racks.

10.    <u>MARKETING AND PROMOTION.</u>

a.    <u>By Franchisor.</u>

i.      Recognizing the value of advertising to the goodwill and public image of
        BAB Systems Stores, Franchisor shall establish, maintain and administer a
        marketing fund (the "Marketing Fund") for such marketing and related
        programs as Franchisor may deem necessary or appropriate, in its sole
        discretion.  Franchisee shall contribute to the Marketing Fund an amount
        equal to two percent (2%) of the Gross Revenues of the Store.   Such
        Marketing Fund contributions shall be payable weekly together with the
        royalty fees due hereunder.  Franchisor shall have the right from time to time
        to increase Franchisee's Marketing Fund contributions hereunder to an
        amount not to exceed the Marketing Fund contribution charged under
        Franchisor's then-current form of franchise agreement, but never to exceed
        5% of Gross Revenues.  Franchisor has a program to rebate a portion of
        Franchisee's contribution to the Marketing Fund, based upon Franchisee's
        expenditures on local advertising and promotion, as set forth in the
        Operations Manual.

ii.     Franchisor shall direct all marketing programs financed by the Marketing
        Fund, with sole discretion over the creative concepts, materials and
        endorsements used therein, and the geographic, market, and media
        placement and allocation thereof.  Franchisee agrees that the Marketing
        Fund may be used to pay the costs of preparing and producing video, audio
        and written advertising materials; administering multi-regional advertising
        programs, including without limitation, purchasing direct mail and other
        media advertising and employing advertising agencies to assist therewith;
        and supporting public relations, market research and other advertising and
        marketing activities.  The Marketing Fund shall furnish Franchisee with
        existing marketing, advertising and promotional formats and sample
        materials without charge.  Franchisor will furnish Franchisee with multiple
        copies of marketing, advertising and promotional materials at its direct cost
        of producing them.

iii.    The Marketing Fund shall be accounted for separately from the other funds
        of Franchisor and shall not be used to defray any of Franchisor's general
        operating expenses, except for such reasonable salaries, administrative costs
        and overhead as Franchisor may incur in activities reasonably related to the
        administration of the Marketing Fund and its marketing programs (including
        without limitation, conducting market research, preparing advertising and
        marketing materials and collecting and accounting for contributions to the
        Marketing Fund).  Franchisor may spend in any fiscal year an amount
        greater or less than the aggregate contribution of all BAB Systems Stores to
        the Marketing Fund in that year and the Marketing Fund may borrow from
        Franchisor or other lenders to cover deficits of the Marketing Fund or cause
        the Marketing Fund to invest any surplus for future use by the Marketing

Fund. Franchisee authorizes Franchisor to collect for remission to the Marketing Fund any advertising or promotional monies or credits offered by any supplier based upon purchases by Franchisee. All interest earned on monies contributed to the Marketing Fund will be used to pay advertising costs of the Marketing Fund before other assets of the Marketing Fund are expended. A statement of monies collected and costs incurred by the Marketing Fund shall be prepared annually by Franchisor and shall be furnished to Franchisee upon written request.

iv.    Franchisee understands and acknowledges that the Marketing Fund is intended to maximize recognition of the Marks and patronage of BAB Systems Stores. Although Franchisor will endeavor to utilize the Marketing Fund to develop advertising and marketing materials and programs, and to place advertising that will benefit all BAB Systems Stores, Franchisor undertakes no obligation to ensure that expenditures by the Marketing Fund in or affecting any geographic area are proportionate or equivalent to the contributions to the Marketing Fund by BAB Systems Stores operating in that geographic area or that any BAB Systems Stores will benefit directly or in proportion to its contribution to the Marketing Fund from the development of advertising and marketing materials or the placement of advertising.

v.    Franchisor reserves the right, in its sole discretion, to terminate or discontinue the Marketing Fund upon thirty (30) days' written notice to Franchisee. All unspent monies on the date of termination or discontinuance shall be distributed to franchisees of Franchisor in proportion to their respective contributions to the Marketing Fund. Franchisor shall have the right to reinstate the Marketing Fund upon the same terms and conditions herein set forth upon thirty (30) days' prior written notice to Franchisee.

vi.    Franchisor assumes no direct or indirect liability or obligation to Franchisee or to the Marketing Fund with respect to any failure by any franchisees of Franchisor to make any contributions to the Fund.

b.    **By Franchisee.**

i.    Franchisee agrees to list his Store at his expense (and in addition to any other expenditures made for advertising or promotion hereunder) in each of the telephone directories distributed within his general market, in such business classifications as Franchisor prescribes from time to time.

ii.    In addition, on an ongoing basis, Franchisee will spend not less than two percent (2%) of Franchisee's Gross Revenues on local advertising and promotion. Such expenditures shall be made directly by Franchisee, subject

to approval and direction by Franchisor. Within fifteen (15) days of Franchisor's request, Franchisee shall furnish to Franchisor, in a manner approved by Franchisor, an accurate accounting of the expenditures on local advertising and promotion for the period requested. This requirement for local advertising and promotion expenditures shall commence immediately upon the Store opening.

iii.   Franchisee shall join any local advertising co-operative which has been or may be formed consisting of franchisees and/or Franchisor-owned or affiliate-owned Stores in his area. Franchisor assumes no direct or indirect liability or obligation to Franchisee or to any local co-operative with respect to the maintenance, direction, or administration of the co-operative, including without limitation, any failure by any franchisees to make any contributions to the co-operative. Any contributions to a local advertising cooperative will be credited toward the local advertising and promotional expenditure required by Paragraph 10.b.ii. above.

iv.   Prior to their use by Franchisee, samples of all local advertising and promotional materials not prepared or previously approved by Franchisor shall be submitted to Franchisor for approval. If written disapproval is not received by Franchisee within fifteen (15) days from the date of receipt by Franchisor of such materials, Franchisor shall be deemed to have given the required approval. Franchisee shall not use any advertising or promotional material that Franchisor has disapproved.

11.   **RECORDS AND REPORTS.**

a.   **Accounting and Records.** During the Term, Franchisee agrees, at his expense: (1) to establish and maintain record keeping and accounting systems conforming to the requirements prescribed by Franchisor from time to time; and (2) to prepare and preserve for three (3) years from the date of their preparation full, complete and accurate books, records and accounts prepared pursuant to such accounting procedures as may be prescribed by Franchisor from time to time, copies of sales tax returns and copies of such portions of Franchisee's state and federal income tax returns as reflect the operation of the Store.

b.   **Reports and Tax Returns.**

i.   **Furnished to Franchisor.** Franchisee shall furnish to Franchisor the following: (1) concurrently with the payment of the royalty fees, a report of the Gross Revenues of the Store for the preceding week; (2) by the thirtieth (30th) day of each quarter a profit and loss statement as of the end of the preceding quarter, a year-to-date profit and loss statement and a balance sheet as of the end of the preceding month; and (3) within ninety (90) days

after the end of each fiscal year of the Store, an annual profit and loss statement and source and use of funds statement for the Store and a balance sheet for the Store as of the end of each fiscal year, reviewed by an independent certified public accountant, or, if requested by Franchisor, accompanied by an opinion of a certified public accountant or firm of certified public accountants selected by Franchisee and approved by Franchisor, which opinion may be qualified only to the extent reasonably acceptable to Franchisor. Further, Franchisee shall furnish to Franchisor copies of other reports designated by Franchisor and such other information and supporting records as Franchisor from time to time prescribes. All such financial statements, reports and information shall be on forms approved by Franchisor and shall be signed and verified by Franchisee. Franchisee agrees that his cash register will be polled (accessed by electronic means) by Franchisor to verify Gross Revenues.

ii.    **Availability for Inspection.** Franchisee shall maintain readily available for inspection by Franchisor, and shall furnish to Franchisor upon its request, exact copies of all state sales tax returns and such portions of Franchisee's federal and state income tax returns as reflect the operation of the Store. In addition, Franchisee at his expense shall furnish to Franchisor (and its accountant and/or other designee) for inspection or audit such forms, reports, records, financial statements and other information as Franchisor may require. Franchisee shall make such financial and other information available at such locations as Franchisor may reasonably request (including Franchisor's office) and shall afford Franchisor (and its accountant and/or other designee) full and free access thereto during regular business hours. Franchisor (and its accountant and/or other designee) shall have the right to make extracts from the copies of all such documents and information.

c.    **Use of Data, Name, Photograph, and Biographical Information.** Franchisee consents to the use of Franchisee's name, photograph, and biographical and financial data concerning the operation of Franchisee's business, as well as photographs of the interior and exterior of Franchisee's Store, in Franchisor's advertising and other literature promoting BAB Systems.

12.    **INSPECTIONS AND AUDITS.**

a.    **Examinations of Books and Records.**

i.    **Franchisor's Right to Examine and Audit.** Franchisor shall have the right at any time during business hours, and without prior notice to Franchisee, to examine or audit or cause to be examined or audited the business records, bookkeeping and accounting records, bank statements, sales and income tax

records and returns and other books and records of the Store and the books and records of any corporation, partnership or limited liability company ("LLC") which is the Franchisee under this Agreement. Franchisee shall maintain all such books, records and supporting documents at all times at his business office. Franchisee shall fully cooperate with representatives of Franchisor and accountants hired by Franchisor to conduct any such examination or audit.

ii.    **Audit Fees.** In the event any such examination or audit shall disclose an understatement of Gross Revenues of the Store, Franchisee shall pay to Franchisor, within fifteen (15) days after receipt of the examination or audit report, the royalty fees and any Marketing Fund contributions due on the amount of such understatement, plus interest (at the rate and on the terms provided in Section 8.d. hereof) from the date originally due until the date of payment. Further, in the event such examination or audit is made necessary by the failure of Franchisee to furnish reports, supporting records, financial statements or other documents or information, as herein required, or failure of Franchisee to furnish such reports, records, financial statements, documents or information on a timely basis, or if an understatement of the Gross Revenues of the Store for any period is determined by any such examination or audit to be two percent (2%) or greater, Franchisee shall reimburse Franchisor for the cost of such audit or examination, including, without limiting, the charges and disbursements of any independent accountants and the travel expenses, room and board (if any) and compensation of employees of Franchisor in connection with such audit or examination. The foregoing remedies shall be in addition to all other remedies and rights of Franchisor hereunder or under applicable law.

iii.    **Right to Inspect the Store.** To determine whether Franchisee is complying with this Agreement, Franchisor shall have the right at any time during business hours, and without prior notice to Franchisee, to inspect the Store. Franchisee shall fully cooperate with representatives of Franchisor making any such inspection and shall permit representatives of Franchisor to take photographs, movies or videotapes of the Store and to interview employees and customers of the Store.

13.    **TRANSFER**

a.    **By Franchisor.** This Agreement is fully transferable by Franchisor and shall inure to the benefit of any transferee or other legal successor to the interests of Franchisor herein.

b.    **By Franchisee.**

i.    **Franchisee May Not Transfer Without Approval of Franchisor.**
Franchisee understands and acknowledges that the rights and duties created
by this Agreement are personal to Franchisee (and its owners) and that
Franchisor has granted the Franchise to Franchisee (and its owners) in
reliance upon the individual or collective character, skill, aptitude, attitude,
business ability and financial capacity of Franchisee (and its owners).
Accordingly, neither this Agreement nor the Franchise (or any interest
therein), nor any part or all of the ownership of Franchisee or of the assets of
Franchisee or the Store (or any interest therein) may be transferred, sold,
assigned, pledged, mortgaged or liened without the prior written approval of
Franchisor, and any such transfer without such approval shall constitute a
breach hereof and convey no rights to or interests in this Agreement, the
Franchise, Franchisee, the Store or its assets.

ii.   **Conditions for Approval of Transfer.** If Franchisee and its owners are in
full compliance with this Agreement, Franchisor shall not unreasonably
withhold its approval of a transfer that meets all the applicable requirements
of this Paragraph.   The proposed transferee and its owners must be
individuals of good moral character and otherwise meet Franchisor's then
applicable standards for BAB Systems Store franchisees.   Franchisor shall
interview and evaluate the proposed transferee at Franchisor's principal place
of business or at such other location that Franchisor designates.   A transfer
of ownership in the Store may only be made in conjunction with a transfer of
the interest in Franchisee, or is one of a series of transfers which in the
aggregate constitute the transfer of the Franchise or a controlling interest in
Franchisee.   All of the following conditions must be met prior to or
concurrently with the effective date of the transfer (unless otherwise
specified):

(1)   the assignee, transferee or purchaser shall have been approved by
Franchisor for financial responsibility, good moral character and
suitability as an operator of a BAB Systems Store;

(2)   Franchisee or the assignee shall pay to Franchisor prior to assignee
attending the required training program a transfer fee of Five
Thousand Dollars ($5,000.00);

(3)   the assignee, transferee or purchaser shall not be engaged as a
licensor, franchisor, independent operator or franchisee of any chain
or network which is similar in nature to or in competition with
Franchisor, except that the assignee, transferee or purchaser may be
an existing franchisee of Franchisor or its affiliate;

(4) Franchisee shall have paid all outstanding debts and obligations to Franchisor and its affiliates, including the royalty fees and all amounts due the Marketing Fund, and to its designated suppliers;

(5) Franchisee and its owners shall execute a release of any and all claims against Franchisor, and Franchisor's officers, directors, agents, employees and affiliates, arising out of or related to this Agreement, which release shall contain language and be of the form prescribed by Franchisor;

(6) the assignee, transferee or purchaser (and its owners) shall, at Franchisor's sole discretion, have executed and agreed to be bound by: (i) an assignment and assumption agreement satisfactory to the Franchisor, whereby the assignee assumes the obligations of Franchisee under this Agreement; or (ii) Franchisor's then-current form of franchise agreement, for a term equal to the remaining term of the franchise, but which may provide for a different rate for royalty fees and Marketing Fund contributions required hereunder;

(7) if required, the lessor of the premises of the Store has consented to Franchisee's assignment or sublease of said premises to the proposed assignee;

(8) Franchisor shall have approved the material terms and conditions of such assignment and shall have determined that the price and terms of payment are not so burdensome as to adversely affect the future operations of the Store by the assignee; and

(9) Franchisee shall have entered into an agreement with Franchisor agreeing to subordinate to such assignee's obligations to Franchisor, including, without limitation, any royalty fees, any Marketing Fund contributions, and any obligations of such assignee to make installment payments of the purchase price to Franchisee.

(10) the assignee, transferee or purchaser shall complete to Franchisor's satisfaction, at transferee's expense and upon such terms and conditions as Franchisor may reasonably require, any training programs then in effect for franchisees at such time and place designated by Franchisor;

(11) if the transfer is of a Satellite/Kiosk Store, the transferee must have a B.A.B Production Store.

iii.    In the event Franchisee shall request consent to a transfer of this Agreement

or a controlling interest in Franchisee and for any reason such transfer is not completed or consummated, Franchisor shall be entitled to reimbursement of its reasonable expenses incurred in connection with such proposed transfer in the manner and in accordance with the procedures set forth herein, including, without limitation, expenses related to investigating, processing and training any proposed transferee.

    iv.    **Transfer to a Wholly-owned Corporation.**  If Franchisee is in full compliance with this Agreement, Franchisor shall not unreasonably withhold its approval of a transfer in the case of a proposed assignment or transfer of this Agreement and the Franchise to a corporation, partnership or LLC which conducts no business other than the Store, which is actually managed by Franchisee and in which Franchisee maintains management control and owns and controls at least fifty-one percent (51%) of the general partnership interest or the equity and voting power of all issued and outstanding capital stock, provided that all owners of such corporation, partnership or LLC agree jointly and severally to guarantee the obligations of Franchisee under this Agreement and to be bound by the provisions of this Agreement in the form prescribed by Franchisor. Transfers of shares or interest representing 50% or more of the ownership in such corporation, partnership or LLC will be subject to the provisions of Paragraph 13.b.ii., except that the transfer fee required under Paragraph 13.b.ii.(2) shall be waived. Franchisee shall notify Franchisor in writing of the name and address of each and every shareholder, partner, officer, member, director and supervisory employees of any such corporation, partnership or LLC and any changes thereto.

c.    **Death or Disability of Franchisee.**

    i.    **Transfer of Interest.**  Upon the death or permanent disability of Franchisee or the owner of a controlling interest in Franchisee, the executor, administrator, conservator, guardian or other personal representative of such person shall transfer his interest in this Agreement and the Franchise, or such interest in Franchisee, to a third party approved by Franchisor. Such disposition of this Agreement and the Franchise, or such interest in Franchisee (including without limitation, transfer by bequest or inheritance), shall be completed within a reasonable time, not to exceed six (6) months from the date of death or permanent disability and shall be subject to all the terms and conditions applicable to transfers contained in this Section 13. Failure to so transfer the interest in this Agreement and the Franchise or such interest in Franchisee within said period of time shall constitute a breach of this Agreement.

    ii.    **Operation After Death or Permanent Disability.**  Upon the death or

permanent disability of Franchisee or the owner of a controlling interest in Franchisee, the executor, administrator, conservator, guardian or other personal representative of such person shall appoint a manager to operate the Store within a reasonable time, not to exceed thirty (30) days from the date of death or permanent disability of such person. The appointment of such manager shall be subject to the prior written approval of Franchisor and, if requested by Franchisor, such manager shall attend and complete Franchisor's training program for franchisees. Such manager shall execute Franchisor's then-current form of Confidentiality and Non-Competition Agreement. If in the judgment of Franchisor, the Store is not being managed properly after the death or permanent disability of Franchisee or the owner of a controlling interest in Franchisee, Franchisor shall have the right to appoint a manager for the Store. All funds from the operation of the Store during the management by Franchisor's appointed manager will be kept in a separate bank account, and all expenses of the Store including compensation, other costs, and travel and living expenses of Franchisee's manager will be charged to this account. Franchisor shall have the right to charge a reasonable management fee (in addition to the royalty fee and Marketing Fund contributions payable under this Agreement) during the period in which Franchisor manages the Store as herein provided.

iii.  **Definition of Permanent Disability.**  Franchisee or the owner of a controlling interest in Franchisee will be deemed to have a "permanent disability" if his usual, active participation in the Store as contemplated by this Agreement is for any reason curtailed for a continuous period of three (3) months.

d.  **Effect of Consent to Transfer**.  Franchisor's consent to a transfer of this Agreement and the Franchise, or any interest in Franchisee or the Store or its assets, shall not constitute a waiver of any claims it may have against Franchisee (or its owners), nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms or conditions of this Agreement by the transferee.

e.  **Franchisor's Right of First Refusal**.  If Franchisee or its owners shall at any time determine to sell an interest in this Agreement, the Franchise, the Store or an ownership interest in Franchisee, Franchisee or its owners shall obtain a bona fide, executed written offer from a responsible and fully disclosed purchaser and shall immediately submit an exact copy of the offer to Franchisor. Franchisor shall have the right, exercisable by written notice delivered to Franchisee or its owners within thirty (30) days from the date of delivery of an exact copy of such offer to Franchisor, to purchase such interest for the price and on the terms and conditions contained in such offer, provided that Franchisor may substitute cash for any form of payment proposed in such offer. Franchisor's credit shall be deemed equal to the credit of any proposed purchaser. Franchisor shall have not less than sixty (60) days

from the date of exercise of its right of first refusal to prepare for closing. Franchisor shall be entitled to purchase such interest subject to all customary representations and warranties given by the seller of the assets of a business or voting stock of an incorporated business, as applicable, including without limitation, representations and warranties as to ownership, condition and title to stock and/or assets. If Franchisor does not exercise its right of first refusal, Franchisee or its owners may complete the sale to such purchaser pursuant to and on the exact terms of such offer, subject to Franchisor's approval of the transfer, as provided in Paragraphs 13.b.i. and 13.b.ii. If the sale to such purchaser is not completed within ninety (90) days after delivery of such offer to Franchisor, or if there is a material change in the terms of the sale, Franchisor shall have an additional right of first refusal for thirty (30) days on the same terms and conditions as are applicable to the initial right of first refusal.

14. **TERMINATION BY FRANCHISEE.** If Franchisee is in substantial compliance with this Agreement and Franchisor materially breaches this Agreement and fails to cure such breach within thirty (30) days after written notice thereof is delivered to Franchisor, or if such breach cannot reasonably be cured within such thirty (30) day period, and Franchisor fails to commence a bona fide program to cure such breach within such thirty (30) day period, and continues to complete such cure, then Franchisee may terminate the Franchise effective ten (10) days after delivery to Franchisor of written notice of termination. A termination of this Agreement for any other reason than breach of this Agreement by Franchisor, and failure to cure such breach within the time period specified herein, shall be deemed a termination by Franchisee without cause.

15. **TERMINATION BY FRANCHISOR.**

    a.    Franchisor shall have the right to terminate this Agreement effective upon delivery of notice to Franchisee, and without an opportunity to cure, if:

        i.    Franchisee fails, except for delays which are beyond Franchisee's reasonable control, to have a site selected and approved by Franchisor within ninety (90) days following execution of this Agreement, or if Franchisee fails to have the Store open for business within four (4) months from the date of possession by Franchisee of the approved site, or within ten (10) months from the date of this Agreement;

        ii.    Franchisee abandons, surrenders, transfers control of, loses the right to occupy the premises of the Store, or fails to actively operate the Store;

        iii.    Franchisee assigns or transfers this Agreement or any interest therein or in the Franchise, the Store, or the assets of the Store without compliance with the provisions of this Agreement;

iv.    Franchisee is adjudged bankrupt, becomes insolvent or makes a general assignment for the benefit of creditors;

v.    Franchisee or any of its owners is convicted of or pleads no contest to a felony or is convicted or pleads no contest to any crime or offense that is likely to adversely affect the reputation of the Store or the goodwill associated with the Marks;

vi.    Franchisee's operation of the Store would result in a threat or danger to the public health and safety;

vii.    Franchisee fails on three (3) or more separate occasions within any twelve (12) consecutive month period to submit when due financial statements, reports or other data, information or supporting records; to pay when due the royalty fees, Marketing Fund contributions, amounts due for purchases from Franchisor or its affiliates or other payments due to Franchisor or its affiliates; or otherwise fails to comply with this Agreement, whether or not such failures to comply are corrected after notice thereof is given to Franchisee;

viii.    Franchisee or any of its owners fails to comply with the covenants contained in Paragraph 9.f. of this Agreement;

ix.    Franchisee or any of its owners discloses or divulges the contents of the Operations Manual or other trade secret or other confidential information provided to Franchisee by Franchisor contrary to provisions of this Agreement, or makes any unauthorized use of the Marks;

x.    Franchisee fails to satisfactorily complete the Production or Satellite/Kiosk Store training program in which event none of the initial franchise fee shall be refunded to Franchisee;

xi.    Upon the death or permanent incapacity of Franchisee or owner of a controlling interest in Franchisee, an approved transfer is not effected as provided in Section 13 of this Agreement;

xii.    Franchisee fails to timely pay any lender to whom Franchisor has guaranteed Franchisee's obligations, or Franchisor if Franchisee has entered into a financing arrangement with Franchisor:

    (1)    more than three (3) times if the defaults are cured, or

    (2)    one (1) time if the default is not cured

during the financing term; or

xiii.   Franchisee fails to timely pay any vendors or supplier more than 3 times during the term of the franchise.

b.   Franchisor shall have the further right to terminate this Agreement, effective upon the delivery of notice of termination to Franchisee, if Franchisee fails to pay when due any monies owed to Franchisor, or its affiliates or designated suppliers and does not correct such failure within ten (10) days after written notice thereof is given to Franchisee, or fails to comply with any other provision of this Agreement or any mandatory specification, standard or operating procedure prescribed by Franchisor and does not correct such failure within thirty (30) days after written notice of such failure to comply is given to Franchisee.

c.   A default under this Agreement shall also constitute a default under any and all other agreements entered into between Franchisor and Franchisee (or related entities), with the right to terminate the other agreement(s) in accordance with the provisions of those agreement(s).

16.   **RIGHTS OF FRANCHISOR AND OBLIGATIONS OF FRANCHISEE UPON TERMINATION OR EXPIRATION OF THE FRANCHISE**

a.   **Payment of Amounts Owed to Franchisor.**   Franchisee agrees to pay to Franchisor within fifteen (15) days after the effective date of termination or expiration of the Franchise, or such later date that the amounts due to Franchisor are determined, such royalty fees, Marketing Fund contributions, amounts owed for purchases by Franchisee from Franchisor, its affiliates, or designated suppliers, interest due on any of the foregoing and all other amounts owed to Franchisor, its affiliates, or designated suppliers which are then unpaid.

b.   **Marks.**   Franchisee agrees that after the termination or expiration of the Franchise he will: (1) not directly or indirectly at any time or in any manner identify himself or any business as a current or former BAB Systems Store, or as a franchisee or licensee of or as otherwise associated with Franchisor, use any Mark or any colorable imitation thereof in any manner or for any purpose or utilize for any purpose any trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with Franchisor; (2) return to Franchisor or destroy all forms and materials containing any Mark or otherwise identifying or relating to a BAB Systems Store; (3) return to Franchisor all inventory bearing the Marks at Franchisee's cost; (4) take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to his use of any Mark; (5) change the telephone number of the Store and instruct all telephone directory publishers to modify all telephone directory listings of the Store associated with any Marks when the directories are next published; (6) if requested by

Franchisor, transfer to Franchisor or Franchisor's designee the telephone number of the Store and all telephone directory listings associated with the Marks; and (7) furnish to Franchisor, within thirty (30) days after the effective date of termination or expiration, evidence satisfactory to Franchisor of Franchisee's compliance with the foregoing obligations. Upon request by Franchisor, Franchisee will furnish Franchisor photographs of the Store as evidence of the removal of Franchisor's Marks and trade dress.

c.    **Confidential Information.** Franchisee agrees that, upon termination or expiration of the Franchise, he will immediately cease to use any Confidential Information of Franchisor disclosed to or otherwise learned or acquired by Franchisee in any business or otherwise and return to Franchisor all copies of the Operations Manual and any other confidential materials which have been loaned or made available to him by Franchisor.

d.    **Covenant Not to Compete.** Upon termination of this Agreement by Franchisor in accordance with its terms and conditions or by Franchisee without good cause, or upon expiration of this Agreement, Franchisee and its owners agree that for a period of two (2) years, commencing on the effective date of termination or expiration or the date on which Franchisee ceases to operate the Store, whichever is later, neither Franchisee nor its owners shall (1) have any direct or indirect ownership interest in any Competitive Business located or operating within two (2) miles of the Store or within two (2) miles of any other franchisee of Franchisor, or of any company-owned or affiliate-owned BAB Systems Store; or (2) have any direct or indirect ownership interest in any entity which has granted or during such two (2) year period grants franchises or licenses for the operation of Competitive Businesses within two (2) miles of the Store or within two (2) miles of any other franchisee of Franchisor, or of any company-owned or affiliate-owned BAB Systems Store; or (3) perform services as a director, officer, manager, employee, consultant, representative, agent, lender, lessor, or otherwise for any Competitive Business located within two (2) miles of the Store or within two (2) miles of any other franchisee of Franchisor, or of any company-owned or affiliate-owned BAB Systems Store. The restrictions of this Section shall not be applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent three percent (3%) or less of the number of shares of that class of securities issued and outstanding. To the extent that any provision of this Paragraph 16.d. or Paragraph 9.f. hereof is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but could be enforceable by reducing any or all thereof, Franchisee and Franchisor agree that same shall be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought. Competitive Business shall mean the sale of bagels, cream cheeses, muffins, and/or coffee to the public through retail or wholesale channels of distribution.

e.    **Continuing Obligations.**  All obligations of Franchisor and Franchisee which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.

f.    **Franchisor's Option To Purchase.**

    i.    If this Agreement expires (without renewal) or is terminated by Franchisor in accordance with its provisions or by Franchisee without cause, then Franchisor shall have the option, exercisable by giving written notice thereof within sixty (60) days from the date of such expiration or termination, to purchase from Franchisee all the tangible assets (including, without limitation, inventory of saleable products, equipment, fixtures, furniture, signs, cash registers, fax machines, computers, leasehold improvements and any other assets of the Store owned by Franchisee, but excluding any unamortized portion of the initial franchise fee, cash, goodwill, short-term investments and accounts receivable) of the Store (collectively, the "Purchased Assets") and to an assignment of Franchisee's lease for (a) the premises of the Store (or, if an assignment is prohibited, a sublease for the full remaining term and on the same terms and conditions as Franchisee's lease) and (b) any other tangible assets used in connection with the Store. Franchisor shall have the unrestricted right to assign this option to purchase and assignment of leases separate and apart from the remainder of this Agreement.

    ii.    The purchase price for the Store (except for the signage, the purchase price of which is $100) shall be either, at Franchisor's option: (a) the Book Value (as defined below) of the Purchased Assets, or (b) the fair market value of the Purchased Assets, which will be calculated by averaging three appraisals conducted by appraisers, one of whom is selected by Franchisor, one of whom is selected by Franchisee, and one of whom is selected by the two appraisers. The fees and costs of the appraisers shall be shared equally by Franchisor and Franchisee. "Book Value" shall mean the net book value of the Purchased Assets, as disclosed by the balance sheet of the last monthly statement of the Store required to have been submitted to Franchisor pursuant to Paragraph 11.b. hereof prior to such termination or expiration, provided, however, that: (1) each depreciable asset shall be valued as if it had been depreciated on a "straight-line" basis from the date of its acquisition over its Useful Life (defined below) without provision for salvage value; and (2) Franchisor may exclude from the Purchased Assets any inventory, equipment, fixtures, furniture, signs, cash registers, fax machines, computers, or leasehold improvements of the Store that have not been acquired in compliance with this Agreement.  No value shall be attributed to goodwill of the Store, the assignment of lease (or sublease) for

the premises of the Store, or the assignment of any lease for any other tangible assets used in connection with the Store, and Franchisor shall not be required to pay any separate consideration for any such assignment or sublease.

iii.    For purposes of this Paragraph 16.f., "Useful Life" shall be as follows:

Furniture, fixtures, signs: 7 years
Equipment (including electronic equipment): 5 years
Leasehold improvements: 10 years

iv.    If Franchisee has not furnished Franchisor a balance sheet of the last monthly statement of the Store, Franchisor may establish Book Value of the Purchased Assets based on Franchisee's initial cost, depreciated on a "straight-line" basis as described above. If evidence of Franchisee's initial cost for any Purchased Asset is not proven by actual receipts, Franchisor will assign an initial cost based on its best information for like items being sold at the time Franchisee opened his Store.

v.    The purchase price, as determined above, shall be paid in cash at the closing of the purchase, which shall take place no later than sixty (60) days after the delivery of Franchisor's notice of its election to purchase the Store, at which time Franchisee shall: (1) deliver instruments transferring good and merchantable title to the assets purchased, free and clear of all liens, encumbrances and liabilities to Franchisor or its designee, with all sales and other transfer taxes paid by Franchisee; (2) transfer or assign all licenses or permits which may be assigned or transferred; (3) assign to Franchisor or its designee Franchisee's leasehold interest in the premises of the Store or, if an assignment is prohibited, sublease same to Franchisor or its nominee for the full remaining term and on the same terms and conditions as Franchisee's lease, including renewal and/or purchase options; and (4) assign to Franchisor or its designee any leases for any other tangible assets used in connection with the Store. In the event that Franchisee cannot deliver clear title to all of the Purchased Assets as aforesaid, or in the event there shall be other unresolved issues, the closing of the sale shall, at Franchisor's option, be accomplished through an escrow. Further, Franchisee and Franchisor shall, prior to closing, comply with the Bulk Sales provisions of the Uniform Commercial Code as enacted or previously in force in the state where the Store is located. Franchisor shall have the right to set off against and reduce the purchase price by any and all amounts owed by Franchisee to Franchisor or any of its affiliates.

vi.    If Franchisor exercises the foregoing option to purchase the Store, Franchisor shall have the right pending the closing of such purchase to

appoint a manager to maintain the operation of the Store in accordance with the relevant provisions of 9.e. hereof. Alternatively, Franchisor may require Franchisee to close the Store during such time period without removing any assets of the Store.

17. **ENFORCEMENT.**

    a.     <u>Severability and Substitution of Valid Provisions.</u> Except as expressly provided to the contrary herein, each section, paragraph, term, and provision of this Agreement, and any portion thereof, shall be considered severable and if for any reason any such provision of this Agreement is held to be invalid, contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which Franchisor is a party, that ruling shall not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise intelligible, which shall continue to be given full force and effect and bind the parties hereto. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and Franchisor shall have the right, in its sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable. Such modifications to this Agreement shall be effective only in such jurisdiction, unless Franchisor elects to give them greater applicability, and shall be enforced as originally made and entered into in all other jurisdictions.

b.    **Waiver of Obligations.**

   i.    Franchisor and Franchisee may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice thereof to the other or such other effective date stated in the notice of waiver.  Any waiver granted by Franchisor shall be without prejudice to any other rights Franchisor may have, will be subject to continuing review by Franchisor and may be revoked, in Franchisor's sole discretion, at any time and for any reason, effective upon delivery to Franchisee of ten (10) days' prior written notice. Franchisor and Franchisee shall not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including, without limitation, the right to demand exact compliance with every term, condition and covenant herein or to declare any breach thereof to be a default and to terminate the Franchise prior to the expiration of its term) by virtue of any custom or practice of the parties at variance with the terms hereof; any failure, refusal or neglect of Franchisor or Franchisee to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder including, without limitation, any mandatory specification, standard or operating procedure; any waiver, forbearance, delay, failure or omission by Franchisor to exercise any right, power or option, whether of the same, similar or different nature, with respect to any other BAB Systems Store; or the acceptance by Franchisor of any payments from Franchisee after any breach by Franchisee of this Agreement.

   ii.    Franchisor makes no warranties or guaranties upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by granting any waiver, approval or consent to Franchisee, or by reason of any neglect, delay or denial of any request therefor. Any waiver granted by Franchisor shall be without prejudice to any other rights Franchisor may have, will be subject to continuing review by Franchisor, and may be revoked, in Franchisor's sole discretion, at any time and for any reason, effective upon delivery to Franchisee of ten (10) days' prior written notice.

   iii.    Neither Franchisor nor Franchisee shall be liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform its obligations results from: (1) transportation shortages, inadequate supply of labor, material or energy, or the voluntary foregoing of the right to acquire or use any of the foregoing in order to accommodate or comply with the orders, requests, regulations, recommendations or instructions of any federal, state or municipal government or any department or agency thereof; (2) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state, or municipal government or any department

or agency thereof; (3) acts of God; (4) acts or omissions of the other party; (5) fires, strikes, embargoes, war, or riot; or (6) any other similar event or cause. Any delay resulting from any of said causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable.

c.   **Rights of Parties are Cumulative.**  The rights of Franchisor and Franchisee hereunder are cumulative and no exercise or enforcement by Franchisor or Franchisee of any right or remedy hereunder shall preclude the exercise or enforcement by Franchisor or Franchisee of any other right or remedy hereunder or which Franchisor or Franchisee is entitled by law to enforce.

d.   **Costs and Attorneys' Fees.**  If a claim for amounts owed by Franchisee to Franchisor is asserted in any arbitration or judicial proceeding or appeal thereof, or if Franchisor or Franchisee is required to enforce this Agreement in an arbitration or judicial proceeding or appeal thereof, the party prevailing in such proceeding shall be entitled to reimbursement of its costs and expenses including, but not limited to, reasonable accounting, legal and attorneys' fees.

e.   **Governing Law/Consent to Jurisdiction.**  All matters relating to arbitration shall be governed by the Federal Arbitration Act (9 U.S.C. §1 et. seq.).  Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other federal law, this Agreement and the Franchise shall be governed by the laws of the State of Illinois.  Franchisee agrees that Franchisor may institute any action against Franchisee to enforce the provisions of this Agreement in any state or federal court of general jurisdiction in the State of Illinois, and Franchisee irrevocably submits to the exclusive jurisdiction of such courts and waives any objection he may have to either the jurisdiction or venue of such court.

f.   **Waiver of Jury Trial.**  Each party irrevocably waives trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either party.

g.   **Limitations of Claims.**  Except for claims against Franchisee concerning the under-reporting of gross revenue, any and all claims arising out of or relating to this agreement or the relationship among the parties hereto shall be barred unless an action or legal or arbitration proceeding is commenced within one (1) year from the date Franchisee or Franchisor knew of the facts giving rise to such claims.

h.    **Binding Effect**.  This Agreement is binding upon the parties hereto, and their respective executors, administrators, heirs, assigns and successors in interest.

i.    **Modification**.  This Agreement shall not be modified except by written agreement signed by both Franchisee and Franchisor.  Notwithstanding the preceding sentence, Franchisor may modify the Operations Manual pursuant to Paragraph 4.c.

j.    **Construction**.  The preambles and riders are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral, electronic, or written understandings or agreements between Franchisor and Franchisee relating to the subject matter of this Agreement.  Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto.  Except where this Agreement expressly obligates Franchisor reasonably to approve or not unreasonably to withhold its approval of any action or request by Franchisee, Franchisor has the absolute right to refuse any request by Franchisee or to withhold its approval of any action or omission by Franchisee.  The headings of the several sections and paragraphs hereof are for convenience only and do not define, limit or construe the contents of such sections or paragraphs.  The term "attorneys' fees" shall include, without limitation, reasonable legal fees, whether incurred prior to, in preparation for or in contemplation of the filing of any written demand or claim, action, hearing or proceeding to enforce the obligations of this Agreement.  The term "affiliate" as used herein is applicable to any company directly or indirectly owned or controlled by Franchisor, under common control with Franchisor or any principal of Franchisor.  References to a "controlling interest" in Franchisee shall mean more than fifty percent (50+%) or more of the voting control of Franchisee.  The term "Franchisee" as used herein is applicable to one or more persons, a corporation, a partnership, or LLC, as the case may be, and the singular usage includes the plural and the masculine and neuter usages include the other and the feminine.  If two or more persons are at any time Franchisee hereunder, whether or not as partners or joint venturers, their obligations and liabilities to Franchisor shall be joint and several.  This Agreement shall be executed in multiple copies, each of which shall be deemed an original.

k.    **Time is of the Essence**.  Time is of the essence of this Agreement.

l.    Mandatory and Binding Arbitration.

    i.    All disputes, controversies or claims arising out of or relating to this Agreement shall be submitted for arbitration to the Chicago, Illinois office of the American Arbitration Association on demand of either party. Such arbitration proceedings shall be conducted in Chicago, Illinois and shall be heard by one arbitrator in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association. All matters within the scope of the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) shall be governed by it.

    ii.    The arbitrator shall have the right to award or include in his award any relief which he deems proper in the circumstances, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief and attorneys' fees and costs, in accordance with Paragraph 17.d., provided that the arbitrator shall not have the authority to award exemplary or punitive damages, nor shall he have jurisdiction over any dispute relating the ownership, validity or registration of any name or Mark licensed hereunder. The award and decision of the arbitrator shall be conclusive and binding upon all parties hereto and judgment upon the award may be entered in any court of competent jurisdiction. Each party waives any right to contest the validity or enforceability of such award. The parties agree to be bound by the provisions of any limitation on the period of time by which claims must be brought. The parties further agree that, in connection with any such arbitration proceeding, each shall submit or file any claim which would constitute a compulsory counterclaim (as defined by rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed in such proceeding shall be barred.

    iii.    Franchisor and Franchisee agree that arbitration shall be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between Franchisor and Franchisee shall not be consolidated with any other arbitration proceeding involving Franchisor and any other person, corporation, partnership or LLC.

    iv.    This provision shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

v.   Notwithstanding the above and foregoing, Franchisor shall have the right to apply directly to a court of competent jurisdiction for a temporary restraining order, preliminary injunction or other emergency relief which may be available to protect the name, Marks or System licensed hereunder, without the necessity of first filing an arbitration demand.

18.   **NOTICES AND PAYMENTS.** All written notices and reports permitted or required to be delivered by the provisions of this Agreement or of the Operations Manual shall be deemed so delivered at the time delivered by hand, one (1) business day after transmission by facsimile, telegraph or other electronic system, one (1) business day after being placed in the hands of a commercial courier service for overnight delivery, or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the parties as follows:

Franchisor:   8501 W. Higgins Road, Suite 320
Chicago, Illinois 60631

Franchisee:   **Marc Steinman, Marvin Steinman and Lee Steinman
381 Santa Rosa Boulevard, C-704
Fort Walton Beach, Florida 32548**

or at the most current principal business address of which the notifying party has been notified. Any required payment or report not actually received by Franchisor during regular business hours on the date due (or postmarked by postal authorities at least two (2) days prior thereto) shall be deemed delinquent.

19.   **ACKNOWLEDGEMENTS.** Franchisee acknowledges that he has read this Agreement and Franchisor's Uniform Franchise Offering Circular; and that he understands and accepts the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain Franchisor's high standards of quality and service and the uniformity of those standards at all BAB Systems Stores and thereby to protect and preserve the goodwill of the Marks and the System. Franchisee acknowledges that he has conducted an independent investigation of the business venture contemplated by this Agreement and recognizes that it involves business risks and that the success of the venture is largely dependent upon the business abilities of Franchisee. Franchisee further represents to Franchisor, as an inducement to its entry into this Agreement, that Franchisee has made no misrepresentations in obtaining the Franchise.

IN WITNESS WHEREOF the parties hereto have executed, sealed, and delivered this Agreement in __2__ counterparts effective on the day and year first above written.

Franchisor:                                  Franchisee:
BAB SYSTEMS, INC.                            Corporate Signature:
an Illinois corporation
                                             _____
                                             a _____ corporation

By: _____                   By: _____
Title: _____                  Title: _____
Date Accepted: _____                   Date Signed: _____

                                             Individual Signatures:


                                             _____
                                             Marc Steinman                Date


                                             _____
                                             Marvin Steinman              Date


                                             _____
                                             Lee Steinman                 Date

<u>Rider A</u>

TO THAT CERTAIN
BAB SYSTEMS FRANCHISE AGREEMENT
BY AND BETWEEN BAB SYSTEMS, INC.
AND Marc Steinman, Marvin Steinman and Lee Steinman
DATED _____, 19 ____
(the "Franchise Agreement")

The parties hereto agree that the BAB Systems Store to be operated by Franchisee pursuant to the Franchise Agreement shall be located at the following premises:

Shalimar Plaza
1191-Beglin Parkway
Shalimar, Florida 32579

Franchisee acknowledges and agrees that Franchisor's approval of the premises for the Store and any information communicated to Franchisee regarding the premises for the Store do not constitute a representation or warranty of any kind, expressed or implied, as to the suitability of the premises for a BAB Systems Store, of the economic terms of the lease or sublease, or for any other purpose. Franchisor's approval of the premises indicates only that Franchisor believes that the premises falls within the acceptable criteria established by Franchisor as of the time period encompassing the evaluation. Both Franchisee and Franchisor acknowledge that application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and premises and that, subsequent to Franchisor's approval of a site and premises, demographic and/or economic factors, including competition from other businesses, included in or excluded from Franchisor's criteria could change, thereby altering the potential of a site and premises. The uncertainty and instability of such criteria are beyond Franchisor's control and Franchisee must agree that Franchisor will not be responsible for the failure of a site and premises approved by Franchisor to meet expectations as to potential revenue or operational criteria. Franchisee further acknowledges and agrees that his acceptance of a franchise for the operation of a BAB Systems Store at the above premises is based on his own independent investigation of the suitability of the premises.

BAB SYSTEMS, INC.
an Illinois Corporation                    Franchisee: Marc Steinman


By ___ ___ _____ _____          _____ _____ ___ ___ ___ ___
Title: _ ___ ___ __ _____ _____    Franchisee: Marvin Steinman

Franchisee:  Lee Steinman

<u>Rider B</u>

TO THAT CERTAIN
BAB SYSTEMS FRANCHISE·AGREEMENT
BY AND BETWEEN BAB SYSTEMS, INC.
AND Marc Steinman, Marvin Steinman and Lee Steinman
DATED _____, 19____.
<u>(the "Franchise Agreement")</u>

## COLLATERAL ASSIGNMENT OF LEASE

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby assigns, transfers and sets over unto BAB SYSTEMS, INC., an Illinois corporation ("Assignee") all of Assignor's right, title and interest as tenant in, to and under that certain lease, a copy of which is attached hereto (the "Lease") respecting premises commonly known as **Shalimar Plaza, 1191-Beglin Parkway, Shalimar, Florida 32579 (the "Premises")**. This Assignment is for collateral purposes only and except as specified herein, Assignee shall have no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee shall take possession of the premises demised by the Lease pursuant to the terms hereof and shall expressly agree in writing to assume the obligations of Assignor thereunder.

In the event Assignor owns the land and/or building in which the Store is located, Assignor does hereby grant an option to Assignee or its designee to lease such premises on a triple-net basis for the remainder of the then-current term of the Franchise Agreement, at a reasonable commercial rental rate, as determined by a licensed commercial real estate broker selected by Assignee.

Assignor represents and warrants to Assignee that it has full power and authority to so assign the Lease and its interest therein and that Assignor has not previously, and is not obligated to, assign or transfer any of its interest in the Lease or the premises demised thereby.

Upon a default by Assignor under the Lease or under the franchise agreement for a BAB Systems Store to be operated at the Premises, between Assignee and Assignor (the "Franchise Agreement"), or in the event of a default by Assignor under any document or instrument securing said Franchise Agreement, Assignee shall have the right and is hereby empowered to take possession of the Premises, expel Assignor therefrom, and, in such event, Assignor shall have no further right, title or interest in the Lease.

Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee. Throughout the term of the Franchise Agreement and any renewals thereof, Assignor agrees that it shall elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days prior to the last day that said option must be exercised, unless Assignee otherwise agrees in writing, and upon failure of Assignor to so elect to extend or renew the Lease as aforesaid, Assignor hereby appoints

Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and stead of Assignor for the sole purpose of effecting such extension or renewal.

**IN WITNESS WHEREOF,** the parties hereto have set their hands and seals this \_\_\_\_\_ day of _____, 19_____.

_____

Assignor: Marc Steinman

_____

Assignor: Marvin Steinman

_____

Assignor: Lee Steinman

## Rider C

TO THE BAB SYSTEMS, INC. FRANCHISE AGREEMENT

GUARANTY AND ASSUMPTION OF OBLIGATIONS

THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS is given this         day of _____.  _____, 1998, by Marc Steinman, Mara Henderson, Marvin Steinman and Lee Steinman.

In consideration of, and as an inducement to, the execution of that certain BAB SYSTEMS, INC. Franchise Agreement of even date herewith (the "Agreement") by BAB Systems, Inc. (the "Franchisor"), each of the undersigned hereby personally and unconditionally (a) guarantees to Franchisor, and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that Steinman & Steinman, Inc. ("Franchisee") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including without limitation the provisions of Paragraph 9.f. and 16.d.

Each of the undersigned waives: (1) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (2) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (3) protest and notice of default to any party with respect to the indebtedness or nonperformance of obligations hereby guaranteed; (4) any right he may have to require that an action be brought against Franchisee or any other person as a condition of liability; and (5) any and all other notices and legal or equitable defenses to which he may be entitled.

Each of the undersigned consents and agrees that: (1) his direct and immediate liability under this guaranty shall be joint and several; (2) he shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; and (4) such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend his guaranty, which shall be continuing and irrevocable during the term of the Agreement.

IN WITNESS WHEREOF, each of the undersigned has hereunto affixed his signature on the same day and year as the Agreement was executed.

|  | PERCENTAGE OF OWNERSHIP OF FRANCHISEE |
| --- | --- |
| GUARANTOR(S) | |
| _____  _____  Marc Steinman | _____  __  ___ % |
| __  _____  __  _____  _____  Mara Henderson | __  ___  __  __ % |
| ___  _____  __  ___  _____  Marvin Steinman | _____  _% |
| _____  _  ____  _____  Lee Steinman | _____  _  __ % |
| _____  _____  _____ | _____  ___  __ % |

FILE # 2500810 RCD: 06/09/2008 @ 03:09 PM, BK: 2845  PG: 1121   RECORDING:
$15.00   RECORDING ARTICLE V:  $12.00     DEPUTY CLERK KSCHOOLCRAFT DON W.
HOWARD, CLERK OF COURTS, OKALOOSA COUNTY FL

This Instrument Prepared By:
Matthew W. Burns, Esq.
Post Office Bix 1226
Destin, Florida 32540

**CLAIM OF LIEN**

State of Florida
County of Okaloosa

Before me, the undersigned notary public, personally appeared FREDA J. FIFE, who was

duly sworn and says that she is the Secretary/Treasurer and Agent of the Lienor herein, FIFE

REFRIGERATION, INC., whose address is 106 Perry Avenue, S.E., Fort Walton Beach, Florida

32548; and that in accordance with a contract with MARC STEINMAN, whose address is 1191-

B Eglin Parkway, Shalimar, Florida, 32579, and STEINMAN & STEINMAN, INC., a Florida

corporation whose address is also 1191-B Eglin Parkway, Shalimar, Florida, 32579, both doing

business as "Big Apple Bagel, contracting for themselves and for BAB, INC., a foreign

corporation whose address is 500 Lake Cook Road, Suite 475, Deerfield, Illinois, 60015, and for

SHALIMAR PLAZA, LLC., a Florida limited liability company whose address is 105 Auburn

Avenue, Fort Walton Beach, Florida 32547, the above Lienor furnished labor, services, or

materials consisting of the following, to-wit:

> Repair walk-in cooler, West air handler, replace thermostat;
> repair deli case; Repair APW Wyott toaster; repair back kitchen air
> conditioning; service AP Wyott Toaster; oven rack, water pump and drain
> line on ice machine; replace walk-in cooler compressor and filter drier,
> recharge with freon, inspect wiring and breakers; modify power circuits for
> walk-in cooler condensers and air handlers; service walk-in cooler and
> Gemini rack oven; repair walk-in cooler; repair Federal cream cheese
> cooler; replace and repair timer on Gemini rack oven; repair air handler
> drain pan and replace fan and fan motor on back kitchen air conditioner.

**Exhibit B**

BK:  2845  PG:  1122

used on particular improvements on the following described real property in Okaloosa County, Florida, to-wit:

That portion of the real property named Shalimar Plaza shopping center located at 1193 Eglin Parkway, North, Shalimar, Florida 32547, and more particularly described on Exhibit "A" appended hereto, which portion was occupied by "Big Apple Bagel" as of April 1, 2008, and has a mailing address of 1191-B Eglin Parkway N, Shalimar,FL, 32547,

owned by the said SHALIMAR PLAZA, LLC., 105 Auburn Avenue, Fort Walton Beach,

Florida 32547, of a total value of $5013.69, all of which remains unpaid, and furnished the first

of the items on March 9, 2007, and 16, 1998, and the last of the items on May 5, 2008.

FIFE REFRIGERATION, INC.,
106 Perry Avenue, S.E.,
Fort Walton Beach, Florida 32548
Licnor

By:  *Freda J. Fife*
FREDA J. FIFE
Its Secretary/Treasurer

Sworn to and subscribed before me this ___ day of June, 2008, by FREDA J. FIFE, who presented FL DL F100-370-77-564-0 _____ as identification, or who is otherwise known to me.

Name: Matthew W. Burns
Notary Public
My commission expires on:
January 9, 2010

Matthew W. Burns
Commission # DD363875
Expires January 9, 2009
Bonded Troy Fain - Insurance, Inc. 800-385-7019

BK:  2845  PG:  1123

EXHIBIT "A"
TO CLAIM OF LIEN

Legal Description of Shalimar Plaza:

That real property in Okaloosa County, Florida,  having Property Appraiser's ID  No.
06-2S-23-0000-0018-0050,  more specifically described as :

COMMENCE AT A GENERAL LAND OFFICE MONUMENT MARKING THE NORTHEAST CORNER OF SECTION 6, TOWNSHIP 2 SOUTH, RANGE 23 WEST, OKALOOSA COUNTY, FLORIDA; THENCE SOUTH 01 DEGREES 16'05" WEST A DISTANCE OF 1456.93 FEET TO THE INTERSECTION OF THE EAST RIGHT-OF-WAY LINE OF STATE ROAD NO. 85 (EGLIN PARKWAY) (100' R/W) WITH THE WEST R/W LINE OF SECOND STREET (50' R/W); THENCE CONTINUE SOUTH 01 DEGREES 16'05" WEST ALONG THE R/W OF SECOND STREET A DISTANCE OF 678.70 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 01 DEGREES 16'05" WEST ALONG SAID R/W OF SECOND STREET A DISTANCE OF 292.93 FEET; THENCE NORTH 71 DEGREES 28'17" WEST A DISTANCE OF 278.76 FEET TO THE AFOREMENTIONED EAST R/W OF STATE ROAD NO. 85; THENCE NORTH 17 DEGREES 55'01" EAST ALONG SAID R/W A DISTANCE OF 277.67 FEET; THENCE SOUTH 72 DEGREES 04'59" EAST A DISTANCE OF 194.82 FEET TO THE POINT OF BEGINNING.

Being the property described in that Deed recorded at Book 2533, Page 3067, Official Recdords
of Okaloosa County, Florida, together with all improvements thereon,

JUN. 9. 2008 11:27AM    1-847-405-8140                    NO. 2969    P. 2

# BAB Systems, Inc.   

VIA FACSIMILE: 850-864-4116

June 9, 2008

Mr. Jack Herms

Re: Big Apple Bagels, Shalimar Plaza, 1191-B Elgin Parkway, Shalimar, Florida

Dear Mr. Herms:

Thank you for taking the time last week to talk with me regarding the Big Apple Bagels store in Shalimar. It is my understanding that you would not be willing to rent the location to a Big Apple Bagels Franchise without a corporate guarantee. As I mentioned in our conversation, we are unwilling to provide such a guarantee.

In lieu of a franchisee taking over the location, we have certain purchase rights to the equipment currently located in the store. It is our understanding that the current tenant intends to close the store effective June 11, 2008. We are in the process of finalizing the purchase of the equipment per the franchise agreement and making arrangements to have to the equipment professionally removed. I would like to discuss this process with you and make sure we would meet your requirements to do so in a timely manner. Additionally, we would contact a local sign company to remove any signs that have our registered name or trademarks also in a timely manner.

Please call me to discuss at your earliest convenience since June 11th is two days from now.

Cordially,

Tony Cervini
Director of Development
BAB Systems, Inc.

500 Lake Cook Road, Suite 475 • Deerfield, IL 60015 • 847-948-7520 • Fax: 847-405-8140
www.babcorp.com

**Exhibit C**

JUN-11-2008 WED 09:30 AM MICHAEL Wm MEAD          FAX NO. 18502444849          P. 02/02

Law Offices

## Michael Wm Mead, P.A.

24 Walter Martin Road, Suite 3
Fort Walton Beach, Florida 32548
Telephone: (850) 243-3135
Facsimile: (850) 244-4849

*Michael Wm Mead*
*Michael W. Mead, Jr.*
*John S. Mead*

Please reply to:
Post Office Box 1329
Fort Walton Beach, FL 32549-1329

June 11, 2008

Steinman & Steinman, Inc.
1191-B Eglin Parkway
Shalimar, FL 32579-1252
Fax: 651-0084

BAB, Inc. / BAB Systems, Inc.
ATTN: Mr. Tony Cervini
500 Lake Cook Road, Suite 475
Deerfield, IL 60015
Fax: (847) 405-8140

RE:    1191-B Eglin Parkway, Shalimar, Okaloosa County, Florida

Gentlemen:

My client has received correspondence from both of you concerning the lease of the captioned premises, as well as the personal property contained therein. In order that there is no misunderstanding, the current lease does not expire until April 30, 2009 and rent for that time period is due and owing, but is paid incrementally on the first of each month.

A portion of your correspondences has referenced the possible removal of equipment and other personal property from the demised premises. The purpose of this letter is to caution both of you against any removal of that personal property or equipment, as the landlord has a statutory Landlord's Lien on such equipment as provided by Chapter 83 of the Florida Statutes. Such lien continues through the end of the lease, and then only upon the successful and complete payment of all rents.

Please govern yourselves accordingly.

Sincerely,

*(Mr. Mead was obliged to leave the office*
*before signing this document that was*
*personally dictated by him)*

Michael Wm Mead
MWM/bjg

cc:    Zachary A. VanDyke, Esquire
       c/o Anchors, Smith & Grimsley
       909 Mar Walt Drive, Ste 1014
       Fort Walton Beach, FL 32547
       Fax: 863-1591

cc: Shalimar Plaza, LLC
    via fax: 864-4116
    ATTN: Jack Henns

**Exhibit D**

## LEASE

THIS INDENTURE OF LEASE, entered into this 1ˢᵗ day of May, 2007, by and between Shalimar Plaza, LLC, hereinafter referred to as "Landlord" and Steinman and Steinman, Inc. doing business as Big Apple Bagels hereinafter referred to as "Tenant".

### WITNESSETH THAT:

In consideration of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord hereby leases to Tenant, and Tenant hereby takes from Landlord, the Premises, as defined in Section 1.1.(b),

TO HAVE AND TO HOLD the Premises for the Term, defined in Section 1.1 (c).

### ARTICLE I

### DEFINITIONS AND ENUMERATION OF EXHIBITS

1.1.   In addition to other terms which are elsewhere defined in this lease, the following terms when used in this lease shall have the meanings set forth in this section, and only such meanings, unless such meanings are expressly limited or expanded elsewhere herein

(a) SHOPPING CENTER: (i) The real estate depicted or described on Exhibit "A", hereto attached; (ii) such contiguous real estate as Landlord may from time to time designate in writing as being included in Shopping Center; (iii) the buildings and improvements constructed on such real estate substantially in accordance with Exhibits "B" and "C", attached hereto, together with all alterations and additions thereto; and (iv) such improvements as may be constructed on such real estate after the Rental Commencement Date. Landlord reserves the right to change the number and location of buildings, building dimensions, and the Common Areas, provided that reasonable access to the Premises and the parking facilities provided within the Shopping Center shall not be materially impaired.

(b) THE PREMISES: That portion of Shopping Center which is outlined in red on the floor plan, or plans, marked Exhibit "B", hereto attached. The Premises are deemed to contain approximately 2130 square feet of Gross Rentable Area, being approximately 24 feet of frontage and approximately 90 feet of depth extending to the center line of the party walls and to the exterior faces of all other walls, but reserving and excepting to Landlord the use of the roof and exterior walls (other than store fronts) and the right to install, maintain, use, repair, and replace pipes, ducts, conduits, wires, and appurtenant fixtures, leading through the Premises in locations which will not materially interfere with Tenant's use thereof.

(c) READY FOR OCCUPANCY: When Landlord's Work on the Premises as described in Exhibit "C", hereto attached, has been substantially completed (except for minor finishing operations or items necessarily awaiting performance of Tenant's Work).

(d) RENTAL COMMENCEMENT DATE:    May 1, 2007.

(e) LEASE TERM OR TERM: The period of time commencing with the date of this lease and terminating two (2) years and zero (0) months after the Rental Commencement Date (April 30, 2009), unless such terminating date is other than the last day of a calendar month, in which event this lease shall terminate on the last day of the calendar month in which such date falls.

(f) SCHEDULED COMPLETION DATE: Intentionally left blank.

(g) MINIMUM GUARANTEED RENTAL: $25,560.00 per annum, payable $2,130.00 per month.

(h) PERCENTAGE RENTAL RATE: zero (0) %

(i) ADVANCE DEPOSIT: $ 0.00  applied as _____

(j) SECURITY DEPOSIT: $

(k) TENANT'S TRADE NAME:  Big Apple Bagels

(l) TENANT'S WORK: Intentionally left blank

(m) LANDLORD'S WORK: Intentionally left blank

(n) LANDLORD'S MAILING ADDRESS: 105 Auburn Road, Fort Walton Beach, Florida 32547

(o) TENANT'S MAILING ADDRESS: 1191-B Eglin Parkway, Shalimar FL 32579-1252 or such other address as may from time to time be designated by Tenant in a written notice to Landlord.

(p) USE OF PREMISES: The premises may be used on for sale of Bagels and related products (bagel chips, bagel sandwiches, bagel pretzels); tenant may also sell muffins, cinnamon rolls, espresso and related drinks (cappuccino, latte, mocha, etc.); whole bean and ground coffee sales. Upon prior approval of Landlord, Tenant may reasonably modify the use of the premises, including Tenant's trade name and Tenant's signage. Such prior approval of Landlord will not be unreasonably withheld.

(q) LANDLORD'S CONTRIBUTION TO TENANT'S WORK: n/a

(r) COMMON AREAS: Those areas of the Shopping Center, including all parking areas which are from time to time open for joint use by the tenants of Shopping Center or by the public including, without limiting the generality of the foregoing, driveways, truck ways, delivery passages, walkways, concourses, malls, planted areas, landscaped areas, and public restrooms and common truck loading and receiving areas which are not leased to or reserved for individual tenants.

(s) GROSS RENTABLE AREA: Floor area designed for tenant occupancy and exclusive use, measured from the exterior of outside walls and store fronts and from the center of party walls.

Initial here

(l) **LIABILITY INSURANCE LIMITS:** $500,000.00 with respect to injuries to or death of any one person, and $500,000.00 with respect to any one occurrence, and $100,000.00 with respect to property damage or a combined single limit of $500,000.00.

7.11 **LEASE YEAR:** The Term "Lease Year" shall mean in the case of the first Lease Year, that period from the Rental Commencement Date to the first succeeding December 31; thereafter "Lease Year" shall mean each successive twelve (12) calendar month period following the expiration of the first Lease Year, in each case commencing on January 1 and ending the next succeeding December 31, except that in the event of the termination of this lease on any day other than December 31, then the last Lease Year shall be the period from the end of the preceding Lease Year to such date of termination.

1.2 The exhibits enumerated in this section (if used) and attached to this lease are incorporated in this lease by this reference and are to be construed as a part of this lease.

(a) Exhibit "A"  Legal Description
(b) Exhibit "B"  General floor area plan of Premises and building containing Premises
(c) Exhibit "C"  Not Used
(d) Exhibit "D"  Estimated charges for those items set forth in Sections 4.3 and 15.2
(e) Exhibit "E"  Short Form Lease
(f) Exhibit "F"  Rules and Regulations
(g) Exhibit "G"  Special Stipulations
(h) Exhibit "H"  Sign Criteria
(i) Exhibit "I"  Addendum

ARTICLE II

CONSTRUCTION AND ACCEPTANCE OF PREMISES

2.1 Tenant accepts premises as is.

2.2 Should Tenant desire to make construction modifications to the Premises, Tenant agrees to submit to Landlord within thirty (30) days after the date of this lease, plans and specifications in such detail as Landlord may reasonable request covering proposed Tenant's Work on the premises. Such plans and specifications shall comply with all requirements of applicable building codes. Tenant shall not commence any work in the Premises until Landlord has approved such plans and specifications in writing, which approval shall not be unreasonably withheld or delayed.

2.3  n/a

2.4  n/a

2.5  n/a

2.6  n/a

2.7  n/a

2.8 Landlord may, from time to time, do any one or more of the following with respect to buildings, and/or the Common Areas then existing in the Shopping Center or buildings and/or the Common Areas to be constructed in the Shopping Center: (i) construct alterations therein; (ii) construct additions thereto; (iii) construct additional stories thereon; (iv) construct additional buildings, free-standing or connected to then-existing buildings; (v) construct deck or elevated parking facilities, freestanding or connected to then-existing buildings; or (vi) rearrange, build upon or eliminate any Common Areas, provided that in no event shall there be provided less than the minimum parking facilities as set forth in Section 4.1 hereof.

ARTICLE III

RENT

3.1 Rental and other charges due and payable hereunder shall accrue hereunder from the Rental Commencement Date until the termination of this lease and shall be payable at the following mailing address unless otherwise directed by landlord in writing: 105 Auburn Road, Fort Walton Beach, FL 32547.

3.2(a) Tenant shall pay to Landlord the Minimum Guaranteed Rental in twelve (12) equal monthly installments. The first such monthly installment shall be due and payable on or before the Rental Commencement Date (except that if the Rental Commencement Date falls on a day other that the first day of a calendar month, the first payment shall be an amount equal to that percentage of a monthly installment which the number of days from the Rental Commencement Date to the end of such calendar month bears to the total number of days in such month) and a like installment, unless adjusted upward as provided below, shall be due and payable without notice on or before the first day of each succeeding calendar month during the Term. The covenant of Tenant to pay all rents hereunder is and shall be deemed a separate and independent covenant and Tenant shall have no right of deduction or set-off whatsoever.

ARTICLE IV

COMMON AREAS

4.1 Landlord agrees that it will maintain parking facilities in Shopping Center or in reasonable proximity thereto which shall contain at all times after tenant has opened the Premises to the public for business at least 4.0 parking space for each one-thousand (1,000) square feet of Gross Rental Area occupied by tenants of Shopping Center, excluding any space used for a theater, provided, however, that if a portion or portions of the parking areas shall be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase under threat thereof, Landlord shall be relieved of its obligations to provide parking facilities in accordance with this section to the extent that such parking facilities cannot be provided without unreasonable expense, or in reasonable proximity to the Shopping Center.

4.2 Tenant, and its licensees, concessionaires, employees and customers shall have the non-exclusive right to use the Common Areas as constituted from time to time, such use to be in common with Landlord, other tenants of Shopping Center and other persons entitled to use

 Initial here

the Common Areas, subject to such reasonable rules and regulations as Landlord may from time to tome prescribe, provided that Landlord may require that automobiles owned by Tenant, its licensees, concessionaires and employees be parked in specific portions of the Common Areas or other parking areas outside Shopping Center which are in reasonable proximity thereto. Upon request by Landlord, Tenant shall furnish to Landlord a complete list of the license numbers of all automobiles operated by Tenant, its licensees, concessionaires and employees. If Tenant, its licensees, concessionaires, and employees fail to park their cars in the designated Common Areas, Landlord shall have the right in its sole discretion to (i) charge Tenant Ten Dollars ($10.00) per day per car parked in any Common Areas other that those designated, and/or (ii) have such car(s) physically removed from the Shopping Center at Tenant's expense without any liability whatsoever to Landlord. Tenant shall not interfere with the rights of other persons to use the Common Areas. Landlord may temporarily close any part of the parking facilities or other portions of the Common Areas for such periods of time as may be necessary for (i) temporary use as a work area in connection with the construction of buildings or other improvements within the Shopping Center or contiguous property, (ii) repairs or alterations in or to the Common Areas or to any sewers, utility facilities or distribution lines located within the Common Areas, (iii) preventing the public from obtaining prescriptive rights in or to the Common Areas, (iv) security reasons, or (v) doing and performing such other acts (whether similar or dissimilar to the foregoing) in, to and with respect to, the Common Areas as in the use of good business judgment the Landlord shall determine to b e appropriate for he Shopping Center, provided however, that Landlord shall use reasonable efforts not to unduly interfere with or disrupt Tenant's business.

4.3 Tenant agrees to pay as additional rent, as hereinafter provided, its share of expense incurred by Landlord at its discretion for the operation and maintenance of the Common Areas, including without limiting the generality of the foregoing, costs incurred for lighting, painting, cleaning, central trash disposal, (if Landlord elects to provide), traffic control, policing, inspecting, landscaping and repairing and replacing the Common Areas, or any part thereof together with a reasonable allowance for Landlord's direct overhead, depreciation of maintenance equipment, hazard and public liability insurance and property damage insurance, all water consumed in Shopping Center which is not separately metered to tenants (single or multiple) and if the Premises abut upon an enclosed mall, a contribution to the cost of heating and air conditioning the enclosed mall, but excluding depreciation of Landlord's original investment in Shopping Center. The share to be paid by Tenant shall be that percentage of the cost of operation and maintenance of the Common Areas which the Gross Rental Area of the Premises bears to the Gross Rentable Area of the Shopping Center. Tenant shall pay said amounts to the Landlord in monthly installments at the same time and place as the monthly minimum rents are required to be paid, without demand. Landlord may at its option make monthly or other periodic charges based upon the estimated annual cost of operation and maintenance of the Common Areas, payable in advance but subject to adjustment after the end of each calendar year on the basis of he actual costs for such year. In accordance with the annual adjustment, any deficiency resulting from any underpayments by Tenant shall be due and payable within ten (10) days from the date of any statement rendered to Tenant by Landlord and any overpayments by Tenant shall be credited against future estimated installments due by Tenant. Within ninety (90) days after the close of each calendar year, upon written request from Tenant, Landlord will furnish to Tenant a detailed statement of the expenses relating to the Common Areas for such year, such statement to be prepared in accordance with generally accepted accounting practices and to include Tenant's proportionate share of the expenses relating to the Common Areas computed as herein provided.

4.4 In the event Tenant is not billed directly by the appropriate authority for water consumed on the Premises and/or for sewer rents or charges, the bill rendered by Landlord for the above shall be based upon Tenant's pro-rated share of such service as determined by Landlord and shall be payable by Tenant within five (5) days of receipt of Landlord's bill, and such costs or expense incurred or payment which are made by the Landlord for water or sewer service used on the Premises shall be deemed to be additional rent payable by Tenant and collectible by Landlord as such.

ARTICLE V

USE AND CARE OF PREMISES

5.1 Tenant shall in good faith continuously throughout the Term of this lease conduct and carry on in the entire Premises the type of business described in Section 1.1(p) and the Premises shall not be used for any other purpose. Tenant shall use Tenant's Trade Name in the transaction of business in the Premises. Tenant shall not sell, display or solicit sales in the Common Areas. Tenant shall not use or permit the use of any vending machines or public telephones on, at or about the Premises without the prior written consent of Landlord. Tenant shall not commit waste, perform any acts or carry on any practices which may injure the Shopping Center or be a nuisance or menace to other tenants in the Shopping Center. Tenant shall operate its business in a dignified manner and in accordance with high standards of store operations so as to maintain a character in keeping with the rest of Shopping Center, and so as to produce the maximum Tenant's Gross Sales and shall, at all time when the Premises are open for business with the public, keep the Premises properly equipped with fixtures, stocked with an adequate supply of merchandise and attended by adequate personnel.

5.2 In the use and occupancy of the Premises, Tenant shall comply with all laws and ordinances and all valid rules and regulations of the United States, the State of Florida, City of Shalimar the County of Okaloosa and other applicable government or agency having authority over insurance rates.

5.3 Tenant shall at all times keep the Premises at a temperature sufficiently high to prevent freezing of water pipes and fixtures.

5.4 If the Premises are part of the enclosed mall, then during all hours when Shopping Center generally is open for business to the public, Tenant shall maintain the following temperatures in all merchandising areas in the Premises, subject to any adjustments required by any governmental agency.

(a) Heating Season: A prevailing minimum temperature of sixty-eight (68°) degrees Fahrenheit.

(b) Cooling Season: A prevailing maximum temperature of seventy-eight (78°) degrees Fahrenheit and relative humidity of approximately sixty percent (60%).

ARTICLE VI

TENANT'S COVENANTS

6.1 Tenant shall not, nor shall Tenant at any time permit any occupant of the Premises to, (i) conduct or permit any fire, bankruptcy or auction sale (whether real or fictitious) unless directed by order of a court of bankruptcy or of competent jurisdiction, or conduct or permit any fictitious "Going Out of Business" sale; (ii) use, or permit to be used, the malls or sidewalks adjacent to such Premises, or any other area outside the Premises for the sale or display of any merchandise or for any other business, occupation or undertaking, or for outdoor public meetings, circus or other entertainment (except for promotional activities in cooperation with the management of the Shopping Center or an association of merchants within the Shopping Center); (iii) use or permit to be used, any sound broadcasting or amplifying device which can be heard outside of the Premises; (iv) operate or cause to operated any "elephant trains" or similar transportation devices; (v) use of permit to be used any portion of the Premises for any unlawful purpose or use or permit the use of any portion of the Premises as regular living quarters, sleeping apartments or lodging rooms or for the conduct of any manufacturing business; (vi) use the Premises for or conduct therein activities, the purpose for which is excluded from or inconsistent with or not included within the purpose for which the Premises may be used according to Section 1.1(p) of this lease, or (vii) use, operate or maintain the Premises in such manner that any of the rates for any insurance carried by Landlord, or the occupant of any premises within the Shopping Center, shall thereby be increased, unless Tenant shall pay to landlord or such occupant within the Shopping Center, as the case may be, an amount equal to any such increase in rates, su9ch payment to be made promptly on demand as each premium which shall include such increase shall become due and payable.

Initial here

6.2 Tenant (i) will not represent or advertise that it regularly or customarily sells merchandise at "manufacturer's", "distributor's", or "wholesale", "warehouse", "fire sale", "bankruptcy sale", or similar prices or other than at retail prices; (ii) will keep all mechanical apparatus free of vibration or noise which may be transmitted beyond the confines of he Premises; (iii) will not cause or permit odors to emanate from the Premises except for ordinary odors associated with the preparation and sale of food items; (iv) will not load or unload or permit the loading or unloading of merchandise, supplies or other property except within the area designated by Landlord from time to time; and (v) will not permit the parking or standing, outside of such designated area, of trucks, trailers or other vehicles or equipment engaged in such loading or unloading.

6.3 Tenant (i) will keep clean the inside and outside of all glass in the doors and windows of the Premises; (ii) will replace promptly at its own expense with glass of like kind and quality any plate or window glass,; (iii) will replace doors or door hardware of the Premises which may for any reason become cracked or broken; (iv) will maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin, and other pests; (v) will not permit undue accumulation of garbage, trash rubbish or other refuse in the Premises; and (vi) will keep such refuse in proper containers inside the Premises until such time as same is called for to be removed.

6.4 Tenant shall keep the Premises open for business with the public during all hours when Shopping Center generally is open for business with the public. Unless the hours during which the Shopping Center shall be open for business with the public shall have been otherwise determined by a merchant's association, if in operation, or Landlord, if not, Tenant shall keep the Premises open for business with the public on each business day at least during the hours indicated below or such extensions of the minimum as shall be determined by the Landlord.

### STORE HOURS

|           | Open      | Close     |
|-----------|-----------|-----------|
| Monday    | 6:00 a.m. | 3:00 p.m. |
| Tuesday   | 6:00 a.m. | 3:00 p.m. |
| Wednesday | 6:00 a.m. | 3:00 p.m. |
| Thursday  | 6:00 a.m. | 3:00 p.m. |
| Friday    | 6:00 a.m. | 3:00 p.m. |
| Saturday  | 7:00 a.m. | 2:00 p.m. |
| Sunday    | 7:00 a.m. | 2:00 p.m. |

Store hours may be modified from time to time by Tenant upon prior approval of Landlord, such approval not to be withheld unreasonably.

In no event shall any Tenant be open for business less than 30 hours in any given week. Notwithstanding the provisions of this Section, no Tenant shall be required to keep its Premises open for business at any time prohibited by applicable law, ordinance or governmental regulations and Tenant shall be permitted to close the Premises during reasonable periods for repairing, cleaning or decorating the Premises, with written permission from Landlord.

6.5 In the event that at any time during the Term, or any extension or renewal thereof, Tenant should vacate, abandon, or desert the Premises or cease operating the store therein, Tenant shall be in default hereunder.

6.6 If Tenant is engaged in retail sales, then Tenant shall install and maintain at all times displays of merchandise in display windows in the Premises. Tenant will light any electric signs and keep the display windows in the Premises well lighted during such times as the level of light outside the Premises is less than ten (10) foot candles of natural light, except that Tenant shall not be required to keep its electric signs and windows lighted more than one hour following the store closing hour.

6.7 The rules and regulations as shown on Exhibit "F" are hereby made a part of this Lease, and Tenant agrees to comply with and observe the same. Tenant's failure to keep and ob serve said rules and regulations shall constitute a breach of the terms of this lease in the manner as if the same were contained herein as covenants. Landlord reserves the right from time to time to amend or supplement said rules and regulations and to adopt and promulgate additional rules and regulations applicable to the Premises and the Shopping Center. Notice of such additional rules and regulations, and amendments and supplements, if any, shall be given to Tenant and Tenant agrees thereupon to comply with and observe all such rules and regulations, and amendments thereto and supplements thereof, provided the same shall apply uniformly to all tenants of the Shopping Center.

### ARTICLE VII

### MAINTENANCE AND REPAIR OF PREMISES,
### ALTERATIONS AND LANDLORD'S RIGHT OF ACCESS

7.1 Landlord shall keep the foundation, he roof and the exterior walls of the Premises (except plate glass, doors, door closures, door frames, store fronts, windows and window frames located in exterior building walls) in good repair, except that Landlord shall not be required to make any repairs occasioned by the act of neglect of Tenant, its assignees, sub lessees, servants, agents, employees, invitees, licensees, or concessionaires, or the servants, agents, employees, invitees, licensees, or concessionaires of Tenant's assignees or sub lessees or any damage caused by or as a result of Tenant's occupancy of Premises, or any damages cause by break-in, burglary, or other similar acts in or to the Premises. In the event that the Premises should become in need of repairs required to be made by Landlord hereunder, Tenant shall give immediate written notice thereof to Landlord; and Landlord shall not be responsible in any way for failure to make any such repairs until reasonable time shall have elapsed after the giving of such written notice.

7.2 Tenant shall, at its sole cost and expense, keep the Premises in a safe, sightly, and serviceable condition and free from any infestation by insects, rodents, or other pests, and, except as provided in Sections 7.1, 12.1, 12.2, and 13.5 hereof, make all needed maintenance, repairs and replacements for the proper operation of Tenant's business within the Premises, including, but not limited to, all maintenance, repairs, and replacements to (i) the heating, ventilating, and air conditioning systems serving the Premises; (ii) the exterior and interior portion of all doors, windows, window frames, plate glass, door closures, door frames and store fronts; (iii) all plumbing and sewage facilities within the Premises, including free flow up to the connection to the main sewer line; (iv) all fixtures within the Premises; (v) all electrical systems serving the Premises (whether or not located within the Premises); (vi) all sprinkler systems serving the Premises; (vii) all interior walls, floors and ceilings; (viii) any of Tenant's Work; (ix) all repairs, replacements or alterations required by any governmental authority; and (x) all necessary repairs and replacements of Tenant's trade fixtures required for the proper conduct and operation of Tenant's business. If at any time and from time to time during the Term, and any extensions and renewals thereof, Tenant shall fail to make any maintenance, repairs or replacements in and to the Premises as required in this Lease, Landlord shall have the right, but not the obligation, to enter the Premises and to make such maintenance, repairs and replacements for and on behalf of Tenant, and all sums expended by Landlord for such maintenance, repairs and replacements shall be deemed to be additional rent hereunder and shall be payable to landlord upon demand. At the termination of this Lease, Tenant shall surrender the Premises in good condition, reasonable wear and tear and loss by fire or other casualty alone excepted.

7.3 Tenant shall not make any alterations, additions, or replacements to the Premises, or any repairs required of Landlord under Section 7.1 of this lease, without prior written consent of Landlord, except for Tenant's Work and the installation of unattached moveable fixtures which may be installed without drilling, cutting, or otherwise defacing the Premises. All alterations, additions and improvements made in and to the Premises and all floor covering that is cemented or adhesively fixed to the floor and all fixtures (other than trade fixtures) which are


Initial here

installed in the Premises shall remain in and be surrendered with the Premises and shall become the property of Landlord at the expiration or sooner termination of this lease. So long as Tenant is not in default hereunder, Tenant shall have the right to remove its trade fixtures from the Premises, provided that Tenant shall repair and restore any damage to the Premises caused or occasioned by such removal.

7.4 All Tenant's Work and all repairs, alterations, additions and improvements done by Tenant within the Premises shall be performed in a good and workmanlike manner, in compliance with all governmental requirements, and at such times and in such manner as will cause a minimum of interference with other construction in progress and with the transaction of business in Shopping Center. Whenever Tenant proposes to do any construction work within the Premises, Tenant shall first furnish to Landlord plans and specifications covering such work in such detail as Landlord may reasonably request. Such plans and specifications shall comply with such requirements as Landlord may from time to time prescribe for construction within the Shopping Center. In no event shall any construction work be commenced within the Premises without Landlord's written approval of such plans and specifications.

7.5 Landlord shall have the right, but not the duty, to enter upon the Premises at any time for the purpose of inspecting the same, or of making repairs to the Premises, or of making repairs, alterations or additions to adjacent property, or of showing the Premises to lenders or to prospective purchasers or tenants.

7.6 Tenant shall not suffer or permit any material man's, mechanics', artisans' or other liens to be filed or placed or exist against the land or buildings for which the Premises are a part, or Tenant's interest in Premises by reason of work, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Premises or any part thereof through or under the Tenant, and nothing contained in this lease shall be deemed or construed in any way as constituting the consent or request of Landlord, expressed or implied, to any contractor, subcontractor, laborer or material man for the performance of any labor or the furnishing of any materials for any improvements, alterations or repairs of or to the premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials that would give rise to the filing of material man's, mechanics', or other lien against the Premises. If any such lien should, at any time, be filed, Tenant shall cause the same to be discharged of record within fifteen (15) days after the date of filing the same. If Tenant shall fail to discharge such lien within such period, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed t be due or by procuring the discharge of such lien by a deposit in court or by posting a bond. An amount paid by Landlord for any of the aforesaid purposes, or for the satisfaction of any other lien not caused by Landlord, and all reasonable expenses of Landlord in defending any such action or in procuring the discharge of such lien, shall be deemed additional rent hereunder and shall be repaid by Tenant to Landlord on demand.

7.7 Landlord shall not be liable to Tenant for any interruption of Tenant's business or inconvenience caused by Tenant or Tenant's assigns, sub lessees, customers, invitees, employees, licensees or concessionaires in the Premises on account of Landlord's performance of any repair, maintenance or replacement in the Premises or any other work therein pursuant to Landlord's rights or obligations under this lease so long as such work is being conducted by Landlord in accordance with the terms of this lease and without gross negligence or gross disregard for Tenant's business operations.

ARTICLE VIII

SIGNS, STORE FRONTS AND ROOF

8.1 Tenant shall not, without the prior written consent of Landlord, (i) paint, decorate or make any changes to the store front of the premises; (ii) install any exterior lighting, awning or protrusions, or any exterior signs, advertising matter, decoration or painting; (iii) install any drapes, blinds, shades or other coverings on exterior windows and doors; (iv) affix any window or door lettering, sign decoration or advertising matter to any window or door glass; or (v) erect or install any signs, window or door lettering, placards, decorations or advertising media or any type which can be viewed from the exterior of the Premises, excepting only dignified displays of customary type in store windows. Tenant shall, if requested by Landlord, install at Tenant's expense an exterior sign conforming to the general appearance of the other signs in Shopping Center and the Sign Criteria set forth in Exhibit "H" (if used). Tenant shall at all time keep all signs in good condition, in proper operating order and in accordance with all applicable government regulations. Use of the roof of the Premises is reserved o landlord, and Landlord may install upon the roof equipment, signs, antennae, displays, and other objects and may construct additional stories above the Premises, provided any such use does not unreasonably interfere with Tenant's occupancy of the Premises.

If Landlord should undertake any remodeling or renovation of the Shopping Center which requires modification of Tenant's signs, then Tenant shall, if required by Landlord, conform to the standard Sign Criteria used for such remodeling or renovation.

ARTICLE IX

UTILITIES

9.1 Landlord agrees to cause to be provided such mains, conduits and other facilities necessary to supply electricity, water, sewer, telephone and gas (if available) to the Premises, in accordance with and subject to any special provisions contained in Exhibit "C".

9.2 Tenant shall promptly pay all charges for electricity, water, sewer, telephone, gas (where available), and chilled water service (where applicable) furnished to the Premises, and Landlord may, if it so elects, furnish one or more of such services to Tenant, and, in such event, Tenant shall purchase such services as are tendered by landlord and shall pay for such services at the rates established therefore by Landlord, provided that such rates shall not exceed the rates which would be charged for the same service if furnished directly by the applicable public utility then furnishing such service. In the event that at any time during the Term, or any extensions and renewals thereof, Tenant shall fail to promptly pay any of the foregoing charges, landlord shall have the right, but not the obligation, to pay such charge or charges for and on behalf of Tenant and such amounts so paid shall be deemed to be additional rent hereunder and shall be payable by Tenant to Landlord upon demand.

9.3 Landlord shall not be liable in the event of any interruption in the supply of any utilities including without limitation any heating and air-conditioning if provided. Tenant agrees that it will not install any equipment which will exceed or overload the capacity of any utility facilities serving the Premises, and that if any equipment installed by Tenant shall require additional utility facilities, the same shall be installed at Tenant's expense in accordance with plans and specifications to be approved in writing by Landlord.

ARTICLE X

INDEMNITY AND NON-LIABILITY

10.1 Tenant does hereby agree to indemnify and save Landlord harmless from and against any and all liability for any injury to or death of any person or persons or any damage to property in any way arising out of or connected with the condition, use or occupancy of Premises, or in any way arising out of the activities in the Premises, Common Areas or other portions of Shopping Center, of the Tenant, its assigns or sub lessees or of the respective agents, employees, licensees, concessionaires or invitees of Tenant, its assigns, or sub lessees and from all costs, expenses and liabilities, including, but not limited to, court costs, and reasonable attorneys' fees, incurred by Landlord in connection therewith, excepting however, liability caused by Landlord's gross negligence.


Initial here

10.2 Tenant covenants and agrees that Landlord shall not be liable to Tenant for any injury or death of any person or persons or for damage to any property of Tenant, or any person claiming through Tenant, arising our of any accident or occurrence on the Premises or any other portion of Shopping Center, including, without limiting the generality of the foregoing, injury, death or damage caused by the Premises or other portions of Shopping Center becoming out of repair or caused by any defect in or failure of equipment, pipes, or wiring, or caused by broken glass, or caused by the backing up of drains, or caused by gas, water, steam, electricity, or oil leaking, escaping or flowing into the Premises, or caused by fire or smoke, or caused by the act of omissions of other tenants of Shopping Center.

10.3 Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's merchandise, equipment, fixtures or other personal property or to Tenant's business; and Landlord shall not be responsible or liable for any defect, latent or otherwise, in any building in the shopping Center or any of the equipment, machinery, utilities, appliances or apparatus therein.

ARTICLE XI

PUBLIC LIABILITY INSURANCE

11.1 Tenant shall, at its sole cost and expense, procure and maintain throughout the Term of this lease a policy or policies of insurance, insuring Tenant, Landlord and any other persons designated by Landlord against any and all liability for injury to or death of a person or persons and for damage to property occasioned by or arising out of the condition of the Premises, the use or occupancy of the Premises or any construction work being done on the Premises by Tenant, or if applicable, boiler explosion. The limits of such policy shall be in an amount not less than the Liability Insurance Limits and shall be written by an insurance company or companies reasonably satisfactory to Landlord. Such policies shall be non-cancellable except after ten (10) days written notice to Landlord and designees of Landlord. Such policies or duly executed certificates of insurance with respect thereto shall be delivered to Landlord prior to the Rental Commencement Date and renewals thereof as required shall be delivered to Landlord at least thirty (30) days prior to the expiration of the respective policy terms.

ARTICLE XII

DAMAGE BY CASUALTY

12.1 Tenant shall give immediate written notice to Landlord of any damage to the Premises caused by fire or other casualty, and if Landlord does not elect to terminate this lease as hereinafter provided, Landlord shall proceed with reasonable diligence and at its sole cost and expense to rebuild and repair the Premises. Notwithstanding the foregoing, in the event that (i) the insurance proceeds payable in connection with such damage and destruction shall e insufficient to make such restoration, (ii) the building in which the Premises are located shall be destroyed or substantially damaged by casualty not covered by standard fire or extended coverage insurance, (iii) said building shall be destroyed or rendered untenantable by any casualty to the extent of at least fifty percent (50%) of the Gross Rentable Area of said building, (iv) Landlord shall not have actual and unconditional receipt of the insurance proceeds payable in connection with such damage and destruction, (v) the holder of any mortgage, deed to secure debt, deed of trust, or other instrument in the nature thereof which encumbers Landlord's interest hereunder or in the Premises shall require that such proceeds shall be applied against any indebtedness owed to such holder, or (vi) there shall be less than two (2) years remaining in the Term, or any extension or renewal thereof, then, in any of such events, Landlord may elect either to terminate this lease or to proceed to rebuild and repair the Premises. Landlord shall give written notice to Tenant of such elections within ninety (90) days after the occurrence of such casualty.

12.2 Landlord's obligation to rebuild and repair the Premises under this Article XII shall in any event be limited to restoring Landlord's Work to substantially the condition in which the same existed prior to the casualty, and Tenant Agrees that promptly after the completion of such work by Landlord, Tenant will proceed with reasonable diligence and at its sole cost and expense to restore Tenant's Work to substantially the condition in which the same existed before the casualty.

12.3 Tenant agrees that during any period of reconstruction or repair of the Premises, it will continue the operation of its business within the Premises to the extent practicable. During the period from the occurrence of a casualty until Landlord's repairs are completed, the Minimum Guaranteed Rental shall be reduced and abated in proportion to the amount of Gross Rentable Area of the Premises which is rendered untenantable as a result of such casualty, provided however, that if such damage or destruction is caused by the intentional or negligent acts or omissions of Tenant, its assignees, sub lessees, servants, agents, employees, invitees, licensees or concessionaires of Tenant's assignee or sub lessees, then, in that event, the Minimum Guaranteed Rental shall not abate. Tenant shall not be entitled to and hereby waives, releases and relinquishes any and all claims against Landlord for any compensation or damage for loss of use of all or any part of the Premises or for any inconvenience or annoyance occasioned by any such damage, destruction, repair, or restoration of the Premises.

12.4 Tenant agrees at all times at its expense to keep its merchandise, fixtures, Tenant's Work and its other property situated within the Premises insured against fire, with extended coverage, to the extent of at least eighty percent (80%) of the full insurable value thereof. Such insurance shall be carried with companies reasonable satisfactory to Landlord. Such insurance shall be non-cancellable except after ten (10) days written notice to Landlord. Such policies or duly executed certificates of insurance with respect thereto shall be delivered to Landlord prior to the Rental Commencement Date and renewals thereof as required shall be delivered to Landlord at least thirty (30) days prior to the expiration of the respective policy terms. The proceeds of such insurance shall be payable to Landlord and Tenant, jointly, for use by Tenant only, except with the consent of Landlord, for the repair or replacement of merchandise, fixtures, Tenant's Work, or other property which was situated within the Premises.

12.5 All fire and extended-coverage insurance carried by Landlord or Tenant covering losses arising out of destruction of or damage to the Premises or its contents or to other portions of Shopping Center shall, to the extent reasonably obtainable, provide for waiver of subrogation against Landlord, Tenant and other tenants in Shopping Center, on the part of the insurance carrier. Evidence of the existence of such waiver will be furnished by either party to the other party on request.

12.6 In the event that fifty percent (50%) or more of the Gross Rentable Area of Shopping Center shall be destroyed or substantially damaged by any casualty, notwithstanding that the Premises may be unaffected by such casualty, Landlord may terminate this lease by giving to Tenant thirty (30) days prior written notice of Landlord's election to do so, which notice shall be given, if at all, within ninety (90) days following the date of said occurrence. Rent shall be adjusted as of the date of such termination.

ARTICLE XIII

EMINENT DOMAIN

13.1 If more than ten percent (10%) of the Gross Rentable Area of the Premises is taken for any public or quasi-public use under any governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase under threat hereof, this lease shall terminate upon the election of either party effective on the date of possession of a portion of the Premises is taken by the condemning authority.

13.2 If less than ten percent (10%) of the Gross Rentable Area of the Premises is taken for any public or quasi-public use under any governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase under threat hereof, this lease shall not terminate, or if more than ten percent (10%) of the Gross Rentable Area of the Premises is taken and this lease is not terminated in

Initial here

accordance with Section 13.1, then in either of such events the Minimum Guaranteed Rental (but not percentage rental) payable hereunder during the unexpired portion of the Term shall be reduced by the percentage which the area taken bears to the area of the Premises prior to the date possession of such portion of the Premises is taken by the condemning authority.

13.3 If any portion of the Common Areas should be taken for any public or quasi-public use under any governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase under threat thereof, this lease shall not terminate, nor shall the rent payable hereunder be reduced, nor shall Tenant be entitled to any part of the award made for such taking, except that either Landlord or Tenant may terminate this lease if the area of the Common Areas remaining following such taking, plus any additional parking area provided within a reasonable time by Landlord in reasonable proximity to Shopping Center, shall be less than seventy percent (70%) of the original area of the Common Area.

13.4 Any election to terminate this lease following condemnation shall be evidenced by written notice of termination delivered to the other party within thirty (30) days after the date by which Landlord and Tenant are notified of such taking or such sale, and, in the event that neither Landlord, nor Tenant shall so exercise such election to terminate this lease, then this lease shall continue in full force and effect.

13.5 If this lease is not terminated following any condemnation, Landlord shall make all necessary repairs or alterations within the scope of Landlord's Work necessary to make the Premises an architectural whole, and Tenant agrees that promptly after completion or such work by Landlord, Tenant will proceed with reasonable diligence and at its sole cost and expense to make all necessary repairs or alterations within the scope of Tenant's Work necessary to make Premises an architectural whole.

13.6 All compensation awarded for any taking (or the proceeds of private sale under threat thereof), whether for the whole or a part of the Premises, shall be the property of Landlord, whether such award is compensation for damages to Landlord's or Tenant's interest in the Premises, and Tenant hereby assigns all of its interest in any such award to Landlord provided, however, that Landlord shall have no interest in any award made to Tenant for loss of business or for the taking of Tenant's fixtures and personal property within the Premises if a separate award for such items if made to Tenant.

ARTICLE XIV

ASSIGNMENT AND SUBLETTING

14.1 Tenant shall not assign or transfer all or any portion of its interest in this lease or in the Premises, or sublet all or any portion of the Premises, without the prior written consent of Landlord. Any assignment or sublease without Landlord's prior written consent shall be voidable, and, at Landlord's election shall constitute a default of Tenant hereunder. Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights with respect to any subsequent assignment or subletting. If Tenant is a partnership, a withdrawal or change (voluntary, involuntary, or by operation of law) of any partner owning 20% or more of the partnership, or the dissolution or liquidation of partnership, shall be deemed as assignment of this lease. If Tenant consists of more than one person, a purported assignment (voluntary, involuntary, or by operation of law) from any such persons to any other person or entity shall be deemed as assignment of this lease. If Tenant is a corporation, any dissolution, merger, consolidation, or other reorganization of Tenant, or the sale or other transfer of the controlling percentage of the capital stock of Tenant, or the sale of fifty-one percent (51%) of the value of the assets of Tenant, shall be deemed as assignment of this lease. The phrase "controlling percentage" means the ownership of, and the right to vote, stock possessing at least fifty-one percent (51%) of the total combined voting power of all classes of Tenant's capital stock issued, outstanding, and entitled to vote for the election of directors. The foregoing provision shall not apply to corporations, the stock of which is regularly traded through an exchange or over the counter. The term "sublet" shall be deemed to include the granting of licenses, concessions, and any other rights of occupancy of any portion of the Premises, excepting only customary leased department arrangements under which such leased department is not operated under a separate name and is held out to the public as an integral part of the Premises.

14.2 The term "Landlord" as used in this lease mans only the owners or entity from time to time owning the building containing the Premises, so that in the event of any sale or sales thereof, the Landlord who is a grantor in any such sale shall be and hereby is, without further agreement, entirely freed and relieved of all the obligations of Landlord hereunder. Any such sale or sales of the Premises, unless pursuant to a foreclosure sale or deed in lieu of such foreclosure, shall be subject to this lease and it shall be deemed and construed without further agreement that the purchaser at any such sale has assumed and agreed to carry out any and all obligations of Landlord under this lease so long as such purchaser shall be the owner of the building containing the Premises.

14.3 Tenant shall not mortgage, pledge or otherwise encumber its interest under this lease. Tenant has only a usufruct, not subject to levy, sale or other transfer, whether voluntary or by operation of law, except in accordance with this Article XIV.

14.4 In no case may Tenant assign any options granted to Tenant hereunder. all such options being deemed personal to Tenant and exercisable by Tenant only.

14.5 Any request by Tenant for approval to sell or sublet the Premises or to transfer or assign Tenant's interest in this Lease, shall be accompanied by a processing charge in the amount of $300.00.

ARTICLE XV

TAXES

15.1 Tenant shall be liable for and shall pay all taxes levied against personal property, fixtures, and Tenant's Work in the Premises; if such taxes for which Tenant is liable are levied against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of any such items and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is liable hereunder.

15.2 Tenant agrees to pay as additional rent its share of the general real estate taxes, assessments, and governmental charges levied against Shopping Center for each calendar year beginning with the Rental Commencement Date and during the Lease Term and any renewals or extensions thereof. Said taxes, assessments, and governmental charges shall be appropriately pro-rated during the first and last years of the lease term if such years are less than full calendar years. The proportionate share to be paid by Tenant shall be that percentage of said general real estate taxes, assessments, and governmental charges which the Gross Rentable Area of the Premises bears to the Gross Rentable Area of the Shopping Center. Landlord may, at its option, make monthly or other periodic charges based upon the estimated annual taxes, payable in advance but subject to adjustment after receipt of the tax statement by Landlord.

15.3 Tenant agrees to pay as additional rent any rent tax or other tax imposed upon rent payments or imposed upon Landlord based upon rent payments by Tenant to Landlord; however, Tenant shall not be required to pay any income tax of Landlord.

ARTICLE XVI

DEFAULTS AND REMEDIES

Initial here

16.1 (a) If Tenant fails to keep or perform any covenant or provision of this lease (except payment of any installment of rent or other charge or money obligation herein required to be paid by Tenant) or violates any such covenant or provision, Landlord may, without notice and in addition to any other remedies at law or in equity or elsewhere in this lease provided, enjoin Tenant from any such failure or violation hereunder.

(b) If, except as otherwise provided in Sections 7.2, 7.5, and 9.2 hereof, Tenant fails to keep or perform any covenant or provision of this lease (except the payment of any installment of rent or other charge or money obligation herein required to be paid by Tenant) or violates any covenant or provision, and such failure or violation shall continue for a period of ten (10) days after a written notice by Landlord, or in case of a failure or violation which cannot with due diligence be cured within a period of ten (10) days, if Tenant fails to cure such failure or violation promptly after the service of such notice and with all due diligence, the Landlord may, in addition to any other remedies at law or in equity or elsewhere in this lease provided, cure or prosecute the curing of such failure or violation at reasonable expense, which expense shall be deemed to be additional rent hereunder and shall be paid to Landlord by Tenant on demand. Tenant agrees that in the event of any failure or violation covered by this Section 16.1 and Landlord's failure to give notice or to exercise any rights under this section 16.1, all rights of Landlord under this Section 16.1 may be exercised by persons acting on behalf of Landlord, under authority granted by Landlord, with full right of reimbursement as provided hereunder. Tenant agrees that neither Landlord nor any such person acting on Landlord's behalf shall be liable for any loss or damage suffered by Tenant resulting from the exercise of the rights granted under this section.

16.2 Any installment of rent or any other charge or money obligation herein required to be paid by Tenant which is not paid when due shall bear interest at the rate of eighteen percent (18%) per annum or at the maximum rate allowed by law, whichever is less, from the due date until paid, and the Landlord may treat any such charge or money obligation as additional rent hereunder. Tenant shall, in addition, pay a serviced charge of Ten dollars ($10.00) per day and Landlord may treat such charge as additional rent hereunder.

16.3 The happening of any one or more of the following shall be deemed to be events of default under this lease:

(a) The making by Tenant of an assignment for the benefit of its creditors;

(b) The levying of a writ of execution or attachment on or against the property of Tenant within the Premises and the same not being released or discharged within fifteen (15) days thereafter;

(c) The institution of proceedings in a court of competent jurisdiction for the reorganization, liquidation, or voluntary or involuntary dissolution of Tenant, or for its adjudication as bankrupt or insolvent, or for the appointment of a receiver of property of Tenant, and/or for the appointment of the receiver of the property of Tenant, and said proceedings not being dismissed, and any receiver, trustee or liquidator appointed therein not being discharged within fifteen (15) days after the institution of such proceedings;

(d) The doing or permitting of any act by Tenant which creates a lien or claim therefore against the land or building of which the Premises are a part and the same not being released or otherwise provided for by indemnification satisfactory to Landlord within fifteen (15) days thereafter;

(e) Failure of Tenant to pay any installment of rent or other charge or money obligation herein required to be paid by Tenant as and when such payment is due and payable; or

(f) Failure of Tenant to comply with any covenant or provision of the lease (except payment of any installment of rent or other charge or money obligation herein required to be paid by Tennant) within ten (10) days after written notice of such failure to comply is given by Landlord, or if it is not feasible to cure such failure within such period, to begin performance of such covenant within such period and to diligently pursue performance to completion is in a reasonable time thereafter.

16.4 Upon the occurrence of any 0f such events of default, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever:

(a) Terminate this lease, in which event Tenant shall immediately surrender the Premises to Landlord. Landlord may, without prejudice to any other remedy which it may have, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occu9p1ying the Premises or any part thereof, by force, if necessary, without being liable for prosecution or any claim of damages therefore.

(b) Not terminate this lease but rather declare all rents, additional rents, or any of the other monies due from Tenant during the term of this lease or extension thereof immediately due and payable and thereupon all payment due to the end of the term(s) shall be accelerated.

(c) Not terminate this lease but rather enter upon and take possession of the Premises and, if Landlord so elects, make such alterations and repairs as may be necessary to relet the Premises, and relet the Premises or any part thereof, as the agent of Tenant, at such rent and for such terms and subject to such terms and conditions as Landlord may deem advisable and receive the rent therefore. Upon each such reletting, all rentals received by the Landlord from such reletting shall be applied, first, to the payment of any indebtedness other than rent due hereunder from Tenant to Landlord; second, to the payment of any loss and expenses of such reletting, including brokerage fees and attorney's fees and costs of such alterations and repairs; third, to the payment of rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder; and Tenant agrees to pay to Landlord on demand any deficiency that may arise by reason of such reletting. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this lease for such previous breach.

(d) Should Landlord at any time terminate this lease for any breach, in addition to any other remedies it may have, it may recover from Tenant all damages it may incur by reason of such breach, including the cost of recovering the Premises, reasonable attorney's fees, and the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this lease for the remainder of the Term over the then-reasonable rental value of the Premises for the remaining portion of the Term, all of which amounts shall be immediately due and payable from Tenant to Landlord. In determining the rent which would'd be payable by Tenant hereunder, subsequent to default, the annual rent for each year of the unexpired term shall be equal to the average Minimum Guaranteed Rental and percentage rent paid by Tenant from the Rental Commencement Date to the time of default, or during the preceding two (2) Calendar Years, whichever period is shorter.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due to Landlord hereunder or of any damages accruing to Landlord by reason of the violation of any of the covenants and provisions herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default.

16.5 In any action, suit or proceeding to enforce or interpret the terms of this Lease, or to collect any amount due hereunder, the prevailing party shall be entitled to reimbursement for all costs and expense reasonable incurred in enforcing, defending or interpreting its rights hereunder, including, but not limited to, all collection and court costs, and all attorney's fees, whether incurred our of court, in the trial, on appeal, or at bankruptcy or administrative proceedings.

Initial here

16.6 Landlord hereby acknowledges receipt from Tenant of the Advance Deposit set forth in Section 1.1 (i), which shall be applied to the first accruing installments of rent. Landlord further acknowledges receipt from Tenant of the Security Deposit as set forth in Section 1.1 (j) which shall be held by Landlord without interest as security for this lease, it being expressly understood that such deposit is not an advance payment of rent or a measure of Landlord's damages in case of default by Tenant. Upon the occurrence of any event of default by Tenant, Landlord may, from time to time, without prejudice to any other remedy provided herein, or provided by law, use the Security Deposit to the extent necessary to make good any arrears of rent and any other damage, injury, expense or liability caused to Landlord by such event of default. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not then in default hereunder, any remaining balance of the Security Deposit shall be returned by Landlord to Tenant upon termination of this lease.

## ARTICLE XVII

### HOLDING OVER

17.1 If tenant remains in possession of the Premises after the termination of this lease and without the execution of a new lease, Tenant shall be deemed to be occupying the Premises as a tenant at sufferance at a rent equal to the rent (including any percentage rent) herein provided plus fifty (50%) percent of such amount and otherwise subject to all the covenants and provisions of this lease insofar as the same are applicable to a tenant at sufferance and in no event shall there be any renewal of this lease by operation of law.

## ARTICLE XVIII

### SUBORDINATION

18.1 This lease and all rights of Tenant hereunder are and shall be subject and subordinate to the lien of any first priority mortgage, deed to secure debt, deed of trust, or other instrument in the nature thereof which may now or hereafter affect Landlord's fee title to the Premises or Landlord's interest hereunder an to any modifications, renewal, consolidations, extensions, or replacements of any of the foregoing.

This clause shall be self-operative and no further instrument of subordination shall be required by any mortgagee. In confirmation of such subordination, Tenant shall, upon demand at any time or times, execute, seal and deliver to Landlord, without expense to Landlord, any and all instruments in recordable form that may be requested by Landlord to evidence the subordination of this lease and all rights hereunder to the lien of any such mortgage, deed to secure debt, deed of trust or other instrument in the nature thereof, and each renewal, modification, consolidation, replacement, and extension thereof; and if Tenant shall fail at any time to execute, seal and deliver any such instrument, Landlord, in addition to any other remedies available to it in consequence thereof, may execute, seal and deliver the same as the attorney in fact of Tenant and in Tenant's name, place and stead, and Tenant hereby irrevocably makes, constitutes, and appoints Landlord, its successors and assigns, as such attorney in fact for that purpose.

In addition, Tenant shall, upon Landlord's request, at any time or times, execute, seal and deliver to Landlord, without expense to Landlord, any and all instruments that may be requested to make this lease superior to the lien of any such mortgage, deed to secure debt, deed of trust, or other instrument in the nature thereof, and each renewal, modification, consolidation, replacement, and extension thereof, and, if Tenant shall fail at any time to execute, seal and deliver such instrument, Landlord, in addition to any other remedies available to it in consequence thereof, may execute, seal and deliver the same as the attorney in fact to Tenant and in Tenant's name, place and stead, and Tenant hereby irrevocable makes, constitutes, and appoints Landlord, its successors and assigns, such attorney in fact for that purpose.

18.2 (a) If the holder of any mortgage, deed to secure debt, deed of trust, or other instrument in the nature thereof shall hereafter succeed to the rights of Landlord under this lease, whether through possession or foreclosure action or delivery of a new lease, then, at the option of such holder, Tenant shall attorn to and recognize such successor as Tenant's landlord under this lease, and shall promptly execute and deliver any instrument that may be necessary to evidence such attornment.

(b) Upon the attornment provided for in subsection (a) above, this lease shall continue in full force and affect as a direct lease between such successor landlord and Tenant, subject to all the terms, covenants, and conditions of this lease; provided, however, that such holder, as successor landlord, shall not be liable for returning to Tenant, nor crediting against any rent due hereunder, any advance rentals previously paid by Tenant to Landlord or the Security Deposit unless such holder has acknowledged the receipt of the Security Deposit.

## ARTICLE XIX

### LEASE CONTINGENCY

19.1 NOT APPLICABLE

## ARTICLE XX

### NOTICES

20.1 Whenever any notice is required or permitted hereunder, such notice shall be in writing. Any notice or document required or permitted to be given Landlord hereunder shall be deposited in the United States Mail, postage prepaid, certified mail, return receipt requested, addressed to the Landlord at the address specified in Section 1.1 (n) and any such notice or document required or permitted to be given to Tenant hereunder shall be delivered to the Premises or deposited in the United States Mail, postage prepaid, certified mail, return receipt requested, addressed to Tenant at the address specified in Section 1.1 (o).

## ARTICLE XXI

### MISCELLANEOUS

21.1 Tenant agrees that upon the request of either Landlord of the holder of any first priority mortgage, deed to secure debt, deed of trust, or other security instrument in the nature thereof encumbering Landlord's interest in the Premises, Tenant shall send to such holder copies of all notices sent to Landlord, such copies to be forwarded to such holder as and when such notices are sent to Landlord and at the mailing address from time to time provided Tenant by either Landlord or such holder. In addition, Tenant agrees that it may not exercise any of its remedies on account of a default by Landlord under this lease unless and until such holder shall have received written notice of such default from Tenant and a period of thirty (30) days after receipt of such notice for curing such default shall thereafter have elapsed.

21.2 The captions and the tables of contents used in this lease are for convenience only and do not in any way limit or amplify the terms and provision hereof. Whenever the singular number is used, the same shall include the plural, and words of any gender shall include each other gender.

21.3 One or more waivers of any covenant, term or condition of this lease by either party shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party

 Initial here

requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

21.4 Landlord hereby covenants and agrees that if Tenant shall perform all of the covenants and agreements herein required to be performed on the part of Tenant, Tenant shall, subject to the terms of this lease, at all times during the continuance of this lease have the peaceable and quiet enjoyment and possession the Premises.

21.5 This lease contains the entire agreement between the parties and no agreement, representation or inducement shall be effective to change, modify or terminate this lease in whole or in part unless in writing and signed by the parties.

21.6 Tenant warrants that it has had no dealings with any broker other than NONE in connection with the negotiations and execution of this lease, and Tenant agrees to indemnify Landlord and hold Landlord harmless from and against any and all cost, expense or liability for commissions or other compensation or charges claimed by any broker or agent other than NONE acting for Tenant with respect to this lease.

21.7 At any time and from time to time, Tenant, on or before the date specified in a request made by Landlord, which date shall not be earlier than ten (10) days from the making of such request, shall execute, acknowledge and deliver to Landlord a certificate evidencing whether or not:

   (a)  This lease is in full force and effect;

   (b)  This lease has been amended in any way;

   (c)  There are any existing defaults hereunder to the knowledge of Tenant and specifying the nature of such default, if any; and

   (d)  The date to which rent, including percentage rental, if any, has been paid.

Each certificate delivered pursuant to this Section 21.7 may be relied on by any prospective purchaser or transferee of the Shopping Center or of Landlord's interest hereunder or by any mortgagee of the Shopping Center or of Landlord's interest hereunder or by any assignee of any such mortgage.

21.8 The terms, provisions and covenants contained in this lease shall apply to, inure to the benefit of, and be binding upon the parties hereto and their respective heirs, assigns, successors in interest and legal representatives except as otherwise herein expressly provided; provided, however, that all claims, demands, or causes of action which Tenant may at any time thereafter have against Landlord because of Landlord's failure to comply with any provision hereof, shall be enforceable solely against Landlord's right, title and interest in Shopping Center and no other property of Landlord shall be subject to any such claim, demand or cause of action.

21.9 Time is of the essence in this agreement.

21.10 The laws of the State of Florida shall govern the interpretation, validity, performance, and enforcement of this lease. If any provision of this lease shall be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this lease shall not be affected thereby.

21.11 Tenant shall, on or before the last day of the Term hereof, or on the sooner termination hereof, peaceable and quietly leave, surrender and yield up unto Landlord the Premises, together with all alterations, additions, improvements, fixtures and equipment, including air conditioning equipment but excluding trade fixtures and other personal property of Tenant, any lessee, sublessee, licensee or concessionaire of Tenant, or any other occupant of the Premises. Such alteration, additions, improvements, fixtures and equipment are to be in good order and repair, ordinary wear and tear, obsolescence, damage by fire or other casualty, acts of God, condemnation, civil riot and commotion excepted. All such trade fixtures and other personal property shall be removed by Tenant on or before the last day of the Term hereof, and all such property not so removed shall be deemed abandoned by Tenant and conveyed to Landlord unless Landlord shall give notice to Tenant to remove all or any part hereof, in which event Tenant shall promptly at its expense remove same, or Landlord may do so at Tenant's expense.

21.12 If any term, covenant, or condition of this lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this lease, or the application of such term, covenant, or condition to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each term, covenant, or condition of this lease shall be valid and be enforced to the fullest extent permitted by law.

21.13 Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent nor of partnership or joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant.

21.14 The parties hereto agree to execute a short form of this Lease which shall comply with the provisions of Section 713.10 of the Florida Statutes, and to record said short form lease in the Public Records of Okaloosa County, Florida.

21.15 To the extent that the Special Stipulations set forth in Exhibit "G" and Exhibit "I" conflict with any of the printed provisions of this lease, such Special Stipulations shall control.

Initial here

WITNESS WHEREOF, the parties have caused this lease to be executed by their duly authorized officers and their corporate seals, if applicable, to be hereunto affixed the day and year first above written.

Signed, sealed and delivered by LANDLORD

___ day of _____, 2007

_____
Witness

FOR: Shalimar Plaza, LLC, LANDLORD

BY: _____
    Jack A. Whitworth, Jr.  *Jack Herms*

ITS: Managing Member  *Management Member*

Signed, sealed and delivered by TENANT

29 day of _May_, 2007

_____
Witness

CORPORATE  SEAL

FOR: Steinman and Steinman, Inc., d/b/a Big Apple Bagels

TENANT

BY: _____
    Marc Steinman

ITS: Owner

CORPORATE  SEAL

GUARANTY

FOR VALUE RECEIVED and in consideration for and as an inducement to Landlord making the within lease with Tenant, the undersigned guarantees to Landlord, its heirs, successors and assigns, the full performance and observance of all the covenants, conditions and agreements therein provided to be performed and observed by Tenant without requiring any notice of non-payment, non-performance, or proof, or notice, or demand thereby to charge the undersigned therefore, all of which the undersigned hereby expressly waives and expressly agrees that the validity of this agreement and its obligations of the guarantor hereunder shall in no way be terminated, affected or impaired for reason of the assertion y Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provision of the within lease. The undersigned guarantor further covenants and agrees that this guaranty shall remain and continue in full force and effect as to any renewal, modification or extension of this lease.

Dated: _05/29/07_, 2007

_____
Marc Steinman, Guarantor

GUARANTOR

WITNESS:

_____  *Jack Herms*

```
JANICE E. ALLEN
MY COMMISSION # DD 465148
EXPIRES: July 27, 2009
Bonded Thru Notary Public Underwriters
```

State of FLORIDA

County of OKALOOSA

On this 29 day of _May_, 2007
Personally came to me known and known to me to be the individual described in and who executed the foregoing guaranty and acknowledged to me that he executed the same.

_____
Notary Public
My Commission Expires:

[ ] Initial here

EXHIBIT "A"

LEGAL DESCRIPTION

Commence at a General Land Office monument marking the Northeast corner of Section 6, Township 2 South, Range 23 West, Okaloosa County, Florida:

Thence S-01° 16' 05" W a distance of 1456.93 feet to the intersection of the east right-of-way line of State Road No. 85 (Eglin Parkway) (100' R/W) with the West R/W line of Second Street (50' R/W),

Thence continue S. 01° 16' 05", W along the R/W of Second Street a distance of 678.70 ft to the point of beginning,

Thence continue S. 01° 16' 05" W along said R/W of Second Street a distance of 292.76 ft to the aforementioned East R/W of State Road No. 85;

Thence N 17° 55' 01" E along said R/W a distance of 277.67 ft;

Thence S 72° 04' 59" E a distance of 194.82 ft to the point of beginning.

Contains 66,037 square feet of 4.52 acres, more or less, all lying in Section 6, Township 2 South, Range 23 West, Okaloosa County, Florida.

Bearings referenced to boundary survey, of which the parcel described herein is a portion by Baskerville Donovan Engineers, Inc. dated December 19, 1986, and property description by Baskerville Donovan Engineers, Inc. dated May 13, 1988.

Initial here

EXHIBIT "B"

That portion of Unit 10 below as designated in black outline



Initial here

**EXHIBIT "C"**

**Description of Landlord's Work and Tenant's Work**

Not Applicable

 Initial here

## EXHIBIT "D"

### Estimated Charges for Those Items Set Forth in Section 4.3 and 15.2:

|  | Monthly | Annually |
|---|---|---|
| Rent | $ 2,130.00 | $ 25,560.00 |
| Common Area Maintenance, Real Estate Taxes and Insurance*** | 477.86 | 5,734.32 |
| Rent/CAM, et. subject to sales tax | 2,607.86 | 31,294.32 |
| Sales Tax | 156.47 | 1,877.64 |
| Total | $ 2,764.33 | $ 33,171.96 |

\*\*\* CAM, real estate taxes and insurance continue to be subject to adjustment based on actual costs.

Initial here

EXHIBIT "E"

SHORT FORM LEASE

NOT APPLICABLE

 Initial here

EXHIBIT "F"

**Rules and Regulations**

1. All deliveries or shipments of any kind to and from the demised premises, including loading of goods, shall be made to the side of the buildings facing the customer parking areas in the center of the Property and that such deliveries be made to the extent possible, during normal business hours (9:00 a.m. to 6:00 p.m.).

2. Trash pick-ups by any waste disposal service company providing such service to the Center shall, to the extent possible, occur during the hours from 9:00 a.m. to 7:00 p.m.; in no event shall such trash pick-ups regularly occur outside the hours 9:00 a.m. to 7:00 p.m.

3. Tenant shall not use the public or common areas in the Shopping Center for business purposes or special events unless prior approval in writing has been granted by the Landlord.

4. Plumbing facilities shall not be used for any other purposes than that for which they are constructed, and no foreign substance of any kind shall be thrown therein.

5. Tenant shall use, at Tenant's cost, a pest extermination contractor at such intervals as Landlord may require, but no less often than once annually.

6. Tenant shall not place, or permit:

    a. Displays, decorations, or shopping carts on the sidewalk in front of the demised premises or upon any of the common areas of the Shopping Center;

    b. Anything to be displayed, stacked, hung from the ceiling, racked, stored, etc., on the sidewalks outside the shops unless the tenant:

        i. Obtains the Landlord's prior written approval; and

        ii. Acquires adequate insurance coverage; and

        iii. Accepts all liability for the sidewalk outside the premises.

7. Prior to installation, the Landlord must approve in writing all signs of any type which are to be installed or displayed in the common areas. Unauthorized signs will be removed Landlord without notice.

8. Soliciting for any reason in the common areas requires prior written approval from the Landlord.

9. Distribution of sales flyers, pamphlets, or any type of advertising literature in the common areas, on parked cars, etc., is only permitted with the prior written approval of the Landlord. Distribution of sales flyers, pamphlets, or any type of advertising literature by anyone other than the tenants in the center is not permitted.

Initial here

**EXHIBIT "G"**

**Special Stipulations**

To the extent that the following Special Stipulations conflict with any of the printed provisions of this Lease, the Special Stipulations shall control.

THE TENANT SHALL HAVE THE OPTION TO RENEW THIS LEASE FOR AN ADDITIONAL TERM OF TWO (2) YEARS AT THE EXPIRATION OF THE INITIAL TERM, UPON TERMS AND CONDITIONS TO BE MUTUALLY AGREED UPON BY THE PARTIES. IF NO MUTUAL AGREEMENT CAN BE REACHED FOR THE RENEWAL TERMS AND CONDITIONS, THEN THIS LEASE SHLL END AND THE TENANT SHALL VACATE THE PREMISES AT THE END OF THE INITIAL LEASE TERM.

 Initial here

**EXHIBIT "H"**

Sign Lighting on Building

TO BE INDIVIDUAL BACKL9T NEON LETTERS

BACKLT CAN SIGHN FOR PYLON

**ALL SIGNS TO BE FURNISHED BY TENANT**

ALL SIGNS MUST BE APPROVED PRIOR TO PURCHASE AND INSTALLATION
BY LEO A. WHITWORTH, JR. OR HIS DESIGNEE

Initial here

**EXHIBIT "I"**

**ADDENDUM**

1. Anything contained in this lease to the contrary notwithstanding, Lessor agrees that, without its consent, this lease and the right, title and interest of the Lessee there under, may be assigned by the Lessee to BAB Systems, Inc., an Illinois Corporation, or its designee, provided that said BAB System, Inc. or its Designee shall execute such documents evidencing its agreement to thereafter keep and perform, or cause to be performed, all of the obligations of the Lessee arising under this lease from and after the time of such assignment. (Section 3.1 (i) of the Franchise Agreement). Such assignment, however, shall not release the Lessee or the Guarantors, hereunder from continuing liability for the full and faithful performance of this Lease.

2. Lessor agrees that Lessor shall, upon written request of BAB Systems, Inc., disclose to said corporation, all reports, information or data in Lessor's possession with respect to sales made in, upon or from leased premises.

3. Lessor shall give written notice to BAB Systems, Inc., an Illinois Corporation (concurrently with the giving of such notice to Lessee), of any default of Lessee under the lease and the said BAB Systems, Inc. shall have, after the expiration of the period during which the Lessee may cure such default, an additional thirty (30) days to cure, at its sole option, any such default.

 Initial here

06/20/2008  11:30    8506093073                                    PAGE  02

### IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
### IN AND FOR OKALOOSA COUNTY, FLORIDA

STEINMAN & STEINMAN, INC.,        )
a Florida corporation,             )          08CV3737
                                   )          JUDGE LINDBERG
         **Plaintiff,**            )          MAGISTRATE JUDGE COLE
                                   )
         v.                        )     Case No. 2008-CA-3206 S
                                   )          TC
BAB SYSTEMS, INC., an Illinois     )
corporation,                       )
                                   )
         **Defendant.**            )

### DEFENDANT BAB SYSTEMS, INC.'S
### MOTION TO STAY PROCEEDINGS PENDING ARBITRATION

Defendant BAB Systems, Inc. moves pursuant to 9 U.S.C. § 3 and Section 682.03, Florida Statutes, to stay these proceedings pending arbitration, and says:

### BACKGROUND

1.      This dispute arises out of and relates to a franchise agreement between Plaintiff Steinman & Steinman, Inc. (**"Plaintiff"**) and Defendant BAB Systems, Inc. ("BAB") for the operation of a Big Apple Bagels franchised store in Shalimar, Florida. Plaintiff is the assignee of the Franchise Agreement dated June 11, 1998, which was entered into with BAB by three of Plaintiff's shareholders, Marc Steinman, Marvin Steinman and Lee Steinman.

2.      The Franchise Agreement, which is attached as Exhibit A to Plaintiff's Amended Verified Complaint (the **"Amended Complaint"**), expired by its terms on June 11, 2008. Plaintiff seeks to avoid exercise of BAB's post-term right to purchase certain assets of the business "at a depreciated value," and the covenant not to compete that prevents Plaintiff from engaging in the sale of certain products for two years following the expiration of the Franchise Agreement. (Am. Compl., ¶¶ 25-28, 35.) In its claim for declaratory judgment (Count I),

CHGO1\31228728.2



**EXHIBIT**

E

Plaintiff seeks a declaration that is not entitled to enforce the post-term provisions because: (a) BAB materially breached the Franchise Agreement by failing to provide required franchise support; (b) BAB fraudulently induced Plaintiff into the Franchise Agreement with illusory promises; and (c) the expiration of the Franchise Agreement extinguished all obligations and rights arising therefrom. (Count I, *ad damnum*, ¶¶ (a)-(e).) In addition, Plaintiff seeks to enjoin BAB from dispossessing Plaintiff of its business and business assets due to BAB's alleged breach of the Franchise Agreement and fraud in the inducement. (Am. Compl., ¶ 51.)

3.    The Franchise Agreement contains a broadly-phrased arbitration clause, mandating arbitration of this dispute:

> All disputes, controversies, or claims arising out of or relating to this Agreement shall be submitted for arbitration to the Chicago, Illinois office of the American Arbitration Association on demand of either party.... All matters within the scope of the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) shall be governed by it. (Franchise Agreement, § 17.1.i).

> *       *       *       *

> This provision shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement. (Franchise Agreement, ¶ 17.1.iv).

4.    Notwithstanding the express terms of the arbitration clause in the Franchise Agreement, Plaintiff brought this action in this Court on June 10, 2008, for declaratory judgment and injunctive relief based wholly on rights and obligations under the Franchise Agreement.

5.    Plaintiff's claims depend exclusively on BAB's right to enforce two provisions of the contract which are triggered by its expiration:

> **Covenant Not to Compete.** Upon termination of this Agreement by Franchisor in accordance with its terms and conditions or by Franchisee without good cause, or upon expiration of this Agreement, Franchisee and its owner agree that for a period of two (2) years, commencing on the effective date of termination or expiration or the date on which Franchisee ceases to operate the Store, whichever is later, neither Franchisee nor its owners shall (1) have any direct or indirect

06/20/2008  11:30    8506093073                                    PAGE  04

ownership interest in any Competitive Business located or operating within two (2) miles of the Store.... Competitive Business shall mean the sale of bagels, cream cheeses, muffins and/or coffee to the public through retail or wholesale channels of distribution." (Franchise Agreement, ¶ 16.d)

– and –

"**Franchisor's Option to Purchase**. If this Agreement expires (without renewal) or is terminated by Franchisor in accordance with its provisions or by Franchisee without cause, then Franchisor shall have the option, exercisable by given written notice within 60 days from the date of such expiration or termination, to purchase from Franchisee all tangible assets ... and to an assignment of Franchisee's lease for (a) the premises of the Store...." (Franchise Agreement, ¶ 16.f).

## THE FEDERAL ARBITRATION ACT AND FLORIDA ARBITRATION CODE

6.     The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, compels judicial enforcement of written arbitration agreements.[1] Likewise, the Florida Arbitration Code, Chapter 682 *et seq.*, Florida Statutes, directs the courts of this state to enforce arbitration provisions upon proper application, and to stay attendant court proceedings. Federal and Florida public policy strongly favor resolving disputes through arbitration where the parties have agreed to do so. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25, 111 S. Ct. 1647, 1651, 114 L.Ed. 2d 26 (1991); K.P. Meiring Constr., Inc. v. Northbay I&E, Inc., 761 So.2d 1221, 1225 (Fla. 2d DCA 2000).

7.     "Under both federal statutory provisions and the Florida Arbitration Code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." Seifert v. U.S. Home Corp., 750 So. 2d 633, 636 (Fla. 1999).

---

[1]  The FAA applies because the Franchise Agreement evidences a transaction in interstate commerce. Plaintiff is a Florida corporation with its place of business Shalimar, Florida. (Am. Compl. ¶ 3.) Defendant is an Illinois corporation. (Id. ¶ 4.) In addition to the foregoing jurisdictional facts which

## VALID WRITTEN AGREEMENT TO ARBITRATE

8.      Here, there can be little doubt that there is a valid written agreement to arbitrate. The arbitration clause contained within the Franchise Agreement obligates the parties to arbitrate their disputes, and by its own terms the clause survived the expiration of the Franchise Agreement. (Am. Compl., ¶ 10, Ex. A, §17(l)(iv).)

## ARBITRABLE ISSUES EXIST

9.      Plaintiff's Amended Complaint is centered upon allegations of fraudulent inducement in the offer and sale of a franchise to Plaintiff and breach of the Franchise Agreement, which allegations are expressly included within the ambit of the Franchise Agreement's broad arbitration provision. (See Am. Compl. ¶¶ 16-19.)

10.      It is of no moment that Plaintiff's claims are cloaked in contract or tort allegations; what is of significance is the substance of the claims being asserted, which involves the alleged pre-contract conduct of BAB in the offer and sale of a franchise to Plaintiff, the alleged failure of BAB to perform certain obligations under the Franchise Agreement, and BAB's right to enforce post-term provisions of the Franchise Agreement upon expiration. See Gregory v. Electro-Mechanical corp., 83 F.3d 382, 384 (11th Cir. 1996)("Whether a claim falls within the scope of an arbitration agreement turns on the factual allegations in the complaint rather than the legal causes of action asserted."); Stacey David, Inc. v. Consuegra, 845 So. 2d 303, 306 (Fla. 2d DCA 2003)("Deciding whether a particular claim is covered by a broad arbitration provision requires a determination of whether a significant relationship exists between the claim and the agreement containing the arbitration clause, regardless of the legal label applied to the dispute.")  Here, each of Plaintiff's claims against the BAB implicates the

---

invoke the Federal Arbitration Act, the arbitration provision in the Franchise Agreement specified the application of the Federal Arbitration Act as stated above.

Franchise Agreement and rights and duties that are dependent upon the existence of a contractual relationship between the parties. It is irrelevant to the arbitrability issue that Plaintiff claims that the Franchise Agreement was fraudulently induced. In <u>Buckeye Check Cashing, Inc. v. Cardegna,</u> 546 U.S. 440, 126 S.Ct. 1204, 1210, 163 L.Ed. 2d 1038 (2006), the Supreme Court held that under the Federal Arbitration Act, a challenge to the validity of a contract containing an arbitration clause, rather than to the arbitration clause itself, should be determined in the first instance by the arbitrators. <u>Accord, Rintin Corp., S.A. v. Domar, Ltd.,</u> 476 F.3d 1254 (11th Cir. 2007); <u>see also, O'Rear v. American Family Life Ins. Co. of Columbus, Inc.,</u> 784 F. Supp. 1561, 1566 (M.D. Fla. 1992); <u>Western Int'l Media Corp. v. Johnson,</u> 754 F. Supp. 871, 872 (S.D. Fla. 1991)("While judicial consideration is appropriate where fraud has been alleged with respect to an arbitration provision, allegations of fraud pertaining to a contract as a whole should be resolved in arbitration."); <u>Sease v. Painewebber, Inc.,</u> 697 F. Supp. 1190, 1192 (S.D. Fla. 1988) (holding that plaintiff's claims for common-law fraud and negligence must be arbitrated, stating that "plaintiff cannot avoid broad language of an arbitration clause by pleading an action in tort"); <u>Qubty v. Nagda,</u> 817 So. 2d 952, 956-57 (Fla. 5th DCA 2002)(claims for fraud and rescission, so long as they are directed towards the contract as a whole and not the arbitration provision specifically, are arbitrable); <u>Aztec Medical Services, Inc. v. Burger,</u> 792 So. 2d 617, 622 (Fla. 4th DCA 2001)(statutory claims, such as a claim under FDUTPA, are arbitrable).

## BAB HAS NOT WAIVED ITS RIGHT TO ARBITRATION

11.    Under the FAA, the only prejudice the Court can consider is whether BAB has participated in this litigation to such a degree that Plaintiffs would be prejudiced if arbitration were compelled at this stage of the proceedings. See <u>GLF Construction Corp. v. RECCHI-GLF,</u> 821 So. 2d 372, 373-74 (Fla. 1st DCA 2002)(stating federal law governs issues of waiver of

arbitrability with contract affecting interstate commerce and prejudice to a party is the Court's primary consideration).  Plaintiffs would suffer no prejudice if the Court compels arbitration because BAB has requested arbitration at its earliest opportunity.  Likewise, BAB has not waived its rights to compel arbitration under the Florida Arbitration Code, because its efforts to compel arbitration cannot be said to have waived its rights under the Franchise Agreement.  Miller & Solomon Gen. Contractors, Inc. v. Brennan's Glass Co., 824 So. 2d 288, 291 (Fla. 4th DCA 2002)(holding that because the first substantive filing made by appellants was a motion to stay invoking the contracting arbitration clause, the trial court erred in finding that appellants had waived their right to arbitration).  Therefore, the Court should compel arbitration.

## INTERIM INJUNCTIVE RELIEF IS IMPROPER

12.    The Court has no authority to enter interim injunctive relief pending arbitration, because such relief is only proper if the parties' agreement to arbitrate contemplates such relief. Rath v. Network Marketing, LC, 790 So. 2d 461, 465-66 (Fla. 4th DCA 2001).  Indeed, any action taken inconsistent with the exclusive remedy of relief in arbitration can be considered a waiver of the right to arbitrate.  Id. at 463.  As the court noted, if the parties intended their arbitration agreement to authorize interim injunctive relief pending arbitration, they should have included such language in their agreement. Id. at 466.  Here, the parties' Franchise Agreement contained no such language authorizing Plaintiffs to obtain injunctive relief pending arbitration. Indeed, the parties did carve out a narrow exception to the arbitration provision, but it only permitted BAB to obtain emergency relief from a court in a very limited set of circumstances – i.e., "to protect the name, Marks or System licensed hereunder, without the necessity of first filing an arbitration demand." (Am. Compl., Ex. A, ¶ 17.l.v.4.)

WHEREFORE, Defendant BAB Systems, Inc. requests that:

1) the Court stay these proceedings as to the claims asserted against it;

2) direct that arbitration occur in accordance with the terms of Section 17.1 of the Franchise Agreement; and,

3) vacate the *ex parte* temporary injunction entered against it on June 11, 2008.

Respectfully submitted,

Christian C. Burden
Florida Bar No.: 0065129
Kevin P. McCoy
Florida Bar No.: 0036225
**DLA PIPER US LLP**
100 N. Tampa, Ste. 2200
Tampa, Florida 33602-5809
813-229-2111
Fax: 813-229-1447
Attorneys for BAB Systems, Inc.

## CERTIFICATE OF SERVICE

**I HEREBY** certify that the foregoing was served by U.S. Mail, postage prepaid, and by facsimile, on the following:

Lawrence Keefe
Zachary A. VanDyke
**Anchors Smith Grimsley**
909 Mar Walt Drive, Suite 1014
Fort Walton Beach, Florida 32547
Fax: 850-862-1138

on this 18th day of June, 2008.

Attorney

08CV3737
JUDGE LINDBERG
MAGISTRATE JUDGE COLE

# American Arbitration Association
## Commercial Arbitration Rules

June 17, 2008

To institute proceedings, please send two copies of this demand *and the arbitration agreement,* with the filing fee as provided in the rules, to the AAA. Send the original demand to the respondent.

# DEMAND FOR ARBITRATION

To:    Steinman & Steinman, Inc.
Shalimar Plaza
1191-B Eglin Parkway
Shalimar, FL 32579
Attention: Marc Steinman
Phone: (850) 651-0004

Marc Steinman
Shalimar Plaza
1191-B Eglin Parkway
Shalimar, FL 32579
Phone: (850) 651-0004

Lee Steinman
381 Santa Rosa Boulevard
C-704
Fort Walton Beach, FL 32548

Mara Henderson
c/o Imagitek
2525 South Shore Boulevard, #202
League City, TX 77573

| | |
|---|---|
| Name of Representative | Lawrence Keefe and Zachary A. VanDyke |
| Name of Firm | Anchors Smith Grimsley |
| Representative's Address | 909 Mar Walt Drive, Suite 1014 |
| | Fort Walton Beach, FL 32547 |
| Telephone | (850) 863-4064 |
| Fax | (850) 862-1138 |
| | lkeefe@asglegal.com |
| | zvandyke@asglegal.com |

The named claimant, party to an arbitration agreement contained in a written contract dated June 11, 1998 (a copy of the arbitration agreement is attached hereto as Exhibit A) and providing for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration thereunder.

**THE NATURE OF THE DISPUTE:**

Claimant BAB Systems, Inc. ("BAB") is a franchisor of specialty retail shops selling fresh-baked bagels, cream cheeses, muffins, and gourmet coffees and other food and beverage items under various federally registered marks, including "Big Apple Bagels," "My Favorite Muffin," and "Brewster's." On or about June 11, 1998 BAB entered into a franchise agreement with Marc Steinman, Marvin Steinman and Lee Steinman (the "Steinmans") under which the Steinmans were granted the right to operate a Big Apple Bagels store (the "Store") at the Shalimar Plaza, 1191-B Eglin Parkway, Shalimar, Florida (the "Franchise Agreement"). On or about August 4, 1998 the Steinmans assigned their interest in the Franchise Agreement to Steinman &



**EXHIBIT**

F

Steinman, Inc. ("Steinman & Steinman"), a corporation owned by the Steinmans and Mara Henderson. Pursuant to the assignment, the Steinmans agreed to remain primarily liable to BAB for the performance and keeping of all obligations under the Franchise Agreement. The Steinmans and Henderson also signed a guaranty and assumption of the obligations of Steinman & Steinman pursuant to which they guaranteed payment and performance by Steinman & Steinman of all of its undertakings under the Franchise Agreement, and agreed to be personally bound by and liable for the breach of every provision of the Agreement (the "Guaranty"). Pursuant to the Franchise Agreement, Steinman & Steinman operated a Big Apple Bagels store at Shalimar Plaza, 1191-B Eglin Parkway, Shalimar, Florida (the "Store").

By its terms, the Franchise Agreement expired June 11, 2008 unless Steinman & Steinman exercised its option to renew. Several months prior to expiration, Steinman & Steinman informed BAB that it did not wish to renew the Franchise Agreement. Pursuant to Section 16 of the Franchise Agreement, upon termination or expiration, BAB had a number of rights, and Steinman & Steinman a number of obligations, with respect to the Store, including that Steinman & Steinman not use BAB's name or marks in any respect; that Steinman & Steinman cease use of any confidential information of BAB, including recipes; that for a period of two years neither Steinman & Steinman nor the individual respondents have any interest in a competitive business (i.e., one offering bagels, cream cheeses, muffins and/or coffee for sale to the public) at or within two miles of the Store; and BAB had an option to purchase the tangible assets of the Store at a value determined in accordance with the Franchise Agreement, and to receive an assignment of the lease of the Store premises without any separate consideration. Pursuant to Section 11 of the Franchise Agreement, Steinman & Steinman agreed to furnish quarterly profit and loss statements and balance sheets, as well as an annual profit and loss statement and balance sheet, reviewed by an independent certified public accountant, and such other information and supporting records as BAB from time to time prescribed.

After Steinman & Steinman informed BAB that it did not intend to renew the Franchise Agreement, BAB offered to extend the Franchise Agreement for the ten months remaining on the initial lease term. Alternatively, BAB told Steinman & Steinman that BAB probably would exercise its option to purchase the Store and obtain an assignment of the lease upon expiration of the Franchise Agreement, and that it would attempt to find a new franchisee for the premises, and encouraged Steinman & Steinman to do likewise inasmuch as Steinman & Steinman had indicated a desire to exit the business but still had a remaining lease obligation. BAB also demanded that Steinman & Steinman furnish it various financial statements which previously had not been submitted in violation of the requirements of the Franchise Agreement, and to provide documentation concerning the purchase of furniture, fixtures and equipment, so that BAB could determine the price it would be required to pay to Steinman & Steinman for the tangible assets of the business upon expiration of the Franchise Agreement.

In violation of its obligations under the Franchise Agreement, Steinman & Steinman refused to provide most of the required financial statements and refused to provide any evidence of purchase of furniture, fixtures and equipment during the five years preceding the expiration, in order to thwart BAB's announced intention to exercise its purchase option; Steinman & Steinman interfered with BAB's post-expiration option to purchase the tangible assets of the business and obtain an assignment of the lease; Steinman & Steinman continued to use BAB's federally registered trademarks in the operation of its business following expiration (including, *inter alia*, equipment bearing the "Brewster's Coffee" mark, paper goods bearing the "My Favorite Muffins" mark and logo, and a telephone number listed under the name "Big Apple Bagels"); and Steinman & Steinman

violated the post-term covenant not to compete by continuing to engage in the sale of bagels, cream cheeses, muffins and coffee at the Store.

**THE CLAIM OR RELIEF SOUGHT:**

Claimant BAB seeks the following relief against Respondents Steinman & Steinman and Marc Steinman, Lee Steinman and Mara Henderson:

(a)  An award of damages for breach of the franchise agreement in an amount found due at hearing but not to exceed $300,000;

(b)  A decree of specific performance directing Steinman & Steinman to perform its obligations under the Franchise Agreement, including but not limited to a complete accounting of its furniture, fixtures and equipment purchases during the five years prior to expiration, and allowing BAB full access to Store records for audit purposes;

(c)  Temporary, preliminary and permanent injunctive relief enforcing the post-term noncompetition provisions of the Franchise Agreement prohibiting Respondents from having any direct or indirect interest in a business selling bagels, cream cheeses, muffins and/or coffee to the public at or within two miles of the Store or performing services of any type for such a competitive business;

(d)  An award of BAB's costs and expenses incurred in this proceeding and in wrongfully prosecuted litigation to prevent BAB from asserting its lawful rights, including, without limitation, filing fees, attorneys' fees, expert witness fees and arbitrator's fees; and

(e)  Such other and further relief as the arbitrator finds just and appropriate.

**TYPE OF BUSINESS:**   Claimant – Franchisor of Retail Stores Specializing in the Sale of Baked Goods

Respondent – Former Franchisees of a Retail Store Specializing in the Sale of Baked Goods

**HEARING LOCALE REQUESTED:**  Chicago, Illinois

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association at its Dallas, Texas office, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the administrator.

Signed _____ Title:  Attorney

(May be Signed by a Representative)

| | |
|---|---|
| Name of Claimant | BAB Systems, Inc. |
| Address | 500 Lake Cook Road, Suite 475 |
| City and State | Deerfield, Illinois 60015 |
| Telephone | (847) 948-7520   Fax (847) 405-8140 |

| | |
|---|---|
| Name of Representative | Marc P. Seidler |
| Name of Firm | DLA Piper US, LLP |
| Representative's Address | 203 North LaSalle Street, 19th Floor |
| City and State | Chicago, Illinois 60601 |
| Telephone | (312) 368-2160  Fax (312) 251-2194 |

☐ MEDIATION is a nonbinding process. The mediator assists the parties in working out a solution that is acceptable to them  If you wish for the AAA to contact the other parties to ascertain whether they wish to mediate this matter, please check this box (there is no additional administrative fee for this service).

l.  **Mandatory and Binding Arbitration.**

    i.   All disputes, controversies or claims arising out of or relating to this Agreement shall be submitted for arbitration to the Chicago, Illinois office of the American Arbitration Association on demand of either party. Such arbitration proceedings shall be conducted in Chicago, Illinois and shall be heard by one arbitrator in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association. All matters within the scope of the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) shall be governed by it.

    ii.   The arbitrator shall have the right to award or include in his award any relief which he deems proper in the circumstances, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief and attorneys' fees and costs, in accordance with Paragraph 17.d., provided that the arbitrator shall not have the authority to award exemplary or punitive damages, nor shall he have jurisdiction over any dispute relating the ownership, validity or registration of any name or Mark licensed hereunder. The award and decision of the arbitrator shall be conclusive and binding upon all parties hereto and judgment upon the award may be entered in any court of competent jurisdiction. Each party waives any right to contest the validity or enforceability of such award. The parties agree to be bound by the provisions of any limitation on the period of time by which claims must be brought. The parties further agree that, in connection with any such arbitration proceeding, each shall submit or file any claim which would constitute a compulsory counterclaim (as defined by rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed in such proceeding shall be barred.

    iii.   Franchisor and Franchisee agree that arbitration shall be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between Franchisor and Franchisee shall not be consolidated with any other arbitration proceeding involving Franchisor and any other person, corporation, partnership or LLC.

    iv.   This provision shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.



**EXHIBIT**

A

C:\DOC\C716\3104\FRANAGR\FA98.008

6/17/08 9:17AM

-43-

v.      Notwithstanding the above and foregoing, Franchisor shall have the right to apply directly to a court of competent jurisdiction for a temporary restraining order, preliminary injunction or other emergency relief which may be available to protect the name, Marks or System licensed hereunder, without the necessity of first filing an arbitration demand.

18.    **NOTICES AND PAYMENTS.** All written notices and reports permitted or required to be delivered by the provisions of this Agreement or of the Operations Manual shall be deemed so delivered at the time delivered by hand, one (1) business day after transmission by facsimile, telegraph or other electronic system, one (1) business day after being placed in the hands of a commercial courier service for overnight delivery, or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the parties as follows:

    Franchisor:    8501 W. Higgins Road, Suite 320
                   Chicago, Illinois 60631

    Franchisee:    **Marc Steinman, Marvin Steinman and Lee Steinman**
                   **381 Santa Rosa Boulevard, C-704**
                   **Fort Walton Beach, Florida 32548**

or at the most current principal business address of which the notifying party has been notified. Any required payment or report not actually received by Franchisor during regular business hours on the date due (or postmarked by postal authorities at least two (2) days prior thereto) shall be deemed delinquent.

19.    **ACKNOWLEDGEMENTS.** Franchisee acknowledges that he has read this Agreement and Franchisor's Uniform Franchise Offering Circular; and that he understands and accepts the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain Franchisor's high standards of quality and service and the uniformity of those standards at all BAB Systems Stores and thereby to protect and preserve the goodwill of the Marks and the System. Franchisee acknowledges that he has conducted an independent investigation of the business venture contemplated by this Agreement and recognizes that it involves business risks and that the success of the venture is largely dependent upon the business abilities of Franchisee. Franchisee further represents to Franchisor, as an inducement to its entry into this Agreement, that Franchisee has made no misrepresentations in obtaining the Franchise.

IN THE FIRST JUDICIAL CIRCUIT COURT IN AND FOR
OKALOOSA COUNTY, FLORIDA

STEINMAN & STEINMAN, INC.,
a Florida corporation,

Plaintiff,

vs.

BAB SYSTEMS, INC.,
an Illinois corporation;
SHALIMAR PLAZA, LLC, a Florida LLC
and FIFE REFRIGERATION, INC.,
a Florida Corporation,

Defendant.

_____/

```
┌─────────────────────────┐
│        EXHIBIT           │
│                          │
│  _____G_____       │
└─────────────────────────┘
```

Case No.: 2008-CA-3206

08CV3737
JUDGE LINDBERG
MAGISTRATE JUDGE COLE

TC

## MOTION TO STRIKE UNSIGNED ARBITRATION PROVISION AS UNCONSCIONABLE AND TO STAY ARBITRATION

Plaintiff Steinman & Steinman, Inc. ("Steinman"), by and through its undersigned counsel, and files the instant Motion to Strike Arbitration Provision as Unconscionable and to Stay Arbitration, and in support thereof states as follows:

1.       Steinman is a family-owned business that owns and operates the former Big Apple Bagel Shop located in Shalimar Plaza (the "Shalimar Shop"). The Shalimar Shop was part of a nationwide Big Apple Bagel franchise network. The franchisor is Defendant BAB Systems, Inc. ("BAB"), headquartered in Chicago, Illinois. The ten year franchise relationship between Steinman and BAB concluded on or about June 11, 2008. This lawsuit concerns the parties respective rights to the lease in effect in Shalimar Plaza, to the equipment and property in the Shalimar Shop, and other rights implicated by the termination of the franchise relationship.

2.       In addition to Steinman and BAB, this lawsuit seeks to resolve the competing rights of the landlord, Shalimar Plaza, LLC, and an equipment vendor, Fife Refrigeration, Inc., both of whom claim lien rights in the equipment located in the Shalimar Shop. The lease agreement for the space in Shalimar Plaza was entered into between Steinman and Shalimar Plaza, LLC ("Landlord").

By virtue of this lease, Landlord maintains a statutory Landlord's Lien on the equipment in the premises, pursuant to chapter 83, *Florida Statutes*  Similarly, Fife Refrigeration, Inc. has filed a claim of lien on the equipment to secure its rights as an equipment vendor.

3.    Prior to the expiration of the franchise relationship, on June 9, 2008, BAB's corporate office in Chicago, Illinois, sent a letter to Landlord stating that BAB intended to unilaterally have the equipment in the Shalimar Shop removed. It is undisputed that Steinman is the sole owner of the equipment and property in the Shalimar Shop, which is essential to its business.

4.    On June 11, 2008, Steinman filed a declaratory judgment lawsuit to have its rights vis-a-vis BAB resolved by this Court and obtained an *ex parte* temporary injunction to avoid a confrontation and disruption of Steinman's business in the Shalimar Shop by BAB's unilateral attempt to remove restaurant equipment owned by Steinman.

5.    On June 16, 2008, Steinman filed an Amended Complaint adding Shalimar Plaza, LLC and Fife Refrigeration, Inc. as defendants in this case because both asserted lien rights in the equipment that is owned by Steinman and is being claimed by BAB.

6.    On June 17, 2008, in response to the Amended Complaint, BAB filed a Motion to Stay Proceedings Pending Arbitration citing the unexecuted document attached hereto as Exhibit "A."

7    Also, on June 17, 2008, BAB filed a Demand for Arbitration with the American Arbitration Association seeking an arbitration proceeding in Chicago, Illinois, and attached an unexecuted arbitration provision as the basis for such arbitration.

8    This case should not be compelled to arbitration because Plaintiff did not sign the arbitration agreement on which BAB purports to rely to compel arbitration.

9.    Even if Plaintiff signed the arbitration provision, the arbitration provision should not be enforced because the arbitration provision is both procedurally and substantively unconscionable, which renders it unenforceable.

10    A court may decline to enforce an arbitration clause where it is deemed unconscionable both procedurally and substantively. *See Powertel. Inc. v. Bexley*, 743 So 2d 570, 574 (Fla. 1st DCA 1999) (refusing to enforce arbitration because contract was unconscionable); *Nagrampa v Mailcoups, Inc.*, 469 F. 3d 1257 (9th Cir 2006) (holding franchise agreement unconscionable where substantive terms were one-sided and oppressive); *Tillman v Commercial Credit Loans, Inc.*, 655 S.E. 2d 362, 370 (N.C. 2008) (holding arbitration clause substantively unconscionable where costs of participation were prohibitively high).

11.    Having challenged the arbitration agreement as unconscionable, Plaintiff is entitled to conduct discovery and an evidentiary hearing as to the unconscionability of the arbitration clause is required. *See Chapman v. King Motor Co.*, 833 So. 2d 820, 821 (Fla. 4th DCA 2002).

12.    The arbitration clause, moreover, should not be enforced because the dispute is essentially local in nature involving in rem property rights and lien rights related to the Shalimar Shop and the equipment therein.

WHEREFORE, Plaintiff respectfully requests this Court enter an order staying the arbitration demanded by BAB, allowing for discovery as to whether Plaintiff agreed to arbitration and the unconscionability of the arbitration clause, set this issue for an evidentiary hearing and grant such other relief as this Court deems just and proper.

## [CERTIFICATE OF SERVICE ON FOLLOWING PAGE]

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served by hand-delivery, facsimile, and U.S. Mail on Marc Seidler, DLA Piper US, LLP, 203 North LaSalle Street, Suite 1900, Chicago, Illinois 30301; Christian C. Burden, DLA Piper US, LLP, 100 N Tampa Ste 2200, Tampa, Florida, 33602-5809; Michael Mead, 24 Walter Martin Rd. Ste 3, Ft. Walton Beach, Florida, 32549-1329; and Matthew Burns, P.O. Box 1226, Destin, Florida 32540, this 24th day of June, 2008.

Lawrence Keefe
Florida Bar No. 603809
A. Benjamin Gordon
Florida Bar No. 0528617
Zachary A. VanDyke
Florida Bar No. 020580
Anchors Smith Grimsley
909 Mar Walt Drive, Suite 1014
Fort Walton Beach, FL 32547
Phone: 850/863-4064 / Fax: 850/862-1138
E-mail: lkeefe@asglegal.com
          bgordon@asgelgal.com
          zvandyke@asglegal.com

Attorneys for Steinman & Steinman, Inc.

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
IN AND FOR OKALOOSA COUNTY, FLORIDA

STEINMAN & STEINMAN, INC.,         )
a Florida corporation,             )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        Case No. 2008-CA-3206 S
                                   )
BAB SYSTEMS, INC., an Illinois     )
corporation,                       )
                                   )
            Defendant.             )

## DEFENDANT BAB SYSTEMS, INC.'S
## MOTION TO STAY PROCEEDINGS PENDING ARBITRATION

Defendant BAB Systems, Inc. moves pursuant to 9 U.S.C. § 3 and Section 682.03, Florida Statutes, to stay these proceedings pending arbitration, and says:

### BACKGROUND

1.      This dispute arises out of and relates to a franchise agreement between Plaintiff Steinman & Steinman, Inc. ("Plaintiff") and Defendant BAB Systems, Inc. ("BAB") for the operation of a Big Apple Bagels franchised store in Shalimar, Florida. Plaintiff is the assignee of the Franchise Agreement dated June 11, 1998, which was entered into with BAB by three of Plaintiff's shareholders, Marc Steinman, Marvin Steinman and Lee Steinman.

2.      The Franchise Agreement, which is attached as Exhibit A to Plaintiff's Amended Verified Complaint (the "Amended Complaint"), expired by its terms on June 11, 2008. Plaintiff seeks to avoid exercise of BAB's post-term right to purchase certain assets of the business "at a depreciated value," and the covenant not to compete that prevents Plaintiff from engaging in the sale of certain products for two years following the expiration of the Franchise Agreement. (Am. Compl., ¶¶ 25-28, 35.) In its claim for declaratory judgment (Count I),

Exhibit A

Plaintiff seeks a declaration that is not entitled to enforce the post-term provisions because: (a) BAB materially breached the Franchise Agreement by failing to provide required franchise support; (b) BAB fraudulently induced Plaintiff into the Franchise Agreement with illusory promises; and (c) the expiration of the Franchise Agreement extinguished all obligations and rights arising therefrom. (Count I, *ad damnum*, ¶¶ (a)-(e).) In addition, Plaintiff seeks to enjoin BAB from dispossessing Plaintiff of its business and business assets due to BAB's alleged breach of the Franchise Agreement and fraud in the inducement. (Am. Compl. ¶ 31.)

3.     The Franchise Agreement contains a broadly-phrased arbitration clause, mandating arbitration of this dispute:

> All disputes, controversies, or claims arising out of or relating to this Agreement shall be submitted for arbitration to the Chicago, Illinois office of the American Arbitration Association on demand of either party.... All matters within the scope of the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) shall be governed by it. (Franchise Agreement, § 17.1.i).

> This provision shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement. (Franchise Agreement, ¶ 17.1.iv).

4.     Notwithstanding the express terms of the arbitration clause in the Franchise Agreement, Plaintiff brought this action in this Court on June 10, 2008, for declaratory judgment and injunctive relief based wholly on rights and obligations under the Franchise Agreement.

5.     Plaintiff's claims depend exclusively on BAB's right to enforce two provisions of the contract which are triggered by its expiration:

> Covenant Not to Compete. Upon termination of this Agreement by Franchisor in accordance with its terms and conditions or by Franchisee without good cause, or upon expiration of this Agreement, Franchisee and its owner agree that for a period of two (2) years, commencing on the effective date of termination or expiration or the date on which Franchisee ceases to operate the Store, whichever is later, neither Franchisee nor its owners shall (1) have any direct or indirect

ownership interest in any Competitive Business located or operating within two (2) miles of the Store.... Competitive Business shall mean the sale of bagels, cream cheeses, muffins and/or coffee to the public through retail or wholesale channels of distribution." (Franchise Agreement, ¶ 16.d)

– and –

"**Franchisor's Option to Purchase**. If this Agreement expires (without renewal) or is terminated by Franchisor in accordance with its provisions or by Franchisee without cause, then Franchisor shall have the option, exercisable by given written notice within 60 days from the date of such expiration or termination, to purchase from Franchisee all tangible assets ... and to an assignment of Franchisee's lease for (a) the premises of the Store...." (Franchise Agreement, ¶ 16.f).

## THE FEDERAL ARBITRATION ACT AND FLORIDA ARBITRATION CODE

6.      The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., compels judicial

enforcement of written arbitration agreements.[1]  Likewise, the Florida Arbitration Code, Chapter

682 et seq., Florida Statutes, directs the courts of this state to enforce arbitration provisions upon

proper application, and to stay attendant court proceedings.  Federal and Florida public policy

strongly favor resolving disputes through arbitration where the parties have agreed to do so.  See

Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25, 111 S. Ct. 1647, 1651, 114 L.Ed. 2d

26 (1991); K.P. Meiring Constr., Inc. v. Northbay I&E, Inc., 761 So.2d 1221, 1225 (Fla. 2d DCA

2000).

7.      "Under both federal statutory provisions and the Florida Arbitration Code, there

are three elements for courts to consider in ruling on a motion to compel arbitration of a given

dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue

exists; and (3) whether the right to arbitration was waived." Seifert v. U.S. Home Corp., 750 So.

2d 633, 636 (Fla. 1999).

---

[1]  The FAA applies because the Franchise Agreement evidences a transaction in interstate commerce. Plaintiff is a Florida corporation with its place of business Shalimar, Florida. (Am. Compl. ¶ 3.) Defendant is an Illinois corporation. (Id. ¶ 4.) In addition to the foregoing jurisdictional facts which

## VALID WRITTEN AGREEMENT TO ARBITRATE

8.     Here, there can be little doubt that there is a valid written agreement to arbitrate. The arbitration clause contained within the Franchise Agreement obligates the parties to arbitrate their disputes, and by its own terms the clause survived the expiration of the Franchise Agreement. (Am. Compl., ¶ 10, Ex. A, §17(I)(iv).)

## ARBITRABLE ISSUES EXIST

9.     Plaintiff's Amended Complaint is centered upon allegations of fraudulent inducement in the offer and sale of a franchise to Plaintiff and breach of the Franchise Agreement, which allegations are expressly included within the ambit of the Franchise Agreement's broad arbitration provision. (See Am. Compl. ¶¶ 16-19.)

10.     It is of no moment that Plaintiff's claims are cloaked in contract or tort allegations; what is of significance is the substance of the claims being asserted, which involves the alleged pre-contract conduct of BAB in the offer and sale of a franchise to Plaintiff, the alleged failure of BAB to perform certain obligations under the Franchise Agreement, and BAB's right to enforce post-term provisions of the Franchise Agreement upon expiration. See Gregory v. Electro-Mechanical corp., 83 F.3d 382, 384 (11th Cir. 1996)("Whether a claim falls within the scope of an arbitration agreement turns on the factual allegations in the complaint rather than the legal causes of action asserted."); Stacey David, Inc. v. Consuegra, 845 So. 2d 303, 306 (Fla. 2d DCA 2003)("Deciding whether a particular claim is covered by a broad arbitration provision requires a determination of whether a significant relationship exists between the claim and the agreement containing the arbitration clause, regardless of the legal label applied to the dispute.")  Here, each of Plaintiff's claims against the BAB implicates the

---

invoke the Federal Arbitration Act, the arbitration provision in the Franchise Agreement specified the application of the Federal Arbitration Act as stated above.

Franchise Agreement and rights and duties that are dependent upon the existence of a contractual relationship between the parties. It is irrelevant to the arbitrability issue that Plaintiff claims that the Franchise Agreement was fraudulently induced. In Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 126 S.Ct. 1204, 1210, 163 L.Ed. 2d 1038 (2006), the Supreme Court held that under the Federal Arbitration Act, a challenge to the validity of a contract containing an arbitration clause, rather than to the arbitration clause itself, should be determined in the first instance by the arbitrators. Accord, Rintin Corp., S.A. v. Domar, Ltd., 476 F.3d 1254 (11th Cir. 2007); see also, O'Rear v. American Family Life Ins. Co. of Columbus, Inc., 784 F. Supp. 1561, 1566 (M.D. Fla. 1992); Western Int'l Media Corp. v. Johnson, 754 F. Supp. 871, 872 (S.D. Fla. 1991)("While judicial consideration is appropriate where fraud has been alleged with respect to an arbitration provision, allegations of fraud pertaining to a contract as a whole should be resolved in arbitration."); Sease v. Painewebber, Inc., 697 F. Supp. 1190, 1192 (S.D. Fla. 1988) (holding that plaintiff's claims for common-law fraud and negligence must be arbitrated, stating that "plaintiff cannot avoid broad language of an arbitration clause by pleading an action in tort"); Qubty v. Nagda, 817 So. 2d 952, 956-57 (Fla. 5th DCA 2002)(claims for fraud and rescission, so long as they are directed towards the contract as a whole and not the arbitration provision specifically, are arbitrable); Aztec Medical Services, Inc. v. Burger, 792 So. 2d 617, 622 (Fla. 4th DCA 2001)(statutory claims, such as a claim under FDUTPA, are arbitrable).

## BAB HAS NOT WAIVED ITS RIGHT TO ARBITRATION

11.    Under the FAA, the only prejudice the Court can consider is whether BAB has participated in this litigation to such a degree that Plaintiffs would be prejudiced if arbitration were compelled at this stage of the proceedings. See GLF Construction Corp. v. RECCHI-GLF, 821 So. 2d 372, 373-74 (Fla. 1st DCA 2002)(stating federal law governs issues of waiver of

arbitrability with contract affecting interstate commerce and prejudice to a party is the Court's primary consideration). Plaintiffs would suffer no prejudice if the Court compels arbitration because BAB has requested arbitration at its earliest opportunity. Likewise, BAB has not waived its rights to compel arbitration under the Florida Arbitration Code, because its efforts to compel arbitration cannot be said to have waived its rights under the Franchise Agreement. Miller & Solomon Gen. Contractors, Inc. v. Brennan's Glass Co., 824 So. 2d 288, 291 (Fla. 4th DCA 2002)(holding that because the first substantive filing made by appellants was a motion to stay invoking the contracting arbitration clause, the trial court erred in finding that appellants had waived their right to arbitration). Therefore, the Court should compel arbitration.

## INTERIM INJUNCTIVE RELIEF IS IMPROPER

12. The Court has no authority to enter interim injunctive relief pending arbitration, because such relief is only proper if the parties' agreement to arbitrate contemplates such relief. Rath v. Network Marketing, LC, 790 So. 2d 461, 465-66 (Fla. 4th DCA 2001). Indeed, any action taken inconsistent with the exclusive remedy of relief in arbitration can be considered a waiver of the right to arbitrate. Id. at 463. As the court noted, if the parties intended their arbitration agreement to authorize interim injunctive relief pending arbitration, they should have included such language in their agreement. Id. at 466. Here, the parties' Franchise Agreement contained no such language authorizing Plaintiffs to obtain injunctive relief pending arbitration. Indeed, the parties did carve out a narrow exception to the arbitration provision, but it only permitted BAB to obtain emergency relief from a court in a very limited set of circumstances – i.e., "to protect the name, Marks or System licensed hereunder, without the necessity of first filing an arbitration demand." (Am. Compl., Ex. A, ¶ 17.l.v.4.)

WHEREFORE, Defendant BAB Systems, Inc. requests that:

1) the Court stay these proceedings as to the claims asserted against it;

2) direct that arbitration occur in accordance with the terms of Section 17.1 of the Franchise Agreement; and,

3) vacate the *ex parte* temporary injunction entered against it on June 11, 2008.

Respectfully submitted,

Christian C. Burden
Florida Bar No.: 0065129
Kevin P. McCoy
Florida Bar No.: 0036225
**DLA PIPER US LLP**
100 N. Tampa, Ste. 2200
Tampa, Florida 33602-5809
813-229-2111
Fax: 813-229-1447
Attorneys for BAB Systems, Inc.

## CERTIFICATE OF SERVICE

I HEREBY certify that the foregoing was served by U.S. Mail, postage prepaid, and by facsimile, on the following:

Lawrence Keefe
Zachary A. VanDyke
**Anchors Smith Grimsley**
909 Mar Walt Drive, Suite 1014
Fort Walton Beach, Florida 32547
Fax: 850-862-1138

on this 18th day of June, 2008.

Attorney

## IN THE FIRST JUDICIAL CIRCUIT COURT IN AND FOR
## OKALOOSA COUNTY, FLORIDA

STEINMAN & STEINMAN, INC.,
a Florida corporation;

            08CV3737

            JUDGE LINDBERG

            MAGISTRATE JUDGE COLE

      Plaintiffs,

vs.

            TC

         Case No.:2008-CA-3206 S

BAB SYSTEMS, INC.,
an Illinois corporation;
SHALIMAR PLAZA, LLC, a Florida LLC
and FIFE REFRIGERATION, INC.,
a Florida Corporation.

      Defendant.
_____/

## MOTION TO STRIKE PERSONAL JURISDICTION PROVISION
## IN UNSIGNED DOCUMENT

Plaintiff Steinman & Steinman, Inc., through undersigned counsel, moves this Court to strike, or otherwise not enforce, the personal jurisdiction clause in the unsigned document attached as Exhibit "A" to the Amended Complaint. and in support states as follows:

1.      Defendant BAB Systems, Inc., ("BAB") may seek to enforce the personal jurisdiction provision in the unsigned document attached as Exhibit "A" to the Amended Complaint, which purports to subject Plaintiff to personal jurisdiction in the State of Illinois.

2.      This personal jurisdiction clause states in pertinent part:

> Franchisee agrees that Franchisor may institute any action against Franchisee to enforce the provisions of this Agreement in any state or Federal Court in the State of Illinois, and Franchisee irrevocably submits to the exclusive jurisdiction of such courts and waives any objection to jurisdiction. . . .

3.      This action was first-filed by Plaintiff in the State of Florida, which has personal jurisdiction over BAB, and this forum should exercise jurisdiction over the parties and subject matter



**EXHIBIT**

H

in this lawsuit.

4      A disputed forum selection clause cannot be the sole basis upon which a federal court exercises personal jurisdiction. *See Matrix Z, LLC v. Landplan Design, Inc.*, 493 F. Supp. 2d 1242, 1247 (2007). There must be some type of minimum contacts to establish personal jurisdiction which entail some purposeful availment to conduct activities within the forum invoking benefits and privileges of its laws for which one could generally anticipate being hauled to court there. *See Id.* *at* 1247.

5.      Plaintiff has never availed itself to the laws of the State of Illinois, it never conducted any activities there, it never was conferred any benefits or privileges by Illinois and it certainly never anticipated being hauled to an Illinois state or federal court.

6.      Furthermore, Plaintiff disputes both the validity and authenticity of the personal jurisdiction provision in this document as alleged by BAB.

7.      Allowing this personal jurisdiction provision to invoke jurisdiction over Plaintiff works an injustice and violates Plaintiff's right to due process of law.

8.      Therefore, the personal jurisdiction provision in the unsigned document attached as Exhibit "A" to the Amended Complaint should be stricken or otherwise not enforced.

ACCORDINGLY, and for the foregoing reasons, Plaintiff requests that this Court enter an order striking, or otherwise not enforcing, the personal jurisdiction provision at issue in this motion.

## [CERTIFICATE OF SERVICE ON FOLLOWING PAGE]

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served by hand delivery, facsimile, and U.S. Mail on Marc Seidler, DLA Piper US, LLP, 203 North LaSalle Street, Suite 1900, Chicago, Illinois 30301; Christian C. Burden, DLA Piper US, LLP, 100 N Tampa Ste 2200, Tampa, Florida, 33602-5809; Michael Mead, 24 Walter Martin Rd. Ste 3, Ft. Walton Beach, Florida, 32549-1329; and Matthew Burns, P.O. Box 1226, Destin, Florida 32540, this 24th day of June, 2008.

Lawrence Keefe
Florida Bar No. 603809
A. Benjamin Gordon
Florida Bar No. 0528617
Zachary A. VanDyke
Florida Bar No. 020580
Anchors Smith Grimsley
909 Mar Walt Drive, Suite 1014
Fort Walton Beach, FL 32547
Phone: 850/863-4064 / Fax: 850/862-1138
E-mail: lkeefe@asglegal.com
bgordon@asglegal.com
zvandyke@asglegal.com

Attorneys for Steinman & Steinman, Inc.

## IN THE FIRST JUDICIAL CIRCUIT COURT IN AND FOR OKALOOSA COUNTY, FLORIDA

STEINMAN & STEINMAN, INC.,
a Florida corporation;

08CV3737

JUDGE LINDBERG

MAGISTRATE JUDGE COLE

  Plaintiff.

vs.

TC

Case No.:2008-CA-3206 S

BAB SYSTEMS, INC.,
an Illinois corporation;
SHALIMAR PLAZA, LLC, a Florida LLC
and FIFE REFRIGERATION, INC.,
a Florida Corporation.

  Defendant.

_____/

### MOTION TO STRIKE UNSIGNED VENUE PROVISION

Plaintiff Steinman & Steinman, Inc., through undersigned counsel, moves this Court to strike the venue clause in the unsigned document attached to the Amended Complaint:

1.  Defendant BAB Systems, Inc., ("BAB") may seek to enforce a venue provision in the unsigned document attached as Exhibit "A" to the Amended Complaint.

2.  This venue provision states in pertinent part:

> Franchisee agrees that Franchisor may institute any action against Franchisee to enforce the provisions of this Agreement in any state or Federal Court in the State of Illinois, and Franchisee irrevocably submits to the exclusive jurisdiction of such courts and waives any objection to jurisdiction or venue of such court.

3.  Plaintiff did not sign this document.

4.  Neither Shalimar Plaza, LLC nor Fife Refrigeration, Inc. signed this document.

5.  To be enforceable, a forum selection or venue clause must pass the following three prong test: (1) the chosen forum not be the result of unequal bargaining power between the parties:



EXHIBIT

I

(2) that enforcement of the agreement does not contravene strong public policy; and (3) the clause does not transfer an essentially local dispute into a foreign forum. *See Land O' Sun Management Corp v. Commerce and Industry Ins. Co.*, 961 So. 2d 1078, (Fla. 1st DCA 2007).

6.    Even if this venue provision were signed by Plaintiff, the venue selected by BAB is the result of unequal bargaining power possessed by BAB and the law of the forum contravenes strong public policies of the State of Florida regarding access to the courts and remedies for disputes.

7.    This litigation, moreover, is essentially local in nature concerning property and liens by parties with no connection to the State of Illinois and who never consented to venue in Illinois.

8.    Allowing this  provision to stand works an injustice on Plaintiff and Defendants Shalimar Plaza, LLC and Fife Refrigeration, Inc.

9.    Therefore, this Court should strike or otherwise not enforce the venue clause in the unsigned document attached as Exhibit "A" to the Amended Complaint.

ACCORDINGLY, and for the foregoing reasons, Plaintiff requests that this Court enter an order striking or otherwise not enforcing the venue provision at issue in this motion.


**[CERTIFICATE OF SERVICE ON FOLLOWING PAGE]**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served by hand-delivery, facsimile and U.S. Mail on Marc Seidler, DLA Piper US. LLP, 203 North LaSalle Street, Suite 1900, Chicago, Illinois 30301; Christian C. Burden, DLA Piper US, LLP, 100 N Tampa Ste 2200, Tampa, Florida, 33602-5809; Michael Mead, 24 Walter Martin Rd. Ste 3, Ft. Walton Beach. Florida, 32549-1329; and Matthew Burns, P.O. Box 1226, Destin, Florida 32540, this 24th day of June, 2008.

Lawrence Keefe
Florida Bar No. 603809
A. Benjamin Gordon
Florida Bar No. 0528617
Zachary A. VanDyke
Florida Bar No. 020580
Anchors Smith Grimsley
909 Mar Walt Drive, Suite 1014
Fort Walton Beach, FL 32547
Phone: 850/863-4064 / Fax: 850/862-1138
E-mail: lkeefe@asglegal.com
    bgordon@asgelgal.com
    zvandyke@asglegal.com

Attorneys for Steinman & Steinman, Inc.

## IN THE FIRST JUDICIAL CIRCUIT COURT IN AND FOR OKALOOSA COUNTY, FLORIDA

STEINMAN & STEINMAN, INC.,
a Florida corporation;

        Plaintiffs,

vs.

BAB SYSTEMS, INC.,
an Illinois corporation;
SHALIMAR PLAZA, LLC, a Florida LLC
and FIFE REFRIGERATION, INC.,
a Florida Corporation.

        Defendant.

_____/

08CV3737
JUDGE LINDBERG
MAGISTRATE JUDGE COLE

TC

Case No.:2008-CA-3206 S

### MOTION TO STRIKE CHOICE OF LAW PROVISION

Plaintiff Steinman & Steinman, Inc., through undersigned counsel, moves this Court to strike the choice of law clause in the unsigned document attached to the Amended Complaint, and in support thereof states as follows:

1.    Defendant BAB Systems, Inc., ("BAB") seeks to enforce a choice of law provision in the unsigned document attached as Exhibit "A" to the Amended Complaint.

2.    This choice of law clause states in pertinent part: "[T]his agreement and the franchise shall be governed by the laws of the State of Illinois."

3.    A choice of law provision will be stricken where there is a showing that the law of the chosen forum will contravene strong public policy of the State of Florida or that the clause is otherwise unreasonable or unjust. *Gilman – Ciocia v. Wetherald,* 885 So. 2d 900 (Fla. 4th DCA 2004).

4.    In this case, the choice of Illinois law allows BAB to seek judicial relief, but



precludes Plaintiff therefrom; limits any recovery in an action against BAB to actual damages thereby precluding punitive damages; and fails to provide for the remedies of injunctive and declaratory relief, which may all be enforced per Illinois law.

5.    This Illinois choice of law provision moreover, denies the Plaintiff access to statutory causes of action available under Florida law.

6.    Allowing these provisions to stand work an injustice on Plaintiff and contravenes well established public policy of the State of Florida. Therefore, the choice of law clause in this unsigned document must be stricken.

ACCORDINGLY, and for the foregoing reasons, Plaintiff requests that this Court enter an order striking the choice of law provision.

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served by hand-delivery, facsimile, and U.S. Mail on Marc Seidler, DLA Piper US, LLP, 203 North LaSalle Street, Suite 1900, Chicago, Illinois 30301; Christian C. Burden, DLA Piper US, LLP, 100 N Tampa Ste 2200, Tampa, Florida, 33602-5809; Michael Mead, 24 Walter Martin Rd. Ste 3, Ft. Walton Beach, Florida, 32549-1329; and Matthew Burns, P.O. Box 1226, Destin, Florida 32540, this 24th day of June, 2008.

Lawrence Keefe
Florida Bar No. 603809
A. Benjamin Gordon
Florida Bar No. 0528617
Zachary A. VanDyke
Florida Bar No. 020580
Anchors Smith Grimsley
909 Mar Walt Drive, Suite 1014
Fort Walton Beach, FL 32547
Phone: 850/863-4064 / Fax: 850/862-1138
E-mail: lkeefe@asglegal.com
          bgordon@asglegal.com
          zvandyke@asglegal.com

Attorneys for Steinman & Steinman, Inc.